No. 22-10049

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

PAUL ENGSTROM
*Defendant-Appellant*.

---

On Appeal from the United States District Court for the District of
Nevada
Case No.: 2:21-cr-00190-APG-EJY

---

EXCERPTS OF RECORD

---

Benjamin C. Durham, Esq.
Nevada Bar No. 7684
BENJAMIN DURHAM LAW FIRM
601 S. Rancho Dr. Ste B14
Las Vegas, Nevada 89106
(702) 631-6111
*Attorney for Defendant-Appellant*

# INDEX OF EXCERPTS OF RECORD

Transcript of Detention Hearing ............................................................................1

Detention Order............................................................................................20

Motion Reopen Detention Hearing..........................................................................23

Response to Motion to Reopen ..................................................................................27

Transcript of Hearing, Motion to Reopen....................................................................39

Transcript of Hearing, Decision on Motion to Reopen ...........................................68

Motion for District Court Review..............................................................................74

Response to Motion for District Court Review .........................................................98

Reply to Response to Motion for District Court Review .....................................119

Order Re: Motion for District Court Review............................................................140

Motion to Reconsider ...........................................................................................143

Response to Motion to Reconsider .........................................................................153

Reply to Response to Motion to Reconsider .........................................................159

Order Denying Reconsideration .............................................................................170

Order Releasing Co-Defendant...............................................................................172

Order Releasing Co-Defendant...............................................................................175

Notice of Appeal .....................................................................................................181

Docket Report .........................................................................................................184

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,        )   CASE NO. 2:21-mj-00536-BNW
                                     )
4                 Plaintiff,          )   Las Vegas, Nevada
                                     )   Wednesday, June 23, 2021
5         vs.                        )   Courtroom 3B
                                     )
6   PAUL ENGSTROM, VINCENT CUOMO,    )   Recording method:  Liberty/ECRO
    ABRAHAM ELLIOTT, and JOSEPH      )
7   KRIEGER,                         )   4:19 P.M. - 4:40 P.M.
                                     )   INITIAL APPEARANCE AS TO
8                 Defendants.        )   PAUL ENGSTROM
    ─────────────────────────────────)

9                               *C E R T I F I E D   C O P Y*

10

11                      TRANSCRIPT OF PROCEEDINGS

12           BEFORE THE HONORABLE BRENDA N. WEKSLER,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13

14
    APPEARANCES:  (See next page)
15

16  Recorded by:  Araceli Bareng

17  Transcribed by:     PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                        United States District Court
18                      333 Las Vegas Boulevard South
                        Las Vegas, Nevada  89101
19

20

21

22

23

24  Proceedings recorded by electronic sound recording.
    Transcript produced by mechanical stenography and computer.
25

 1  **APPEARANCES:**

 2

 3  For the Government:

 4          ***DANIEL CLARKSON, AUSA***
            US ATTORNEY'S OFFICE
 5          501 Las Vegas Boulevard South
            Suite 1100
 6          Las Vegas, NV 89101
            (702) 388-6375
 7          E-mail: daniel.clarkson@usdoj.gov

 8

    For Defendant Paul Engstrom:
 9
            ***NISHA BROOKS-WHITTINGTON, FPD***
10          FEDERAL PUBLIC DEFENDERS OFFICE
            411 E. Bonneville Avenue
11          Las Vegas, NV 89101
            (702) 388-6577
12          E-mail: nisha_brooks-whittington@fd.org

13

14

15

16

17

18  ALSO PRESENT:  ***ALICIA SHIVELEY, PTS***

19

20

21

22

23

24

25

 1          LAS VEGAS, NEVADA; WEDNESDAY, JUNE 23, 2021; 4:19 P.M.

 2                      P R O C E E D I N G S

 3                           --o0o--

 4          **COURTROOM ADMINISTRATOR:**  Your Honor, we are now calling

 5   United States of America vs. Paul Engstrom.  The case number is

 6   2:21-mj-00536-BNW.

 7          Beginning with government counsel, Counsel, please state

 8   your names for the record.

 9          **MR. CLARKSON:**  Good afternoon again, Your Honor.  Daniel

10   Clarkson for the United States.

11          **THE COURT:**  Good afternoon, Mr. Clarkson.

12          **MS. BROOKS-WHITTINGTON:**  Good afternoon, Your Honor.

13   Nisha Brooks-Whittington on behalf of Mr. Engstrom, who is present

14   in custody appearing via videoconference.

15          **THE COURT:**  Good afternoon, Ms. Brooks.  Just to let you

16   know, there's a little bit of a delay when you're speaking into

17   the mic, so we'll see how this goes, but we may need you to call

18   in.

19          Mr. Engstrom, can you hear me?

20          **THE DEFENDANT:**  Yes, I can, Your Honor.

21          **THE COURT:**  All right.  So good afternoon.  We are here

22   based on the complaint that's been filed in this district, and

23   I'll go over the details in a moment.  We're here for your initial

24   appearance and your detention hearing.

25          Before I can move forward, I need to make sure you

1 understand that you do have the right to be physically present in

2 court.  The only way that I can go ahead and conduct this hearing

3 by way of Zoom is with your consent.

4          So let me ask you, do you waive your right to be

5 physically present in court and consent to me conducting this

6 hearing by way of Zoom?

7          **THE DEFENDANT:**  Yes, Your Honor.

8          **THE COURT:**  All right.  Very well.

9          Is your true name Paul Engstrom?

10          **THE DEFENDANT:**  Yes, it is.

11          **THE COURT:**  How old are you, sir?

12          **THE DEFENDANT:**  45.

13          **THE COURT:**  How far have you gone in school?

14          **THE DEFENDANT:**  A junior in college.

15          **THE COURT:**  You've been charged by way of a complaint,

16 charging you with one count of conspiracy to distribute a

17 controlled substance, specifically, cocaine, in violation of Title

18 21, United States Code section 841(a)(1), section (b)(1)(A)(2),

19 and Section 846.

20          In addition, you're being charged with a second count of

21 money laundering, which is a violation of Title 18 United States

22 Code section 1956 subsection H.

23          Did you receive a copy of the charges, sir?

24          **THE DEFENDANT:**  I did.

25          **THE COURT:**  You understand what it is that the

1 government is alleging?

2           **THE DEFENDANT:**  I do.

3           **THE COURT:**  You have the right to the assistance of

4 counsel at all stages of these proceedings, and if you cannot

5 afford counsel, one will be appointed to you at the public's

6 expense.

7           Can you afford to hire counsel?

8           **THE DEFENDANT:**  I cannot.

9           **THE COURT:**  Did you provide certain financial

10 information to Ms. Brooks?

11           **THE DEFENDANT:**  Yes, I did.

12           **THE COURT:**  Did you understand that when you were

13 providing that information, you were doing so under the penalty of

14 perjury?

15           **THE DEFENDANT:**  Yes, I did.

16           **THE COURT:**  And is all of the information you provided

17 to her true and correct, to the best of your knowledge?

18           **THE DEFENDANT:**  Yes, it is.

19           **THE COURT:**  Ms. Brooks, we are in receipt of a financial

20 affidavit form.

21           Did you fill out that form?

22           **MS. BROOKS-WHITTINGTON:**  Yes, I did, Your Honor.

23           **THE COURT:**  Was this based on information that

24 Mr. Engstrom provided to you?

25           **MS. BROOKS-WHITTINGTON:**  Yes, Your Honor.

 1          **THE COURT:**  I find that he qualifies for the appointment

 2    of counsel and will appoint the Office of the Federal Public

 3    Defenders to represent him.

 4          Sir, you're not required to make any statements about

 5    the charges, either here in court or to any law enforcement

 6    officer.  Anything you do say can be used against you.

 7          Do you understand these rights?

 8          **THE DEFENDANT:**  Yes, I do.

 9          **THE COURT:**  You also have the right to a preliminary

10    hearing at which the government will be required to show there's

11    probable cause to believe you committed the crime charged.

12          Mr. Miller, could we please have the preliminary hearing

13    date?

14          **COURTROOM ADMINISTRATOR:**  Yes, Your Honor.  The

15    preliminary hearing in this matter will be scheduled for Tuesday,

16    July the 6th, 2021, at four o'clock p.m. in this courtroom.

17          **THE COURT:**  This provision may or may not apply to you.

18    If you are not a United States citizen, you have the right to

19    request an attorney from the government or a law enforcement

20    official notify the counselor office of your country of

21    nationality.

22          Under Criminal Rule 5F, the government is ordered to

23    comply with its disclosure obligations under *Brady v. Maryland* and

24    related cases.  Failure to do so may result in sanctions.  A

25    written order will follow.

 1          Mr. Engstrom, did you have a chance to speak briefly

 2 with Ms. Brooks about the purpose of this hearing?

 3          **THE DEFENDANT:**  Yes, Your Honor.

 4          **THE COURT:**  Ms. Brooks, do you have any reason to

 5 question the competence of your client to understand the charges

 6 against him and to assist in his defense?

 7          **MS. BROOKS-WHITTINGTON:**  No, I do not, Your Honor.

 8          **THE COURT:**  As to the detention hearing, Mr. Clarkson,

 9 are you ready to proceed?

10          **MR. CLARKSON:**  Yes, Your Honor.  I am.

11          **THE COURT:**  Ms. Brooks, are you ready to proceed?

12          **MS. BROOKS-WHITTINGTON:**  Yes, Your Honor.

13          **THE COURT:**  Mr. Clarkson, are you moving for detention?

14          **MR. CLARKSON:**  Yes, Your Honor.  The government is

15 moving for detention.

16          **THE COURT:**  Could you please provide me the basis under

17 which you're moving.

18          **MR. CLARKSON:**  Yes, Your Honor.  As with Mr. Engstrom's

19 co-defendants, Mr. Cuomo and Mr. Elliott, this is a presumption

20 matter under 3142(e)(3)(A).  Given that it is a drug violation

21 with a maximum in excess of ten years, the government is moving

22 for detention based on that same basis under 3142(f)(1)(C) and as

23 a serious risk of flight under (f)(2).

24          **THE COURT:**  All right.  Very well.  Go ahead.

25          **MR. CLARKSON:**  Yes, Your Honor.  Again, as I summarized

1    previously with Mr. Cuomo and Mr. Elliott, Mr. Engstrom and his

2    co-defendants have been operating a large-scaled drug trafficking

3    and money laundering operation in Las Vegas for at least several

4    months, if not years.  This -- basically, in summary, Mr. Engstrom

5    and his co-defendants have been taking orders over the dark web

6    over a marketplace.  They were using an alias, taking those crypto

7    currency payments, processing cocaine here at stash houses in Las

8    Vegas, and then using the U.S. Postal Service, particularly,

9    priority mail, to send very large amounts in total of cocaine to

10   various parties all across the country.  By even conservative

11   estimates, it is a multi-million dollar operation where many, many

12   kilos have been delivered to various people across the country.

13        Mr. Engstrom, along with his co-defendants, was present

14   at the stash house during a takedown a couple of days ago.  We

15   previously mentioned how Cuomo and Elliott tried to escape through

16   the backdoor.  Mr. Engstrom, on the other hand, after the DEA was

17   forced to use charges to enter into the stash house, Mr. Engstrom

18   barricaded himself into a backroom where there was a lot of

19   cocaine present.  In total, 6 kilos were seized during that

20   takedown.  I know the vast majority of that, I believe, was in the

21   backroom Mr. -- with Mr. Engstrom, although I can't be specific as

22   to how much.

23        The SWAT team also appeared to find him basically

24   working with some computers and phones back there, potentially to

25   hide certain evidence is what their belief is.

1        In particular, Your Honor, I think it's relevant that

2   Mr. Engstrom, by all the evidence that has been uncovered so far,

3   which I've covered with Your Honor over the previous appearances,

4   Mr. Engstrom appears to be the leader of this operation and the

5   one responsible for the vast majority of the financial

6   transactions and the money laundering aspect of this case.

7        When these crypto currency payments have been made, the

8   DEA has uncovered multiple crypto currency wallets controlled by

9   Mr. Engstrom, who appears to have used those to take the initial

10  crypto currency payments using various anonymizing techniques

11  called mixers and tumblers to route those from certain types of

12  currency to other types of currency in different wallets and then

13  using a third party to exchange those crypto currency payments for

14  dollars.  And, Your Honor, the government would submit that this

15  is a clear effort to mask the origins of this money and to be

16  secret about its operation, which again, we believe indicates a

17  significant risk of flight here.

18        In particular -- I mean, I'm not sure what Mr. Engstrom

19  reported in his financial affidavit, but he reported to pretrial

20  services in keeping with this 8 to $10 million worth of crypto

21  currency assets along with numerous other types of assets,

22  motorcycles and property worth several hundred thousand dollars,

23  so it is clear he has the means to travel wherever he wants and to

24  leave the jurisdiction, if necessary.

25        As I previously summarized with the other defendants but

1  I'll say again here, the strength of the evidence is very strong

2  in this case based on multiple months of surveillance that have

3  captured Mr. Engstrom as well as his co-defendants at the stash

4  house on numerous occasion making these deliveries of cocaine

5  through a runner to the post office.  Every time the DEA has

6  seized these envelopes, in total, 44 envelopes, they've always

7  contained cocaine.  And the DEA has successfully been able to

8  place covert orders using the alias that they have tied to

9  Mr. Engstrom and hence have tracked those orders and surveilled

10 this drug trafficking -- or operation delivering cocaine to the

11 fake address provided by the DEA, and they have tracked the

12 payments accordingly.  So it's very clear from the evidence that

13 Mr. Engstrom and his operation are tied to this dark web operation

14 that the DEA has uncovered.

15          I would also point out, there are publicly available

16 reviews on that web site showing that this is a long-running

17 operation where millions of dollars of cocaine have been placed.

18          Briefly, also, Your Honor, as far as Mr. Engstrom's

19 history, he does have a criminal history.  While not overly

20 lengthy, there are some serious violations there.  He has a bank

21 robbery conviction from the mid-'90s where he then violated a

22 supervised release.  He has an identity theft conviction there in

23 2006, and then I would also note that relatively recently, in

24 2015, he was charged in this same court with a drug distribution

25 violation similar to what he's charged with here.

Case 2:21-cr-00190-APG-EJY Document 294 Filed 12/07/22 Page 11 of 19

1    I would note that Judge Ferenbach did order him detained

2  pending trial.  I don't see any reason why the circumstances would

3  have changed in Mr. Engstrom's favor since then until now.  If

4  anything, they seem to have gone against him given the nature of

5  this new enterprise that he has resumed, the sophistication that

6  is involved, the large amount of money and crypto currency.  We

7  believe that all makes Mr. Engstrom a significant risk of flight

8  and risk of nonappearance, and so we would move for his detention.

9         **THE COURT:**  Thank you, Mr. Clarkson.

10        Ms. Brooks, go ahead.

11        **MS. BROOKS-WHITTINGTON:**  Thank you, Your Honor.  Your

12 Honor, I start with -- first is that there is a little

13 (indiscernible) presumption in this case, and we believe we can

14 present -- or satisfy our burden with production in this matter.

15        First, Your Honor, I would start with the fact that

16 Mr. Engstrom does have ties to this community.  He has been a

17 resident for over 14 years.  His ex-wife resides here, and

18 Pretrial Services spoke to his ex-wife, who confirmed the address

19 that he would be allowed to reside with her should he be released

20 (indiscernible).  He's resided at that address for at least the

21 past three months.  I also note, Your Honor, his ties to the

22 community is shown through his ownership of Vegas Assets, Ltd., a

23 business that he has been running for the past two years.

24        Mr. Engstrom has -- can also show, Your Honor, that he

25 is not a serious flight risk; one, Your Honor, because

Case 2:21-cr-00190-APG-BNW Document 94 Filed 12/07/22 Page 12 of 19

 1  Mr. Engstrom was on supervision under the office of probation, and

 2  during that supervisory term, he did not violate any of his

 3  conditions.  He was granted early termination after being on

 4  supervision for about 18 months.  So that is another fact that we

 5  ask the Court to consider.

 6          There are also facts, Your Honor, to consider that the

 7  operation here seems to have been in place for the past eight

 8  months in terms of law enforcement's involvement.  So with respect

 9  to the (indiscernible) here, Your Honor, I find it very

10  interesting that they've known about this operation since October

11  of last year, yet made no efforts to take Mr. Engstrom and the

12  co-defendants into custody until a few days ago.

13          Your Honor, I also note that the complaint in this case

14  is a complaint.  There has not been an indictment filed yet in

15  this matter.  With respect to some of the allegations that are

16  contained in the complaint, Your Honor, it's unclear to me as to

17  whether law enforcement announced their presence when they went

18  into my -- this residence.

19          I do think that that is important for the Court to know,

20  because it is unclear as to whether the people that were in that

21  home knew who was entering the home forcefully.

22          I also note that Mr. Engstrom, unlike the two

23  co-defendants, was not in a situation where he had access to a

24  vehicle.  Mr. Engstrom, according to the complaint, fled to a

25  room, and Mr. Engstrom denies that, Your Honor.  He denies that he

PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
United States District Court

1   fled to any room.  And so, I want to make that record.

2          Mr. Engstrom, if released, Your Honor, we do believe

3   there are conditions that this Court can fashion that will

4   reasonably assure his appearance as well as (indiscernible).  We

5   would ask the Court to place him on a personal recognizance bond

6   with conditions, those conditions to include Pretrial Services

7   supervision, to include travel restriction.  Mr. Engstrom does not

8   have a passport.  There is no allegation that he has ever

9   attempted to flea this country or that he has connections to any

10  other country.

11         I'd also ask if the Court were to place him on home

12  custody with electronic monitoring (indiscernible), Your Honor, we

13  would ask the Court to add as a condition that he have no contact

14  with the co-defendants during this matter and -- and not possess

15  or use (indiscernible).

16         Unless, Your Honor, if there is a still concern with the

17  conditions we propose with assuring the safety of the community,

18  we would recommend, Your Honor, that his ex-wife be held as a

19  third-party custodian.  She is agreeable to be a third-party

20  custodian.  And Pretrial Services was -- did look at her record,

21  and they do believe she to be a suitable third-party custodian.

22         Your Honor, briefly, with respect to his prior criminal

23  history, my client does not have a lengthy criminal history.  Most

24  of his convictions are pretty stale.  The bank robbery conviction

25  occurred when he was 19 years old, over 26 years ago.  And while

 1  we admit that he -- his probation was revoked and he was sent back

 2  into custody for a few months, again, then, Your Honor -- again,

 3  Your Honor, that is stale.  That occurred back in 1999.  I think

 4  (indiscernible) on supervision and the fact that he did not

 5  violate any of his conditions and that the federal court granted

 6  early termination of his (indiscernible).

 7          With respect to the identity theft incident, again, Your

 8  Honor, that incident occurred a number of years ago.  It occurred

 9  back in 2006.  He ultimately resolved that case as a way of a

10  gross misdemeanor.  And again, he was placed on probation

11  (indiscernible) to pay a fine, and there are no allegations that

12  he violated probation or that he failed to pay the fine.  He was

13  discharged from probation in 2020.

14          I think those are four examples of the fact that my

15  client takes the court system seriously; that he has matured from

16  his conviction back in 1999 where he was a juvenile; and that he

17  is more than capable of complying with any conditions this Court

18  would set in this matter.

19          Thank you, Your Honor.

20          **THE COURT:**  Thank you, Ms. Brooks.

21          One quick question, Mr. Clarkson, you did mention --

22  you've heard me in the other two cases.  My main concern has to do

23  with the arrest conduct.

24          Can you tell me where it is that you derive your

25  information regarding the barricade -- him barricading himself

1  into a room?

2          As you've heard Ms. Brooks, he is denying that.

3          **MR. CLARKSON:**  You asked me what the source of that is,

4  Your Honor?

5          The source of that information I've obtained from the

6  case agent or one of the DEA agents who's supervising, who was

7  reported to by, I believe, a Henderson Police Department SWAT team

8  that was responsible for the takedown.  So that is the source of

9  my information from the DEA case agent who was one of the DEA case

10  agents who'd been supervising this operation.

11          **THE COURT:**  Is this the same person who provided you the

12  information as to the other two co-defendants?

13          **MR. CLARKSON:**  Yes.  Agent Kurinec, I believe, who was

14  the affiant for the complaint that Your Honor issued a few days

15  ago.

16          **THE COURT:**  All right.  The government has moved for

17  detention based on 3142(f)(1)(C) and (f)(2)(A).  Under the Bail

18  Reform Act, the presumption is that the individual will be

19  released, unless the Court finds that no condition or combination

20  of conditions will reasonably assure the appearance of the person

21  as required and the safety of any other person in the community.

22          This is a rebuttal presumption case under section

23  (e)(3)(A).  Although the presumption shifts the burden of

24  production to the defendant, this burden of persuasion remains

25  with the government.  When the defendant proffers evidence to

015

1  rebut the presumption, the Court considers the factors under

2  subsection G to determine whether the release would be

3  appropriate.

4       The presumption is not erased when the defendant

5  proffers evidence to rebut it.  Rather, it remains in the case as

6  an evidentiary finding militating against release to be weighed

7  along with other evidence relevant to the factors under section G.

8  I do agree here with Ms. Brooks that he has met his burden of

9  production, and I'll list some of those factors in a moment.

10      So I'll go ahead and consider the factors under

11 subsection G.  I also -- I'm also reminded of the fact that this

12 is a presumption case, which is an additional factor to consider

13 which militates against release.

14      Here, the government has met its burden to show by a

15 preponderance of the evidence that no condition or combination of

16 conditions will reasonably assure his appearance.  However, I do

17 not find that the government has met its burden to show by clear

18 and convincing evidence that no condition or combination of

19 conditions will reasonably assure the safety of any other person

20 in the community.

21      I'll give you my rationale here momentarily, but given

22 that I do find the government has met its burden with regard to

23 flight risk, Mr. Engstrom will remain detained pending trial.

24      This is a drug trafficking and money laundering case

25 involving the dark web and crypto currency as alleged.  The

1  mandatory minimum sentence involved is ten years.  The weight of

2  the evidence here is strong.  It involves months of surveillance,

3  controlled buys.  The execution of the arrest warrant revealed 6

4  kilograms of cocaine at the house as well as other instruments

5  that suggest distribution of cocaine.

6          I do agree that his ties to the community are strong.

7  He's been in Las Vegas since 2007.  There is information --

8  there's conflicting information as to where he said he's been

9  residing, but ultimately, there's information from Ms. Engstrom

10 that suggests that he can return to his residence and that he has

11 a long established residency here in Las Vegas.

12         He owns and works at Vegas -- Vegas Assets, Ltd.  He can

13 return to his work.  And I do believe with Ms. Brooks that there's

14 something to be said about the danger and the seriousness of -- of

15 any danger he may pose to the community given that the DEA agents

16 have known about this operation for quite a bit of time and have

17 waited until now to arrest them.

18         So I -- I am concerned with his criminal history, and I

19 rely on the information that Mr. Clarkson has provided.  However,

20 I do agree that most of these convictions are stale.  The bank

21 robbery's from 1995.  The ID theft is from 2006.  The most

22 concerning situation has to do with the 2015 conspiracy to

23 contribute -- the conspiracy to distribute a controlled substance.

24         But the question here is whether conditions can be

25 fashioned that would reasonably assure the safety of the

1  community, and I think that that can be fashioned in this case.

2        What I don't think can be overcome here is the risk of

3  flight risk given the arrest conduct in this case, which includes

4  him barricading himself in his house.

5        I do hear what you're saying, Ms. Brooks, that your

6  client denies this.

7        The DEA agent that informed the Court as to the other

8  two co-defendants has provided a different account as to the other

9  two co-defendants.  I find that the information here is credible.

10       I rely on Mr. Clarkson, who's an officer of the court,

11 that this information is, in fact, true.  If there's some

12 information that comes out in the future to suggest that this is

13 not correct, Ms. Brooks, of course, please bring this back before

14 the Court, and I'll be more than happy to reconsider my order.

15 But the main thing here has to do with his arrest conduct.

16       So for those reasons, I find the government has met its

17 burden with regard to the flight risk, and I will order

18 Mr. Engstrom detained pending trial.

19       Mr. Clarkson, anything else in this case?

20       **MR. CLARKSON:**  No, Your Honor.  Thank you.

21       **THE COURT:**  Ms. Brooks.

22       **MS. BROOKS-WHITTINGTON:**  Nothing further.  Thank you,

23 Your Honor.

24       **THE COURT:**  Thank you, everyone.

25             (*Proceedings adjourned at 4:40 p.m.*)

1                          --o0o--

2        I, Paige M. Christian, a court-appointed transcriber,

3  certify that the foregoing is a correct transcript transcribed

4  from the official electronic sound recording of the proceedings in

5  the above-entitled matter.

6

7  Date:  October 30, 2021

8                          /s/ Paige M. Christian_____

9                          Paige M. Christian, RPR, CRR, CCR #955
                           Official Court Reporter
10                         United States District Court
                           District of Nevada
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AO 472 (Rev. 11/16) Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 2:21-mj-0536-BNW |
| PAUL ENGSTROM | ) | |
| _Defendant_ | ) | |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☒ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

☒ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted. This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** _(previous violator)_: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

☐ **(e)** any felony that is not otherwise a crime of violence but involves:
**(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; _**and**_

☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; _**and**_

☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; _**and**_

☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

020

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

☒**B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

☒ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

☐ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☒**C.  Conclusions Regarding Applicability of Any Presumption Established Above**

☒The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

**OR**

☐The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III - Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

☐By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☒By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

☐ Weight of evidence against the defendant is strong
☐ Subject to lengthy period of incarceration if convicted
☐ Prior criminal history
☐ Participation in criminal activity while on probation, parole, or supervision
☐ History of violence or use of weapons
☐ History of alcohol or substance abuse
☐ Lack of stable employment
☐ Lack of stable residence
☐ Lack of financially responsible sureties
☐ Lack of significant community or family ties to this district

021

AO 472 (Rev. 11/16) Order of Detention Pending Trial

☐ Significant family or other ties outside the United States
☐ Lack of legal status in the United States
☐ Subject to removal or deportation after serving any period of incarceration
☐ Prior failure to appear in court as ordered
☐ Prior attempt(s) to evade law enforcement
☐ Use of alias(es) or false documents
☐ Background information unknown or unverified
☐ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:
The defendant is ordered detained as a flight risk as defined by The Bail Reform Act for the following reasons: This is a drug trafficking and money laundering operation case involving the dark web and cryptocurrency, and the offense involves a ten year mandatory minimum sentence if convicted. The weight of the evidence, while the least significant factor for the Court to consider, is nonetheless very strong and involves months of surveillance and controlled buys. The execution of the arrest warrant revealed six kilograms of cocaine at the residence as well as instruments that suggest the distribution of cocaine. The defendant's ties to the communites are strong and he has been in Las Vegas, NV since 2007. There is conflicting information as to where the defendant has been residing, but ultimately there is information that the defendant can return to his residence and that he has a long established residence here. The defendant owns and works at his own business and can return to his work if released. The Court notes that there is something to be said about the danger to the community given that the DEA agents have known about this operation for a long period of time and have waited until now to arrest the defendant. The Court relies on the information provided by the Government with respect to the defendant's criminal history and notes that most of the convictions are stale. However, the Court is concerned with the 2015 conspiracy to distribute a controlled substance. What cannot be overcome is the risk of flight given the arrest conduct by the defendant in this case, which includes the defendant barricading himself in his house. While the defendant denies that allegation, the DEA Agent that informed the Court as to the co-defendants has provided an account that the Court deems credible and the Court relies on the US Attorney, as an officer of the court, that the information is true.

### Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _____06/23/2021_____      _____

United States Magistrate Judge

RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
JAWARA GRIFFIN
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Jawara_Griffin@fd.org

Attorney for Paul Engstrom

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAUL ENGSTROM,<br><br>Defendant. | Case No. 2:21-cr-00190-APG-EJY-1<br><br>**MOTION TO REOPEN DETENTION HEARING** |

Paul Engstrom, through his attorney, Jawara Griffin, files this motion to reopen his detention hearing pursuant to 18 USC 3142. On June 23, 2021, this Court ordered Mr. Engstrom detained pending trial finding he was a flight risk. ECF No. 11. The Court specifically noted,

- The defendant's ties to the communities are strong and he has been in Las Vegas, NV since 2007. There is conflicting information as to where the defendant has been residing, but ultimately there is information that the defendant can return to his residence and that he has a long-established residence here. The defendant owns and works at his own business and can return to his work if released.

- What cannot be overcome is the risk of flight given the arrest conduct by the defendant in this case, which includes the defendant barricading himself in his house. While the defendant denies that allegation, the DEA Agent that informed the Court as to the co-defendants has provided an account that the Court deems credible and the Court relies on the US Attorney, as an officer of the court, that the information is true.

United States Code 3142 (f)(2) allows a detention hearing to be reopened if "judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release…" Engstrom submits there is new material information that directly weighs on the court's earlier decision to detain him as a flight.

### I. Mr. Engstrom did not flee the front room into another room barricading himself in the room

Understandably, the Court relied on the AUSA's representation as it was told to her by agents. Per the agents, The AUSA reported to the court that when Mr. Engstrom heard officers entering the residence, he ran from the room they had entered through into another room and barricaded himself in the room.

Based on this information, the Court found that Mr. Engstrom was a flight risk. Specifically, the Court stated, "It's main concern was the arrest conduct of Mr. Engstrom barricading himself in a room." (Exhibit 1 - Bond Hearing 6/23/21 @ 15:20.)

However, video footage from inside of the residence directly contradicts those assertions. (Exhibit 2 – Home Video).

2

Video footage from inside of the residence shows that when officers were initially outside preparing to enter the residence, they announced themselves. At that time, two individuals (neither being Mr. Engstrom) leave out of a room and exit into the garage. Whichever room Mr. Engstrom was found in he was already in prior to the officers entering the residence. Mr. Engstrom did not flee into that room in an attempt to elude officers. Mr. Engstrom had already been in that room and remained in that room until he was taken into custody. Further, at no time did Mr. Engstrom barricade or attempt to barricade himself in the room.

## II.    There are conditions this Court can fashion that will reasonably assure Mr. Engstrom's future appearances.

There are conditions that can be fashioned to ensure his appearance in court. First, as the Court has noted, based off of the Pretrial Services Report, Mr. Engstrom can return to his local residence which he shares with his ex-wife. Additionally, the Court can place Mr. Engstrom on GPS location monitoring. Finally, if the court needs further assurance, it can require Mr. Engstrom to report to Pretrial Services for in person check-ins on a weekly basis.

DATED this 29th day of July, 2021.

RENE L. VALLADARES
Federal Public Defender

CHRISTOPHER CHIOU
Acting United States Attorney


*/s/ Jawara Griffin*
By_____

JAWARA GRIFFIN
Assistant Federal Public Defender

*/s/ Daniel Clarkson*
By_____

DANIEL CLARKSON
Assistant United States Attorney

3

## **CERTIFICATE OF ELECTRONIC SERVICE**

The undersigned hereby certifies that he is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on, July 29, 2021, he served a copy of the above and foregoing **MOTION TO REOPEN DETENTION HEARING** by electronic mail to the person(s) named below:

CHRISTOHER CHIOU
Acting United States Attorney
DANIEL CLARKSON
Assistant United States Attorney
501 Las Vegas Blvd. So.
Ste. 1100
Las Vegas, NV 89101

*/s/ Marcus A. Walker, Legal Assistant*
Employee of the Federal Public Defender

4

1 CHRISTOPHER CHIOU
Acting United States Attorney
2 Nevada Bar No. 14853
SUSAN CUSHMAN
3 CHRISTOPHER BURTON
Nevada Bar No. 12940
4 DANIEL CLARKSON
501 Las Vegas Boulevard South, Suite 1100
5 Las Vegas, Nevada 89101
Tel: (702) 388-6336
6 Susan.Cushman@usdoj.gov
Chris.Burton4@usdoj.gov
7 Daniel.Clarkson@usdoj.gov
*Attorneys for the United States*

8

**UNITED STATES DISTRICT COURT**
9 **DISTRICT OF NEVADA**

10 UNITED STATES OF AMERICA,

Case No. 2:21-cr-00190-APG-EJY
11 　　　　　Plaintiff,

**Government's Response in Opposition**
12 　　　　　vs. **to Defendant's Motion to Reopen**
**Detention Hearing [ECF No. 30]**
13 PAUL ENGSTROM,

14 　　　　　Defendant.

15 _____

16 CERTIFICATION: This response is timely.

17 　　　　The Court should deny Defendant Paul Engstrom's Motion to Reopen Detention

18 Hearing because Engstrom fails to advance – as he must – any new information that

19 materially bears on the circumstances of his arrest or his risk of non-appearance. The partial

20 videos provided by Engstrom in support of his Motion are consistent with the

21 representations made by the government at the detention hearing. In addition, these partial

22 videos appear to have been cropped in order to leave out key events surrounding

23 Engstrom's arrest. Moreover, although Engstrom's filing makes clear that he has access to

24 camera footage from the premises, he has *not* provided the Court with footage from the

camera located *inside the room* where he was arrested, which would conclusively show his

actions prior to arrest, including his likely destruction of evidence. Engstrom's misleading

presentation should not prompt the Court to revisit its finding that he is a risk of non-

appearance. The Court should deny the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.    Factual Background

Defendant Paul Engstrom was arrested on June 21, 2021, during a takedown of a

large-scale drug trafficking and money laundering operation, of which Engstrom was the

leader (the "Engstrom DTMLO"). On that date, police officers executed search warrants at

several premises, one of which was used by Engstrom and his co-defendants as a stash

house to store, package, and distribute large amounts of cocaine. This takedown was the

culmination of a months-long investigation into the Engstrom DTMLO, which yielded

overwhelming evidence that Engstrom and his co-defendants were using a dark web

marketplace to take orders for cocaine from numerous customers, processing and

packaging those orders in Las Vegas, sending cocaine nationwide using U.S. Priority Mail,

and then laundering the criminal proceeds through a series of cryptocurrency transactions.

On several occasions during the investigation, law enforcement agents surveilled

defendants Engstrom, Cuomo, Elliott, as they arrived and entered stash houses used by the

DTMLO. After the defendants remained in the stash houses together for some time, one of

the defendants would exit the premises and hand off cocaine-filled Priority Mail envelopes

to a runner (co-defendant Joseph Krieger), who would deposit the envelopes at different

post offices in the Las Vegas area. *See* ECF No. 1, Complaint ¶¶ 3-9. During the

investigation, law enforcement agents seized 44 such envelopes that they had surveilled

being deposited in post office drop boxes by the Engstrom DTMLO; *all* 44 seized envelopes

2

contained heavily wrapped white powder that field tested positive for cocaine. *Id.* ¶ 10. And all of the Priority Mail envelopes seized by law enforcement during the investigation bore the same characteristics in terms of how they were labeled, the type of envelope used, and the way the postage was paid for. *Id.* ¶ 5, 12.

The DEA also conducted three undercover purchases of cocaine from an online moniker associated with the Engstrom DTMLO through an illicit dark web marketplace. In each instance, Priority Mail envelopes containing the purchased amount of cocaine were sent to the undercover address provided by the DEA when making the purchase. In two of these instances, law enforcement agents surveilled the Engstrom DTMLO deposit the cocaine-filled envelopes addressed to the DEA-provided location and seize them before they were mailed. *Id.* ¶ 12 (describing the first two of the three undercover transactions).

Through investigation of financial records and publicly available cryptocurrency transaction records, the DEA was also able to identify Engstrom as the defendant who was receiving cryptocurrency payments made through the dark web and then conducting a series of transactions to launder those proceeds. Those transactions included the use of "mixers" and "tumblers," which are tools that help holders of cryptocurrencies mask the source of their funds. *Id.* ¶ 7.

Law enforcement executed a search warrant on June 21, 2021, at one of the stash houses located at 6145 Harrison Drive, #4. Defendants Engstrom, Cuomo, and Elliott were all present in that stash house when the warrant was executed, ostensibly filling dark web orders for cocaine. During their search of the Harrison Drive location, law enforcement recovered over six kilograms of white powder that field tested positive for cocaine. Most of the cocaine was found in the back office where Engstrom had locked himself. There were also filing cabinets containing numerous Priority Mail envelopes and

3

sealed containers labeled with various amounts of cocaine, as well as other indicia of the Engstrom DTMLO and drug trafficking tools, such as scales.

The initial entry and securing of the Harrison Drive stash house was conducted by the Henderson Police Department (HPD).[1] The glass on the front door and window was covered with a tinted security film that blocked HPD's visibility and made the use of typical entry means (*e.g.*, a battering ram) not feasible or safe. So HPD was required to place charges on the front entrance. HPD then announced their presence and detonated the charges, approached the front door, sawed through a horizontal metal handle across the front door, and entered. *See* Ex. A, 21_11265_437B.mp4 at 16:30 (showing HPD placing charges, announcing their presence, and entering the premises). Due to the amount of time it took HPD to place charges, complete their announcements, and enter the premises, the defendants had a significant amount of time to react the HPD's arrival before they were taken into custody.

As shown on the video provided by Engstrom, and consistent with the government's proffer at their respective detention hearings, defendants Cuomo and Elliott reacted by attempting to flee through the garage and then out of the building. But when they were confronted by the HPD outside the building, they fled back into the garage and hid under vehicles, where they were later arrested.

When HPD officers entered the building, defendants Cuomo and Elliot had already fled. HPD officers attempted to open a door across from the front entrance and found it locked.[2] HPD officers then battered open this second door. After gaining entry to the room

---

[1] The government has obtained body camera footage from several members of the HPD team that entered a secured the premises. The government will manually file those videos with the Court as Exhibit A to this Response.

[2] As seen on the partial video clip Engstrom provides with his filing, one of the other

4

beyond that door, HPD found still a third locked door, which again required use of the battering tool. Defendant Engstrom, and a large amount of cocaine, was found behind this third door. At no point during HPD's entry did Engstrom unlock the door, attempt to communicate with HPD, or exit the back office, despite having several minutes to do so while HPD was securing the premises and taking Cuomo and Elliott into custody. *See* Ex. A, 21_11265_06_21_2021_13_47_48_Forest_Shields.mp4 at 1:15 (showing HPD breaking into the locked office where Engstrom was located after taking Cuomo and Elliott into custody). In the area between the first locked interior door and the second locked door, there was a room with a toilet. It appeared that an unknown amount of cocaine had recently been flushed down the toilet, as officers found a white powdery substance around the toilet bowl, two spoons in the toilet, and a metal tray with white powdery residue on the floor near the toilet.

**B.     Procedural Background**

On June 23, 2021, Engstrom made his initial appearance on a Criminal Complaint charging him with one count of Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) and one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). During the detention hearing, the government argued that Engstrom presented a risk of non-appearance for several reasons. The government noted the rebuttable presumption in favor of detention under 18 U.S.C. § 3142(e)(3). In addition, the government argued that Engstrom faced a significant sentence if convicted (a mandatory minimum of ten years in prison) and that the evidence against him was extremely strong, given the extensive surveillance of the Engstrom DTMLO and

---

defendants also attempted to open this same door prior to HPD's entry and likewise found it locked.

5

the large amount of cocaine located in the stash house, most of which was located in the same room where Engstrom was apprehended. The government also argued that Engstrom appears to have substantial means at his disposal to flee and appeared to be misrepresenting the nature and source of those means to Court. In particular, Engstrom reported to Pretrial Services that he owned eight to ten million dollars' worth of cryptocurrency. Given the ongoing investigation, and the fact that Engstrom appears to have no legitimate source of income, the government believes any cryptocurrency owned by Engstrom is proceeds of drug trafficking.[3] The government also raised Engstrom's arrest conduct – based on conversations with law enforcement – as further indication of his flight risk, given the evidence that cocaine had been flushed down the toilet and that Engstrom had barricaded himself into a back room until HPD broke down the door.[4]

Following the detention hearing, this Court ordered that Engstrom be detained pending trial, finding that the government showed by a preponderance of the evidence that no condition or combination of conditions of release would reasonably assure his appearance in Court. ECF No. 11 (Detention Order). The grand jury subsequently returned

---

[3] Engstrom later told the Court he could not afford an attorney and submitted a financial affidavit that the Court relied upon to find that he qualified for court-appointed counsel. *See* ECF No. 4. The government is not privy to the contents of Engstrom's financial affidavit.

[4] The Motion misstates the representations made by government counsel at the detention hearing. The government never "reported to the court that when Mr. Engstrom heard officers entering the residence, *he ran from the room they had entered through into another room* and barricaded himself in the room." Government counsel stated that Engstrom had barricaded himself into a back room, but did not make any representations that he ran from the front room after HPD entered the premises. Nor did the Court make any statements about Engstrom running from the front room when summarizing its findings regarding Engstrom's flight risk. The government also argued that Engstrom was a danger to the community given he has a prior felony conviction for drug trafficking (*see* Case No. 2:15-cr-255-JAD-PAL) and, based on the evidence known at this time, engaged in the instant drug trafficking conspiracy mere months after being released (early) from supervised release. This Court did not find Engstrom was a danger to the community.

6

a nine-count Indictment, which charged Engstrom with eight counts relating to illegal distribution of cocaine and one count of Conspiracy to Commit Money Laundering. ECF No. 17. Multiple charges against Engstrom carry a mandatory minimum sentence of ten years in prison if he is convicted. *See* Indictment, Counts One and Eight.

On July 29, Engstrom filed this Motion to Reopen Detention Hearing (ECF No. 30, the "Motion"). In support of his Motion, Engstrom filed two short video clips of approximately 21 seconds and 39 seconds in length, respectively. *See* Ex. 2 to Motion. Engstrom argues that these video clips "directly contradict" the representations made by the government that Engstrom had barricaded himself into a back room. Presumably, Engstrom was able to obtain these videos because he has access to the footage from the several security cameras that were in the premises. This response follows.

**C.    Legal Standard**

The Court may reopen a detention hearing only "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing," and that information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B). Courts strictly interpret this provision. *United States v. Turino*, No. 2:09–cr–132–JAD–GWF, 2014 WL 5261292, at *1 (D. Nev. Oct. 15, 2014) ("If evidence was available at the original hearing, no rehearing is granted."). Gratuitously restating information already contained in the original pretrial services report does not constitute a basis for reopening a detention hearing. *See, e.g., United States v. Bowens*, No. CR07 544 2PHX ROSECV, 2007 WL 2220501, at *3 (D. Ariz. 2007). */ / /*

7

**D.      Argument**

Engstrom presents no information in his Motion that materially changes the facts upon which the Court based its detention decision or to warrant re-opening the hearing. The videos filed in support of his Motion are consistent with the government's representations at the detention hearing that Engstrom locked or barricaded himself into a back office once police arrived at the scene. Moreover, Engstrom's presentation to the Court appears calculated to provide only a partial and misleading picture of the events surrounding his arrest. Thus, the Court should deny the Motion.

**a.   The Videos Are Consistent with the Government's Representations**

There is nothing contained in the videos that contradicts the assertion that Engstrom remained locked in his office as HPD officers were executing their search warrant of the premises. The first video confirms that, after HPD began announcing their presence, the door from the front entry room into a secondary room appeared to be locked. This is evident from the fact that one of the other defendants attempted to open that door, but was unable to, before exiting through another door into the garage. In addition, the second video shows that officers had to break through the same door using a battering tool. None of this is inconsistent with the government's representation that Engstrom had barricaded himself into a back office.

In fact, the video clips Engstrom provides support the conclusion that, after learning of HPD's presence, Engstrom flushed cocaine down the toilet and then locked himself into a back office. This can be deduced from the fact that the toilet was located *behind* the first locked door from the front entry room, but *in front of* the second locked door to Engstrom's office. The first video shows that Engstrom's co-defendants were unable to open the first door – which led to the toilet – and instead fled through the garage. This suggests that

8

Engstrom was the *only* person with access to the toilet after HPD began announcing their presence and that he attempted to flush cocaine down the toilet, destroying the very evidence law enforcement was there to collect, before locking himself in the back office.[5]

### b.  The Videos Exclude Key Events

The videos filed by Engstrom also lack materiality because they do not depict key events surrounding Engstrom's arrest. The first of these videos begins several seconds *after* HPD placed charges and started announcing their presence. This is evident from both the audio of the recording and the rectangular shadows on the front door and window, which were caused by the signs placed by HPD to warn people away from the charges. This would have been after HPD had already made their way to the front entrance, placed charges on the door and window, and begun announcing their presence for several seconds. Thus, the video does not capture the critical moments that might show what actions Engstrom took immediately after learning of HPD's presence. Instead, the video appears to show Cuomo and Elliott leave a side room and walk out another door into the garage after one of them unsuccessfully attempts to open one of the two doors Engstrom was found behind. Engstrom has not provided any explanation for this suspicious timing.

The second video begins after the charges have been detonated and HPD has sawed through the metal handle. It shows HPD enter the premises and breach the door from the front entry room into the second room. Notably, Engstrom was *not* located in the room immediately beyond the door HPD breached with a battering tool shown in the video.

---

[5] Indeed, Engstrom appears to contend that the first door was locked *before* HPD arrived on scene. If the Court finds this representation persuasive, Engstrom's exclusive access to the toilet area would have existed even prior to any of the defendants having motivation to destroy evidence.

Engstrom does not explain in his Motion why these videos do not capture any other events before the first clip (when HPD initially arrived at the scene, placed the charges, and started announcing their presence), between the first clip and the second clip, nor after the second clip. Additionally, when law enforcement searched the premises, they found four security cameras, including one camera inside the locked office where Engstrom was arrested. Engstrom likewise does not explain he has provided footage from only one camera.[6] As the videos do not capture how or when Engstrom entered his office, or whether he was already in that office when HPD arrived at the premises, they provide this Court with no new material information, and its detention order should not be disturbed.

That Engstrom provides this Court with only partial video clips from one camera is particularly concerning because Engstrom's filing demonstrates that he has custody or access to the footage from the security cameras in the premises. One of those cameras was *in the office* where Engstrom had locked himself and was arrested. However, Engstrom has not provided the Court or the government with any footage from that camera, which would show what actions he took after HPD arrived and exactly when he entered the back office. The logical inference from this omission is that Engstrom is avoiding providing the Court with a full picture of the events surrounding his arrest.

---

[6] Government counsel contacted Engstrom's counsel after the filing of the Motion to request copies of the full video of the events preceding Engstrom's arrest. Defense counsel responded that the videos were obtained from a "third party" and that additional video had not been provided.

10

### c. The Court Should Detain Engstrom as a Risk of Non-Appearance Even If It Reopens the Detention Hearing

Even if the Court were to consider the videos submitted by Engstrom as sufficient to reopen the detention hearing, the government submits that it has still shown that Engstrom presents a risk of non-appearance by a preponderance of the evidence. This is a presumption case, Engstrom faces at least a ten-year mandatory minimum sentence if convicted, and the evidence against him is extremely strong. He was convicted of distributing controlled substances by this Court in 2017 – a case in which he was also detained pending trial – showing that he is unlikely to take seriously any Court-ordered conditions or sanctions. *See United States v. Engstrom*, 2:15-cr-00255-JAD-PAL. The government also remains highly concerned about the apparent discrepancy between the several millions of dollars in assets that Engstrom reported to Pretrial Services and the supposed lack of financial means he represented to the Court when seeking appointed counsel. This discrepancy appears to indicate that Engstrom is purposefully presenting the Court with two starkly different versions of his financial means. These factors all demonstrate, by a preponderance of the evidence, that Engstrom is a risk of non-appearance and should be detained pending trial.

037

**E.    Conclusion**

For all the foregoing reasons, this Court should deny the Motion.


DATED:  August 2, 2021

                                    Respectfully submitted,

                                    CHRISTOPHER CHIOU
                                    Acting United States Attorney

                            /s/   _Daniel Clarkson_
                                    DANIEL CLARKSON
                                    CHRISTOPHER BURTON
                                    SUSAN CUSHMAN
                                    Assistant United States Attorneys

038

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEVADA

3  UNITED STATES OF AMERICA,      )  CASE NO. 2:21-cr-00190-APG-EJY
                                  )
4              Plaintiff,         )  Las Vegas, Nevada
                                  )  Wednesday, August 4, 2021
5          vs.                    )  Courtroom 3B
                                  )
6  PAUL ENGSTROM, VINCENT CUOMO,  )  Recording method:  Liberty/ECRO
   ABRAHAM ELLIOTT, and JOSEPH    )
7  KRIEGER,                       )  3:13 P.M. - 3:58 P.M.
                                  )  MOTION HEARING AS TO
8              Defendants.        )  PAUL ENGSTROM
   _____)

9                          *C E R T I F I E D   C O P Y*

10

11                     TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE BRENDA N. WEKSLER,
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13

14
   APPEARANCES:  (See next page)
15

16  Recorded by:  Araceli Bareng

17  Transcribed by:      PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                        United States District Court
18                      333 Las Vegas Boulevard South
                        Las Vegas, Nevada  89101
19

20

21

22

23

24  Proceedings recorded by electronic sound recording.
   Transcript produced by mechanical stenography and computer.
25

1  **APPEARANCES:**

2

3  For the Government:

4          ***DANIEL CLARKSON, AUSA***
           ***CHRISTOPHER BURTON, AUSA***
5          US ATTORNEY'S OFFICE
           501 Las Vegas Boulevard South
6          Suite 1100
           Las Vegas, NV 89101
7          (702) 388-6375
           E-mail: daniel.clarkson@usdoj.gov
8                   christopher.burton4@usdoj.gov

9

   For Defendant Paul Engstrom:
10
           ***JAWARA GRIFFIN, FPD***
11         FEDERAL PUBLIC DEFENDERS OFFICE
           411 E. Bonneville Avenue
12         Suite 250
           Las Vegas, NV 89101
13         (702) 388-6577
           E-mail: jawara_griffin@fd.org
14

15

16

17

18

19  ALSO PRESENT:  ***ERIN OLIVER, PTS; ARMANDO AYALA, PTS;***
                   ***DEA SPECIAL AGENT DANIEL KURINEC***
20

21

22

23

24

25

 1          LAS VEGAS, NEVADA; WEDNESDAY, AUGUST 4, 2021; 3:13 P.M.

 2                      P R O C E E D I N G S

 3                          --o0o--

 4          **COURTROOM ADMINISTRATOR:**  Your Honor, good afternoon.

 5  We are now on record, and we are calling United States of America

 6  vs. Paul Engstrom.  The case number is 2:21-cr-00190-APG-EJY.

 7          Beginning with government counsel, Counsel, please state

 8  your names for the record.

 9          **MR. CLARKSON:**  Good afternoon, Your Honor.  Daniel

10  Clarkson for the United States, and along with me is Chris Burton

11  also from my office.

12          **THE COURT:**  Good afternoon to both of you.

13          **MR. GRIFFIN:**  Good afternoon, Your Honor.  Jawara

14  Griffin with the Office of the Federal Defender on behalf of

15  Mr. Engstrom.

16          **THE COURT:**  Good afternoon, sir.

17          And good afternoon, Mr. Engstrom.

18          Mr. Engstrom, can you hear me?

19          **THE DEFENDANT:**  Yes, I can, Your Honor.

20          **THE COURT:**  All right.  Very well.  I also note for the

21  record that we have Ms. Oliver and Mr. Ayala from the Pretrial

22  Services Office and DEA Special Agent Daniel Kurinec joining us,

23  as well.  Good afternoon to all of you.

24          First thing's first.  We are here on a motion to reopen

25  bail, which is at Document 30.  The opposition is at Document 35.

 1   The main question here is whether there was information that was

 2   not known to the movant at the time of the hearing that has a

 3   material bearing on the issue of release.

 4          The defendant represents here that the defendant never

 5   ran into a room to barricade himself.  The government asserts that

 6   it never suggested that the defendant had ran into a room,

 7   although it seems that the government continues to suggest that he

 8   did barricade himself.

 9          I will note and will -- this will be a topic of

10   discussion later on that the complaint in this case at page 11

11   does suggest that -- it does not suggest -- states that

12   Mr. Engstrom fled to the back office, locked the door, and refused

13   commands to exit the office.  So that's what the complaint says.

14          I have listened to the argument that we had during the

15   detention hearing, so Mr. Clarkson is correct that he, himself,

16   never represented that the defendant had ran into a room, but he

17   did represent that defendant barricaded himself in the room.

18          And the question now is whether the video that has been

19   provided by both parties in this case creates a new factual issue

20   that was not known to the movant at the time of the detention

21   hearing but has a material bearing on the issue of release.

22          I do find that the information is relevant, or the lack

23   of information is relevant.  The burden here continues to be the

24   government's such that I will go ahead and reopen the hearing.

25          So with that in mind, I would like to start by asking

 1  Mr. Clarkson, if you could answer this question for me, you did
 2  represent to the Court that Mr. Engstrom had barricaded himself.
 3  I have reviewed video provided by your office as well as video
 4  provided by the defendant.  I understand your position the
 5  defendant has more video available to it that has not been
 6  presented to the Court.

 7          My question to you is the following:  What information
 8  did you rely on when you represented to the Court that he
 9  barricaded himself into the room?

10          **MR. CLARKSON:**  Yes, Your Honor.  When I made that
11  representation, I was relying on information provided to me by
12  Special Agent Kurinec, who had obtained information from the HPD
13  SWAT team who had basically secured and entered the premises.
14  That was the basis of my initial representation.  From -- since
15  that time, I have also reviewed, of course, as we submitted, body
16  cam, and I've had follow-up conversations with Special Agent
17  Kurinec and with members of the HPD SWAT team.

18          **THE COURT:**  And what did that -- what did those
19  conversations reveal?

20          **MR. CLARKSON:**  Yes, Your Honor.  So the government's
21  view of this is that Mr. Engstrom was locked behind two sets of
22  locked doors.  First, the HPD SWAT team had to enter through the
23  front entrance using charges as we show in the video.  There was a
24  first locked door there from the front entrance to the secondary
25  room.

1       Behind that secondary room, there was a room that was

2  sort of like a janitorial bathroom with a toilet as well as a

3  second room, which was the office where Mr. Engstrom was

4  eventually arrested.  That room was also locked, and I have

5  confirmed from further discussions, it was locked.  Both a door

6  lock and a dead bolt lock, which I believe you can see from the

7  body cam video.

8       Now, so based on that, we do believe that there is

9  sufficient basis to say he barricaded himself into that room.

10  Now, I apologize if that word "barricade" -- I did not mean to

11  imply that there is some sort of physical obstruction, like a

12  wooden something or other.  But I do believe that being locked

13  behind two consecutive sets of doors, one of which was double

14  locked, does support the representation I made at the initial

15  hearing, so I apologize if my wording was loose in terms of the

16  word "barricade" versus multiple locked doors.  But I do believe

17  there is sufficient basis to show that Mr. Engstrom avoided the

18  law enforcement by locking himself into two sets of rooms.

19       And again, also, I believe what we have uncovered and

20  confirmed through further looking into it is that as we had

21  mentioned and I had mentioned at the initial detention hearing,

22  there was evidence -- and I've now looked at photos to confirm

23  this evidence that there was white powder found on the toilet --

24       **THE COURT:**  I'll get to that.  We can get to the merits

25  of the actual underlying issue in a second.  I just wanted to

1  confirm the information regarding barricading.  I do appreciate

2  what you're saying to me.  I'm going to ask you, Mr. Clarkson, to

3  be very careful with the representations that you make to this

4  Court.  The Court does take the information that is provided by

5  the government very seriously.  As I mentioned during my detention

6  hearing, there was a credibility issue, and I assign my

7  credibility to the government because of the heightened standard

8  that exists with regards to candor to the Court.  All right?

9          So I'm going to ask you to please be very careful with

10 your choice of words in the future, because they do have different

11 meanings.  And to me, after having reviewed this video, there is

12 no evidence that he was barricaded.  There is no evidence that he

13 locked himself after that SWAT team arrived to the premises.

14         So the way in which arguments are crafted, the way in

15 which words are used, do have specific meaning, especially in the

16 context in which this specific detention hearing came about, which

17 had two co-defendants who had clearly tried to evade police and

18 law enforcement detection in this case.  All right?

19         **MR. CLARKSON:**  Yes, Your Honor.  Understood.

20         **THE COURT:**  Let me turn to you, Special Agent Kurinec.

21 Good afternoon, sir.

22         You had provided to me a complaint.  I swore out the

23 complaint.  I asked you whether the facts that you had provided to

24 me under penalty of perjury were true and correct.  You stated

25 that they were.

1        My question to you is, what evidence did you rely on to
2    say on page 11 of the complaint that Mr. Engstrom fled to a back
3    office?  That's one.  Two, that he locked the door.  That's two,
4    and three, that he refused commands to exit the office.
5        **SPECIAL AGENT KURINEC:**  Yes, ma'am.  So the first -- I'm
6    getting some feedback here.
7        The first was that Mr. Engstrom was found alone in the
8    back office behind two sets of locked doors.  I would stipulate
9    now that no one observed him clearly lock those doors --
10       **THE COURT:**  Let me -- let me just stop you a second.
11   I'm having a hard time hearing you.
12       Mr. Miller, could you turn the volume up a little bit?
13       And Agent Kurinec, I'm going to ask you to speak closer
14   to the mic to the extent that you can.
15       **SPECIAL AGENT KURINEC:**  Yes, ma'am.
16       **THE COURT:**  And if you would start over, please.
17       **SPECIAL AGENT KURINEC:**  Yes, ma'am.  You made the
18   original determination from Mr. Engstrom having locked himself in
19   the back room.  We stipulate now that while he didn't -- while we
20   witnessed him go into the back room, he was the only person that
21   was (indiscernible) in that room behind the two sets of locked
22   doors --
23       **THE COURT:**  Let me -- let me be more specific.  I think
24   that the idea here is that he locked himself into the room after
25   the SWAT team arrived.  So the idea being here is that he actually

1    took the steps to avoid detention.

2          So what is it that you relied on to suggest that that

3    was the case?

4          **SPECIAL AGENT KURINEC:**  Yes, ma'am.  That was from

5    testimony that was received from the HPD SWAT members upon them

6    entering the room.  We had brief discussion with them about the

7    events that unfolded inside the building (indiscernible) and that

8    was when we (indiscernible) confirm and find out exactly what is

9    going on the day of before we're able to go back and review the

10   body cam footage almost several days, a week later.

11         **THE COURT:**  So -- okay.  So that somewhat answers the

12   locked the door part of the sentence.  What about the rest of it,

13   that he fled to the back office and that he refused commands to

14   exit the office?

15         **SPECIAL AGENT KURINEC:**  In speaking again with the

16   Henderson police officers, they gave multiple announcements

17   stating their office and (indiscernible).  They demanded entry,

18   and throughout the course of that time, Mr. Engstrom did not

19   surrender himself and come out of the room to them.  During the --

20         **THE COURT:**  Are these the commands -- are these the

21   commands that were given when the -- when they first entered into

22   the office or --

23         **SPECIAL AGENT KURINEC:**  Those were running -- it was

24   both, ma'am.  When they first entered into the office and after

25   they made entry into that second common area, officers told them,

1   if you can hear me, come to the sound of my voice.  And I believe

2   almost three minutes elapsed, and Mr. Engstrom did not comply with

3   any of those commands.

4        **THE COURT:**  Okay.  And perhaps, Mr. Clarkson, you can

5   see me in to the (indiscernible) video that the agent is referring

6   to so I can review that again.

7        **MR. CLARKSON:**  Yes, Your Honor.  I believe there are

8   couple of videos that reflect this.  I think what Agent Kurinec is

9   talking about, there's one that I would point the Court to.  It's

10  the one that ends in the title 439S, parentheses, 2.  And I think

11  it's at the 8:20 mark in the video.

12       I would point out from -- Agent Kurinec and I have

13  spoken about this.  I -- it is relatively muffled on the body cam,

14  but I believe Agent Kurinec has found the area on the body cam

15  video but also spoken to the HPD officers to help to explain what

16  they were saying, because it is not explicitly clear, I think,

17  from the audio of the video.  You can hear them break into the

18  second room, make some sort of announcement about search warrant,

19  search warrant, and then say some other words.  And it's difficult

20  to tell exactly what they're saying.  So I believe -- and Agent

21  Kurinec can clarify -- that he has heard that video and also

22  followed up with HPD officers to clarify what, exactly, they were

23  saying.

24       **THE COURT:**  All right.  And lastly, Agent Kurinec, with

25  regards to the statement that he fled to the back office, what

1  information is it that you relied upon for that statement?

2       **SPECIAL AGENT KURINEC:**  For that statement, it was that

3  he was located in the back of -- in the back of the structure in

4  the innermost room.  We also relied upon having found the

5  destroyed evidence in there, and we can confirm this with in

6  reviewing the footage that was submitted by the defense, it's

7  clear that the two gentlemen, Mr. Cuomo and Mr. Elliott, when they

8  exit that small closet room, they attempt to reenter that

9  secondary room and are (indiscernible) door handle and find that

10  it's locked, which if they themselves had locked it, they would

11  not have even attempted to go back in that room.

12       So even the two co-defendants were surprised by this,

13  which we believe supports our argument.

14       **THE COURT:**  All right.  So I'm going to also state to

15  you something similar that -- to what I said to Mr. Clarkson.  You

16  have a duty to the Court, sir.  You have a duty to the prosecuting

17  attorney here to make sure that the information that you're

18  relaying to him is true and accurate.  I understand here that this

19  is not you making these statements, that you are, yourself,

20  relying on information that's provided to you by, in this case,

21  the Henderson Police Department.  I do not think that there's any

22  evidence to suggest that Mr. Engstrom fled to the back office, so

23  there's no evidence to suggest that he fled.

24       He may have very well been in that office all along.

25       I think that it's perhaps reasonable to believe that he

 1  may have locked the door based on the information that you just

 2  provided, specifically, that the two co-defendants tried to enter

 3  into that door and seemed surprised not to be able to enter into

 4  that room.  And I will go ahead and look at those videos again to

 5  listen more closely to the commands to exit the office as I did

 6  not -- I do not recall hearing those commands when I first viewed

 7  the video.

 8          But I would ask you to please relay this information to

 9  the officers of the Henderson Police Department that provided you

10  the information that you, in turn, relaid to me during your

11  complaint.  It is very important that the information that I

12  receive is accurate and true.  And if that's not the case, not

13  only are you, yourself, going to run into trouble.  They will run

14  into trouble, and Mr. Clarkson will run into trouble, as well.

15          So in this case, I want to make this very clear to the

16  defense, specifically.  I don't find that the statement in any

17  shape or form changes my view as to whether there's probable cause

18  in this case for the case to continue.  I'm just simply making a

19  comment with regards to the statements that officers of the court

20  make to the Court and as it applies to you, sir, I'm also going to

21  tell you that you need to be careful, as well.  You represented in

22  your papers that the AUSA reported to the court that it was --

23  when Mr. Engstrom heard officers entering the residence, he ran

24  from the room they had entered through into another room.

25  Mr. Clarkson never said that.  So I need everybody to be very

1  careful with the -- the representations that are being made in

2  court.

3          Understood?

4          **SPECIAL AGENT KURINEC:**  Yes, Your Honor.

5          **THE COURT:**  Moving on to the actual hearing,

6  Mr. Clarkson, let's go ahead and hear your argument as to whether

7  -- my finding previously was that the government had met its

8  burden to show by preponderance of the evidence that no conditions

9  should be fashioned as they related to the flight risk portion of

10 the Bail Reform Act.

11         So I'll hear your arguments.

12         **MR. CLARKSON:**  Yes, Your Honor.  Well, I'll focus still

13 since I know Your Honor focused on it at the detention hearing on

14 the arrest conduct.  Now, despite the new material that has come

15 out, we still believe there is significant evidence from the

16 arrest conduct that Mr. Engstrom is the one who tried to destroy

17 evidence when the police arrived at the scene.  I think that is a

18 reasonable assumption based on the fact that the front door -- the

19 door from the front room into the secondary room was locked.  The

20 toilet where drugs had been flushed down the toilet, which was

21 shown by white powder that was on the bowl of the toilet as well

22 as two metal spoons in the toilet and a metal tray with white

23 residue next to the toilet showed that somebody had flushed down

24 cocaine down the toilet.  And since we have now seen from this

25 video that Mr. Engstrom submitted that the other two defendants

 1  were unable to access that room because they were on the other

 2  side of a locked door, the reasonable assumption, I believe, Your

 3  Honor, is that Mr. Engstrom flushed that down the toilet.  Also,

 4  I've learned since the detention hearing that the metal tray that

 5  was found near that toilet matches to metal trays that were found

 6  in the back office room.  As Your Honor may remember, we pointed

 7  out that a substantial amount of drugs that was seized during this

 8  takedown was from the back room where Mr. Engstrom was found.

 9          I believe he had a -- the freezer.  I'm not sure.  I

10  think it was a freezer.  But it had metal trays that had bricks of

11  cocaine, and those metal trays appear to match the one metal tray

12  that was by the toilet which had just been flushed down the

13  toilet.

14          So based on that, even if Mr. Engstrom did not attempt

15  to flea directly from the front room when officers came, we do

16  believe there is signature evidence here that he took part in

17  destruction of evidence when the police arrived.

18          Now, to go back, the government then stands by the other

19  bases for being a risk of flight that we had mentioned before.  As

20  I mentioned at the detention hearing, Your Honor, this is a

21  presumption case.  I know Your Honor found that he had met that

22  presumption.  But as Your Honor also acknowledged, that is still a

23  factor to be weighed when determining his flight risk.

24          There are prior crimes in his past, including a

25  relatively old bank robbery case, but the fact that he was also

 1  convicted.  I believe he was charged in 2015 and then convicted in

 2  2017 with another controlled substances violation in this case,

 3  during that case, he was detained pending trial.  And while the

 4  government acknowledges that he had his supervised release

 5  terminated early, it appears, based on the fact when the earliest

 6  we are aware of the U.S. Postal Service doing undercover buys as

 7  early as August of 2019 as alleged on indictment, which appears to

 8  show that Mr. Engstrom very quickly within a matter of months

 9  after the ending of his prior supervised release then reengaged in

10  this conduct.

11         We'd also point out again, this is mentioned in the

12  briefing, but we are concerned about the fact that Mr. Engstrom

13  appears to have represented to Pretrial Services when he was

14  interviewed before his detention hearing that he has 8 to 10

15  million dollars worth of crypto currency assets in addition to

16  other various assets, like property and motorcycles.  And yet,

17  again, we are not privy to the financial affidavit that he had

18  filled out, but it appears that he must have made representations

19  to the Court that do not jive with that assertion, because he has

20  claimed that he does not have the resources to afford his own

21  counsel.

22         In addition, Your Honor -- one moment, Your Honor.

23         Your Honor, so those show that he has certainly the

24  means to flea the jurisdiction if he wanted to, and we don't

25  believe that putting a GPS bracelet on him and releasing him on

 1  conditions would avoid that.

 2         I also would address one of the other things that came

 3  up at the detention hearing, Your Honor, is that Mr. Engstrom has,

 4  I guess, a limited liability company called Vegas Assets, Limited,

 5  or Vegas Assets, LLC.  I can't remember which one it was.  But the

 6  defense put that forward as a basis for his tie to the community.

 7  But the government would argue that the only apparent source of

 8  income for Mr. Engstrom is this drug trafficking operation.

 9  There's no indication of what this supposed business does other

10  than the fact that it is a company that he has created called

11  Vegas Assets, Limited.  We don't believe that really reflects any

12  sort of tie to the community.  It doesn't take a lot of effort to

13  create some sort of corporate entity and call it Vegas Assets,

14  LLC.

15         So that in combination with the fact that we believe

16  Mr. Engstrom is the leader of this drug traffic organization, as

17  we represented at the detention hearing and we have no reason to

18  revisit this, he is the one who was processing these crypto

19  currency transactions from the dark web, web site they were using,

20  using various means to anonymize those crypto currency payments

21  and then eventually exchanging with a third party to get American

22  dollars shows that he is sophisticated and willing to go through

23  elaborate means to cover his tracks and hide his criminal

24  activity.

25         Your Honor, for all those reasons, we believe that the

 1  government has still met by a preponderance its burden that

 2  Mr. Engstrom is a risk of flight and that he should be detained

 3  pending his trial.

 4          **THE COURT:**  All right.  Thank you, Mr. Clarkson.

 5          Mr. Griffin.

 6          **MR. GRIFFIN:**  Thank you.  And, Your Honor, may I remove

 7  my mask --

 8          **THE COURT:**  You may.  You can remove it if you wish

 9  (indiscernible) the mic can pick you up.

10          **MR. GRIFFIN:**  Thank you, Your Honor.  Your Honor, we're

11  asking the Court to re-- to reconsider its past ruling and

12  actually release Mr. Engstrom on bond.  And if the Court feels as

13  though there needs to be some measures taken to assure his

14  appearance, we're suggesting that a GPS monitor -- a GPS monitor

15  would suffice in assuring that the Court is aware of

16  Mr. Engstrom's whereabouts and also that he will, in fact, return

17  to court.

18          Streamlining my argument, Your Honor, a lot of the

19  issues that the prosecution has just argued, Your Honor already

20  took that into consideration and Your Honor thoroughly evaluated

21  that information and ultimately decided that it was that one issue

22  is what the Court seemed uncomfortable with.  And that one issue

23  was whether or not Mr. Engstrom actually barricaded himself into

24  the room.

25          Now, I don't want to project my understanding of

Case 2:21-cr-00190-APG-EJY Document 78 Filed 10/31/22 Page 58 of 198

1  barricading on the Court, but I think the reasonable inference

2  that can be drawn from a statement such as that -- as to that is

3  that someone put a bunch of furniture or objects in front of a

4  door, barricading themselves in, which would potentially lead to

5  some sort of a standoff before they could gain entry to get

6  someone out.  And I think, if that was the case, then yes, I can

7  see why someone would come to a conclusion that this person is a

8  flight risk because they're trying to elude law enforcement and

9  potentially their court hearings.

10          But in this case now, I believe what is clear is that he

11  was merely in a room.  There's no indication as to whether the

12  door was locked prior to entry or locked after entry.  But even at

13  worst case scenario, the door was locked.  The front door was

14  locked just as well, and they used their, I assuming -- a

15  battering wrench is what I would call it, to enter the front door,

16  and as the second door was locked, they would have used the same

17  means.

18          In addition to the video that I -- the two videos that

19  was submitted by the defense --

20          **THE COURT:**  The partial videos?

21          **MR. GRIFFIN:**  Yes, Your Honor.  Partial videos.  Excuse

22  me.

23          Even prior to the entry, I believe it's clear enough

24  that you can hear the announcements was, Get away from the doors.

25  Get away from the windows.  And that's, in fact, what Mr. Engstrom

1  was complying with, getting away from the door.

2          **THE COURT:**  I -- that's my recollection of the videos,

3  as well.  I just cannot, frankly, remember whether those

4  announcements were made both prior to them entering into the

5  office and prior to them entering into the room where he was at.

6  I do recall that those announcements were made, at the very least,

7  at the time that they were entering into the office.  So I would

8  agree with you there that he would -- that your client would have

9  assumed to be complying with regards to those commands.

10         **MR. GRIFFIN:**  Yes.  Thank you, Your Honor.

11         And so -- and I would suggest to the Court that after

12 the Court seeing the videos that was submitted by the defense,

13 even the videos that were submitted by the prosecution team, that

14 it doesn't indicate, once again, the very strong word of

15 "barricading" to suggest that he was trying to elude arrest and

16 would elude coming to court.

17         And I would ask the Court that since that was -- that's

18 what appeared to the defense as the actual determining factor for

19 the Court, I would suggest that now with the new evidence that has

20 come to light, the partial videos submitted by the defense, the

21 body camera that was submitted by the prosecution, that it

22 establishes that there was no barricade.

23         Two quick things.  And although this was not part of the

24 record -- and I apologize to the Court -- I think that's where I

25 grabbed the running from was from the complaint.  So I do

 1  apologize to the Court for attributing that statement to the

 2  prosecution.  But even with that, and when Your Honor signed the

 3  initial warrant, the indication was that he ran.  He didn't run.

 4          And lastly, in addition -- considering local ties, the

 5  government's merely saying, because this business could have been

 6  some type of haphazard just filing of something, I would like to

 7  bring to the Court's attention that there's a host of family and

 8  friends all from the community who are present here in support of

 9  Mr. Engstrom.  I think one of the more important people is

10  Mr. Engstrom's ex-wife, who the Court did acknowledge that

11  Pretrial spoke to and indicated that Mr. Engstrom will be able to

12  return to the home with her.  So I believe this also bolsters

13  Mr. Engstrom's ties to the community.

14          And based on all of that, we would ask the Court to

15  consider releasing Mr. Engstrom on his personal recognizance.  But

16  if the Court needs some type of additional assurance, Mr. Engstrom

17  would not be opposed to a GPS and even if required, reporting to

18  Pretrial Services on a weekly basis.

19          **THE COURT:**  All right.

20          **MR. GRIFFIN:**  Thank you, Your Honor.

21          **THE COURT:**  You're welcome.  I do have a couple of

22  questions for you.

23          Do you want to address the issue of destruction of

24  evidence and the issue of financial means?

25          **THE DEFENDANT:**  Your Honor, would it be possible that

1    I'd speak also, or can I confer with my attorney for one second --

2             **THE COURT:**  So this is what we'll do.  This is what

3    we're going to do.  I will give you, Mr. Griffin, time to speak to

4    your client.

5             I do not know, Mr. Miller, is there a number that

6    Mr. Griffin can call him at?

7             **COURTROOM ADMINISTRATOR:**  Your Honor, there is a number.

8    I did previously provide that to Mr. Griffin before Your Honor

9    came out this afternoon.  We tried a breakout room, and it didn't

10   really seem to work out too well.  So Mr. Griffin can call

11   Mr. Engstrom at the telephone number I previously provided to you.

12            **THE COURT:**  So this is what we'll do.  We will take a

13   five-minute recess so you can have a conversation with your

14   client.

15            Two things that I'm interested in:  One, I do find that

16   the issue of the kinds of finances that he may have access to are

17   problematic to the Court.  I understand that that was not

18   something that I mentioned during my initial order.  However, I am

19   free to review and vacate or, as I said, review my previous order.

20            I got to tell you that the main reason I detained him

21   was based on the arrest conduct, as I mentioned before.  But I do

22   need to consider his finances, any facts to finances,

23   specifically, the information that he provided to Pretrial

24   Services, which is that he had between 8 to $10 million in crypto

25   currency and well over half a million dollars in other assets.

1          So I didn't get to review that information with him, not

2    only as it applies to the issue of detention but also as to

3    whether he's going to have access to the Federal Public Defender's

4    Office from now on.  All right?

5              **MR. GRIFFIN:**  Understood, Your Honor.  Yes.

6              **THE COURT:**  Let's go ahead and take a five-minute

7    recess.

8              **MR. GRIFFIN:**  And I apologize.  You said there was a

9    second issue, Your Honor, was --

10             **THE COURT:**  Those two --

11             **MR. GRIFFIN:**  Oh, those --

12             **THE COURT:**  -- so it's just his finances.

13             **MR. GRIFFIN:**  Okay.  Yes, Your Honor.

14             **THE COURT:**  Thank you.

15             **COURTROOM ADMINISTRATOR:**  All rise.

16        *(A recess was taken from 3:40 p.m. to 3:50 p.m.)*

17             **THE COURT:**  All right.  Mr. Griffin.

18             **MR. GRIFFIN:**  Thank you, Your Honor.

19             Yes.  I was able to speak with Mr. Engstrom during this

20   break, and what he explained to me is that at the time the

21   officers went into his office and, I guess, his home later, they

22   actually seized all of his computers and USB drives.  He explains

23   to me that on those computers and USB drives are his private keys,

24   which gives him access to his crypto.  Because they have these USB

25   drives and computers, he has no access.

Case 2:21-cr-00190-APG-EJY, Document 78, Filed 10/3/21, Page 23 of 29

1        I asked him specifically, Your Honor, So what would

2    prevent you from going to Best Buy, buying another computer, and

3    then going into your crypto?

4        He says he'd specifically need to have these private

5    keys, and since he no longer has access to these private keys, he

6    can't get to his crypto.

7        So that's why he would require the services of the

8    Federal Public Defender's Office is because he doesn't have access

9    to his crypto.

10        I also asked him about the additional -- I think it was

11    over 500,000 in assets.  He indicates that $450,000 were for eight

12    motorcycles, and these eight motorcycles were also confiscated by

13    law enforcement.  Other than that, Your Honor, he says he has some

14    undeveloped land, which is approximately close to maybe 300,000 on

15    the -- I guess, on a good day.  But it's undeveloped land, and he

16    doesn't -- so he doesn't -- that's not liquid money that he has

17    access to.

18        In speaking with Mr. Engstrom, we also talked about the

19    fact of adding the condition that he is not allowed to buy or

20    trade crypto currency during the pendency of this case, until this

21    case is resolved.  So I think that would potentially also add an

22    extra layer of protection to the Court.

23        **THE COURT:**  All right.  What about the house at San

24    Papino Court?

25        **THE DEFENDANT:**  Your Honor, that is the undeveloped

 1  land.

 2        **THE COURT:**  Okay.  All right.  In regards to the

 3  argument by the government regarding the destruction of evidence.

 4        **MR. GRIFFIN:**  Yes, Your Honor.  And I argued this

 5  cautiously because I want to mitigate it at this time.  But what

 6  Mr. Engstrom explains to me is that the layout of this property is

 7  that -- so, I guess, when you -- from the video, there's the main

 8  living area, and then there's the one room, and then he's in the

 9  second back room.

10        He explains that there's actually two entrances to that

11  middle room.  You can go through the door, which we see on the

12  video, but you can also access that room through the garage.

13        There's a -- I'll say this cautiously, Your Honor, so

14  please excuse me.

15        There's a possibility that when one of the other

16  gentlemen went into the garage area, that they could have accessed

17  that middle room and took some actions.  I'm not saying that

18  that's what actually happened --

19        **THE COURT:**  Understood.

20        **MR. GRIFFIN:**  -- but that is a possibility.

21        **THE COURT:**  All right.  All right.  Anything else you

22  would like me to consider, Mr. Griffin?

23        **MR. GRIFFIN:**  Yes.  Lastly, Your Honor, Mr. Engstrom --

24  I don't know if this just came out, I apologize, in the initial

25  hearing, but Mr. Engstrom is, in fact, a senior at UNLV.  He has

Case 2:21-cr-00190-APG-EJY Document 78 Filed 10/3/21 Page 65 of 198

1 received several commendations and awards for his academic

2 progress.  So I think that in addition to the family and friends

3 also shows that he does have strong community ties.

4          **THE COURT:**  All right.

5          **MR. GRIFFIN:**  Thank you.

6          **THE COURT:**  Thank you, Mr. Griffin.

7          Mr. Clarkson, would you like to address mostly the issue

8 of crypto currency?

9          **MR. CLARKSON:**  Yes, Your Honor.  If I could just address

10 a couple things.  Yes.  As far as the crypto currency, I mean, the

11 issue we have with putting a condition as far as limiting his

12 trading, I mean, as Your Honor may know, crypto currency is -- it

13 is anonymous.  It is very difficult to track.  I've actually

14 chatted with Pretrial Services before this hearing, and they

15 acknowledge that they would really have no ability to enforce any

16 such condition to stop somebody from trading, buying, or selling

17 crypto currency.

18          **THE COURT:**  Understood.  No.  My question really -- let

19 me be more specific.  My question has to do with the government

20 having seized all his computers and USB drives.

21          Is that correct?

22          **MR. CLARKSON:**  Your Honor, we certainly seized a fair

23 amount of electronics.  Again, the government's view is that those

24 electronics were used during the carrying out of this drug and

25 money laundering operation, so yes.  There's certainly electronic

1    items that were seized.  I don't have the full list of what was

2    seized from that location.

3          And, Your Honor, if I might just briefly address a

4    couple of things that were brought up by defense counsel.  First,

5    as far as the possibility that the other two defendants could have

6    run out the garage then come back in from the garage to the other

7    room, flush down cocaine, and then run back out into the garage

8    again and flea, one, I think that's just a very tenuous unlikely

9    scenario.

10         But second, this brings us back to something else that

11   was in the government's briefing that I didn't address earlier,

12   which is just that Mr. Engstrom clearly has access to a security

13   camera that was in that back room with him.  He has provided the

14   Court with partial videos from another camera.  You can see on the

15   body cam video, and I know Agent Kurinec himself has gone to that

16   site to confirm that there was another camera in that back room.

17   So he clearly has the ability to resolve any of these

18   uncertainties but appears to be strategically --

19         **THE COURT:**  Yes, of course, because he has a Fifth

20   Amendment right, and the burden is on the government.

21         **MR. CLARKSON:**  Yeah.  I understand, Your Honor.  But I

22   just believe that we have to take that into account when viewing

23   these other videos.

24         And finally, one other thing, Your Honor, as far as

25   defense counsel mentioned going back to live with his ex-wife --

1   and I just wanted to point out to the extent that the defense

2   counsel is referring to the address at -- I believe it's 305 --

3   excuse me, Your Honor.

4          But on the day that the takedown was conducted, law

5   enforcement also exercised a search warrant at 305 Augustine Lane.

6          **THE COURT:**  Uh-huh.

7          **MR. CLARKSON:**  And when they were doing a search warrant

8   there -- I believe that is the residence -- there was a woman

9   there who represented to be Ms. -- Mr. Engstrom's ex-wife.

10          Law enforcement found $15,000 in cash there that was in

11  a cookie tin who the ex-wife denied any knowledge of.  I believe

12  they also spoke to an adult child who lived at the house who

13  claimed that Mr. Engstrom rarely spent time there.

14          So to the extent that that is being put forward as a

15  suitable residence for him to stay at pending his trial, the

16  government has reservations that that would be true, and does not

17  believe that that would be an appropriate residence given the fact

18  that there seems to be unidentified cash there, indicating that

19  maybe Mr. Engstrom was carrying out criminal activity at that

20  residence, as well.

21          Your Honor, with all that, I think the government has

22  put forward what we want to put forward, and we believe there's

23  sufficient evidence still to find by a preponderance that

24  Mr. Engstrom is a flight risk.

25          Thank you, Your Honor.

Case 2:21-cr-00190-APG-EJY Document 78 Filed 10/31/22 Page 28 of 29

1      **THE COURT:**  Thank you.

2           All right.  Mr. Griffin, this is your motion.

3           Anything else you want me to consider?

4       **MR. GRIFFIN:**  Just lastly, I say this cautiously of a

5   commonsense argument as this was represented the adult child -- or

6   the adult person, excuse me, at the residence said that

7   Mr. Engstrom had barely been there so to suggest that the money at

8   the house was of illegal gain of any manner, I think, is

9   unfounded.  And also, that's probably why it would be a good

10  place, because now he would be back with his ex-wife who, I would

11  suggest, probably wouldn't tolerate too much nonsense.

12      **THE COURT:**  All right.  I'm going to take this matter

13  under submission.  I wanted to thank friends and family for being

14  present here today.

15          Mr. Engstrom, as soon as I have a decision, I will go

16  ahead and bring everybody back into court.  Everybody will be

17  allowed to actually appear by way of video, and I will render my

18  decision then.  I would imagine that I'm going to have a decision

19  by the end of this week.

20          So thank you, everyone.

21      **MR. GRIFFIN:**  Thank you, Your Honor.

22      **MR. CLARKSON:**  Thank you, Your Honor.

23      **THE DEFENDANT:**  Thank you, Your Honor.

24      **COURTROOM ADMINISTRATOR:**  All rise.

25          (*Proceedings adjourned at 3:58 p.m.*)

```
 1                          --o0o--

 2        I, Paige M. Christian, a court-appointed transcriber,

 3  certify that the foregoing is a correct transcript transcribed

 4  from the official electronic sound recording of the proceedings in

 5  the above-entitled matter.

 6

 7  Date:  October 31, 2021

 8                           /s/ Paige M. Christian_____

 9                           Paige M. Christian, RPR, CRR, CCR #955
                             Official Court Reporter
10                           United States District Court
                             District of Nevada
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,      )  CASE NO. 2:21-cr-00190-APG-EJY
                                   )
4              Plaintiff,          )  Las Vegas, Nevada
                                   )  Tuesday, August 17, 2021
5        vs.                       )  Courtroom 3B
                                   )
6   PAUL ENGSTROM, VINCENT CUOMO,  )  Recording method:  Liberty/ECRO
    ABRAHAM ELLIOTT, and JOSEPH    )  11:09 A.M. - 11:14 A.M.
7   KRIEGER,                       )
                                   )  MOTION HEARING AS TO
8              Defendants.         )  PAUL ENGSTROM
    _____    )

9                               *C E R T I F I E D   C O P Y*

10

11                       TRANSCRIPT OF PROCEEDINGS

12            BEFORE THE HONORABLE BRENDA N. WEKSLER,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13

14
    APPEARANCES:  (See next page)

15

16  Recorded by:  Araceli Bareng

17  Transcribed by:      PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                         United States District Court

18                       333 Las Vegas Boulevard South
                         Las Vegas, Nevada  89101

19

20

21

22

23

24  Proceedings recorded by electronic sound recording.
    Transcript produced by mechanical stenography and computer.

25

 1  **APPEARANCES:**

 2

 3  For the Government:

 4          *DANIEL CLARKSON, AUSA*
            *CHRISTOPHER BURTON, AUSA*
 5          US ATTORNEY'S OFFICE
            501 Las Vegas Boulevard South
 6          Suite 1100
            Las Vegas, NV 89101
 7          (702) 388-6375
            E-mail: daniel.clarkson@usdoj.gov
 8                  christopher.burton4@usdoj.gov

 9

    For Defendant Paul Engstrom:
10
            *ANNIE YOUCHAH, FPD*
11          FEDERAL PUBLIC DEFENDER'S OFFICE
            411 E. Bonneville Avenue
12          Suite 250
            Las Vegas, NV 89101
13          (702) 388-6577
            E-mail: jawara_griffin@fd.org
14

15

16

17

18

19  ALSO PRESENT: *ERIN OLIVER, PTS; ARMANDO AYALA, PTS;*
                  *DEA SPECIAL AGENT DANIEL KURINEC*
20

21

22

23

24

25

 1          LAS VEGAS, NEVADA; WEDNESDAY, AUGUST 4, 2021; 3:13 P.M.

 2                          P R O C E E D I N G S

 3                              --o0o--

 4          **COURTROOM ADMINISTRATOR:**  Your Honor, good morning.  We

 5  are now calling United States of America vs. Paul Engstrom.  The

 6  case number is 2:21-cr-00190-APG-EJY.

 7          Beginning with government counsel, Counsel, please state

 8  your names for the record.

 9          **MR. CLARKSON:**  Good morning, Your Honor.  Daniel

10  Clarkson for the United States, and also on the line is Chris

11  Burton from my office and also Special Agent Dan Kurinec from the

12  DEA.

13          **THE COURT:**  All right.  Good morning to all of you.

14          **MS. YOUCHAH:**  Annie Youchah on behalf of Jawara Griffin

15  with the Federal Public Defender's Office.

16          **THE COURT:**  Good morning.  Go ahead and have a seat,

17  please.

18          I also see that we have Ms. Oliver and Mr. Ayala from

19  the Pretrial Services Office.  Good morning to all of you.

20          All right.  So I have my order ready for you, and the

21  transcript will serve as your written order in this case.

22          On June 23rd, Mr. Engstrom appeared for his initial

23  appearance and detention hearing.  The Court ordered him detained

24  at that time.

25          Since then, Mr. Engstrom filed a motion to reopen bail

 1   at Document 30, explaining new circumstances existed that were not

 2   known to the movant on June 23rd, 2021.

 3          On August 4th, 2021, the Court accepted the defendant's

 4   proffered information as new information and heard arguments as to

 5   whether Mr. Engstrom should be released.  This matter was set for

 6   today for the Court to issue a ruling.

 7          The Court has considered all of the factors under Title

 8   18 United States Code section 3142(g) in light of the new

 9   information presented.  As stated before, the Court does not

10   believe the government has met its burden to show by clear and

11   convincing evidence that no conditions can be fashioned to

12   reasonably assure the safety of the community.

13          But the Court finds the government has met its burden to

14   show by a preponderance of the evidence that no conditions can be

15   fashioned to reasonably assure Mr. Engstrom's appearance despite

16   the information provided.  The Court relies on the same rationale

17   it did previously and continues to rely primarily on the arrest

18   conduct for its decision.

19          The Court agrees with defendant that there is no

20   evidence that Mr. Engstrom ran into the room once the police

21   arrived in order to hide.  The Court also agrees with the

22   defendant that the defendant never barricaded himself.  It is not

23   clear why defendant did not come out of the room once ordered to

24   do so.

25          On the one -- excuse me.  On the one hand, he may have

 1  been responding to earlier commands to stay away from the doors

 2  and windows.  On the other hand, the reason for noncompliance may

 3  have been that he was destroying evidence, given there was drug

 4  residue on the toilet seat from which it is believed drugs were

 5  flushed down.

 6          In addition, there's evidence to suggest the defendant

 7  did lock himself into that room.  First, the co-defendants

 8  attempted to enter into that room once the police arrived, which

 9  indicates that the room typically would have been unlocked, and as

10  the Court mentioned earlier, there's credible evidence that the

11  defendant was destroying evidence after the police's arrival.

12          While the Court focused mainly on the arrest conduct on

13  June 23rd to make its determination, the Court would like to note

14  that the financial means of Mr. Engstrom are also of concern to

15  the Court.  While defendant represented that all assets and

16  computers where crypto currency keys would be found were seized by

17  the government, the Court is hard pressed to believe that the

18  defendant cannot access those keys in any other way.

19          While the Court has considered all of the favorable

20  information regarding the defendant's ties to the community, which

21  were already made part of the record on June 23rd and the Court

22  also appreciates the family support he has as made clear by the

23  presence of his family and friends during the last hearing, the

24  Court is reminded that this is after all a presumption case.

25  While the new information has moved the needle somewhat in favor

 1  of defendant, it has not moved it enough for the Court to find

 2  that the government has not met its burden.

 3          For those reasons, the motion at Document 30 is denied.

 4          Ms. Youchah, any questions with regard to my order?

 5          **MS. YOUCHAH:**  No, Your Honor.  Thank you.

 6          **THE COURT:**  Mr. Clarkson, any questions?

 7          **MR. CLARKSON:**  No, Your Honor.

 8          **THE COURT:**  All right.  Very well.  That takes care of

 9  this hearing.  Thank you, everyone.

10          **COURTROOM ADMINISTRATOR:**  All rise.

11          (*Proceedings adjourned at 11:14 a.m.*)

12                          --o0o--

13      I, Paige M. Christian, a court-appointed transcriber,

14  certify that the foregoing is a correct transcript transcribed

15  from the official electronic sound recording of the proceedings in

16  the above-entitled matter.

17

18  Date:  October 31, 2021

19                          /s/ Paige M. Christian_____

20                          Paige M. Christian, RPR, CRR, CCR #955
                            Official Court Reporter
21                          United States District Court
                            District of Nevada
22

23

24

25

Paul Engstrom
2190 E. Mesquite Ave
Pahrump, NV 89060
*In Proper Person*

FILED _____   RECEIVED _____
ENTERED _____   SERVED ON _____
COUNSEL/PARTIES OF RECORD

OCT - 6 2021

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

Plaintiff,

VS.

PAUL ENGSTROM

Defendant,

CASE NO: 2:21-cr-00190-APG-EJY

**Motion for District Judge Review of Magistrate Judge's Detention Order**

CERTIFICATION: This motion is timely.

    This motion is filed by Paul Engstrom, in proper person, for the purpose of requesting that the District Court review the Magistrate Judge's Order of Detention pursuant to § 18 U.S.C. § 3145(b). The Magistrate Judge ruled that Mr. Engstrom was not a danger to the community, but found that Mr. Engstrom had not rebutted the rebuttable presumption of detention pertaining to risk of flight[1] (ECF No. 11), and therefore detained Mr. Engstrom pending trial. This motion is based on the following Memorandum of Points and Authorities.

---

[1] The Detention Order (ECF No. 11) also states that the defendant must be detained pending trial because the Government has proven by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the person as required. This finding is unnecessary when the rebuttable presumption is unrebutted.

1

074

# MEMORANDUM OF POINTS AND AUTHORITIES

## A.    Procedural Background

On June 23, 2021, Mr. Engstrom made his initial appearance on a Criminal Complaint charging him with one count of Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) and one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). This case triggers the rebuttable presumption in favor of detention under 18 U.S.C. § 3142(e)(3), and therefore a detention hearing was held during the initial appearance. At the June 23, 2021 hearing Magistrate Judge Weksler found that Mr. Engstrom was not a danger to the community. ECF No. 11 (Detention Order). Magistrate Judge Weksler found, in relation to risk of flight, that "The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis." *Id.* This finding was stated by the Court to be primarily based on Mr. Engstrom's arrest conduct, specifically stating "It's main concern was the arrest conduct of Mr. Engstrom barricading himself in a room." (Detention Hearing 6/23/2021 at 15:20). Mr. Engstrom disputed the Government's proffered testimony that he had barricaded himself. After canvassing the AUSA regarding their proffered testimony, the Court chose to rely on the information provided by the US Attorney, as an officer of the court, as true. Magistrate Judge Weksler stated that she would be willing to reconsider her finding if additional information was provided.

The grand jury subsequently returned a nine-count Indictment, which charged Engstrom with eight counts relating to the illegal distribution of cocaine and one count of Conspiracy to Commit Money Laundering. ECF No. 17.

On July 29, 2021, Mr. Engstrom, through counsel, filed a Motion to Reopen Detention (ECF No. 30). Magistrate Judge Weksler found that there was new information presented that had a material bearing on the issue of whether Mr. Engstrom was a flight

2

075

1  risk and reopened detention, setting a hearing for August 4, 2021. This new information

2  consisted of videos provided by a third-party. These videos depicted the events inside 6145

3  Harrison Drive #4 during the execution of the search warrant and arrest of Mr. Engstrom,

4  and directly contradicted the Government's proffered testimony. After considering the new

5  information, Magistrate Judge Weksler ruled on August 17, 2021, orally denying the

6  motion and find that the Government had continued to prove, by a preponderance of the

7  evidence, that no condition or combination of conditions will reasonably assure the

8  appearance of the person as required.

9       On August 26, 2021, Mr. Engstrom filed a Notice of Waiver of Counsel. On August

10  27, 2021, Magistrate Judge Youchah set a *Faretta* hearing for September 22, 2021, to

11  determine if Mr. Engstrom's waiver of counsel was knowing, intelligent, and unequivocal.

12  Mr. Engstrom, acting pro se, filed a Motion for District Court Review of Magistrate

13  Judge's Detention Order (ECF No. 49) on August 30, 2021. Additionally, Mr. Engstrom

14  filed a Supplement to that motion on September 7, 2021. ECF No. 51. The government

15  moved to strike Mr. Engstrom's  Motion for District Court Review of Magistrate Judge's

16  Detention Order on September 2, 2021. ECF No. 50. Magistrate Judge Youchah granted

17  the government's motion to strike on September 17, 2021 (ECF No. 53), further ordering

18  that if Defendant's motion to dismiss counsel and represent himself is granted, Defendant

19  may thereafter refile his motion seeking review of the detention order. *Id.* Mr. Engstrom's

20  Motion to represent himself was granted on September 22, 2021. This Motion is filed, as

21  allowed by Magistrate Judge Youchah's order, and is a consolidation of Defendant's Motion

22  for District Court Review of Magistrate Judge's Detention (ECF No. 49) and the

23  corresponding supplement (ECF No. 51).

24

25  **B.    Legal Standard**

26       A person "ordered detained by a magistrate judge, or by a person other than a judge

3

1  of a court having original jurisdiction over the offense and other than a Federal appellate

2  court . . . may file, with the court having original jurisdiction over the offense, a motion for

3  revocation or amendment of the order. The motion shall be determined promptly." 18

4  U.S.C. § 3145(b). Under this provision, the district court conducts its own de novo review

5  of the magistrate judge's detention order. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th

6  Cir. 1990). The district court "should review the evidence before the magistrate and make

7  its own independent determination whether the magistrate's findings are correct, with no

8  deference." *Id.* at 1193. "[T]he district court, while empowered to do so, is not required to

9  hold an evidentiary hearing when no evidence is offered that was not before the

10  magistrate." *Id.* This request for review of the Magistrate Judge's Order of Detention is

11  made in accordance with Local Rule LCR 12-3.

12      In this case, there is a rebuttable presumption in favor of detention under 18 U.S.C.

13  § 3142(e)(3). This presumption "shifts a burden of production to the defendant," United

14  States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008), which requires the defendant to produce

15  "some evidence" that there are conditions that would reasonably assure his or her

16  appearance and the community's safety, United States v. Jessup, 757 F.2d 378, 384 (1st Cir.

17  1985). "The burden of production is not a heavy one to meet" and "[a]ny evidence

18  favorable to a defendant that comes within a category listed in § 3142(g) can affect the

19  operation of . . . the presumption." United States v. Dominguez, 783 F.2d 702, 707 (7th Cir.

20  1986).

21

22      After the burden of production has been met, the release or detention of a defendant

23  pending trial in Federal Court is governed by 18 U.S.C. § 3142.  18 U.S.C. § 3142(a)

24  provides as follows:

25      a) In general. Upon the appearance before a judicial officer of a person

26          charged with an offense, the judicial officer shall issue an order that,

4

pending trial, the person be—

1. Released on personal recognizance or upon execution of an unsecured appearance bond, under subsection (b) of this section;

2. released on a condition or combination of conditions under subsection (c) of this section;

3. temporarily detained to permit revocation of conditional release, deportation, or exclusion under subsection (d) of this section; or

4. detained under subsection (e) of this section.

The act requires a progression from one choice to the next in a judicial officer's determination of whether pretrial detention is called for. See *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985) (en banc). Only after determining that release upon personal recognizance or an unsecured appearance bond will not reasonably assure appearance or will endanger the safety of others (see 18 U.S.C. § 3142(b)), may the judicial officer then proceed to consider the conditions set out in section 3142(c)(1)(B). See *United States v. Maull*, 773 F.2d 1479, 1482 (8th Cir. 1985). The factors to be considered by the judicial officer in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person in the community are enumerated in 18 U.S.C. § 3142(g).

## C.     Argument

### a.     Rebuttable Presumption

It is undisputed that this case triggers the rebuttable presumption in favor of detention under 18 U.S.C. § 3142(e)(3). A rebuttable presumption is defined as:

- A presumption which is not conclusive but may be overcome by opposing evidence. 30 Am J2d Ev § 1165. A provisional procedural assumption of a fact which is prescribed by a rule of a substantive law. Simpson v Simpson, 162 Va 621, 175 SE 320, 94 ALR 909. An assumption of facts made because common experience has established that they ordinarily exist where the basic facts from which the assumption arises have been established, but which may, in truth and fact, not exist at all." (Ballentine's Law Dictionary, 3rd Edition)

5

1    Defendant argues that he has rebutted the presumption that he is a flight risk by
2    proffering that the criteria contemplated by Congress, as shown in the legislative history of
3    the Bail Reform act of 1984 (BRA) do not apply to defendant. Specifically, the legislative
4    history shows that Congress found that persons charged with major drug offenses "have
5    both the resources and foreign contacts to escape to other countries with relative ease in
6    order to avoid prosecution for offenses punishable by lengthy prison sentences," see S.
7    Rep. No. 225, 98th Cong., 1st Sess. 19 (1983) 20, 23-24 and "The drug offender/flight
8    presumption seems a reasonable response to this general problem, requiring that a charged
9    drug offender produce some evidence that he does not present a special risk and then
10   requiring the magistrate to review the matter with Congress's general findings in mind."
11   See, e.g., "Bail Reform," Hearings Before the Subcommittee on the Constitution of the
12   Senate Judiciary Committee, 97th Cong., 1st Sess., Sept. 17, Oct. 21, 1981 at 67, 70
13   (Comm. Print 1982).
14
15       As evidenced by the legislative history the basis for the rebuttable presumption that
16   "no condition or combination of conditions will reasonably assure the appearance of the
17   person as required" (18 U.S.C. § 3142(e)(3)) is based on the assumption that major drug
18   offenders have *both* the resources and foreign contacts to escape to other countries with
19   relative ease in order to avoid prosecution. Mr. Engstrom has neither the resources nor the
20   foreign contacts contemplated by congress to presume an underlying propensity to flee
21   prosecution. Mr. Engstrom proffers the following.
22       Mr. Engstrom does not have the resources to flee. Although defendant did/does
23   have substantial crypto holdings, which he acquired as far back as 2010, all computers,
24   USB drives and hardware wallets that contain the private keys necessary to transfer or sell
25   those holdings were seized by the government. Subsequent to Defendant's August 4, 2021,
26   detention hearing, Defendant has received Administrative Forfeiture notices from the DEA

6

1   on August 19, 2021 and August 23, 2021, for a variety of different crypto holdings that

2   were seized on June 21, 2021. This is further evidence that the government seized the

3   private keys required to transfer the defendants crypto holdings and defendant contends

4   that this would constitute "new information" that is material to the question of whether Mr.

5   Engstrom is a flight risk.

6        Mr. Engstrom does not have the foreign contacts, nor does he have the propensity to

7   flee. Mr. Engstrom does not, nor has he ever had a passport. He has never traveled outside

8   of the United States and does not have any foreign contacts. Government has not argued

9   that Mr. Engstrom has any foreign contacts, nor has the Government offered evidence that

10  defendant has the ability or the propensity to flee.

11       In addition to the information proffered above, the defendant argues that his

12  substantial ties to the Las Vegas community additionally rebut the presumption of flight

13  risk, where he has lived in Las Vegas since 2007; he has a close relationship with his

14  significant other, who has lived in Las Vegas her entire life, whom he met in 2009 and

15  married in 2010; he has operated an ATM business in Las Vegas since 2018; he is a senior

16  at University of Nevada – Las Vegas, where he maintains a 4.0 GPA and has been admitted

17  to three national honor societies; and he has the support of family, friends and members of

18  the community, all who attended his detention hearing on August 4, 2021. Defendant has

19  also shown the ability to abide by conditions of release. Defendant's previous exemplary

20  conduct while on supervision caused the court to grant early termination in accordance

21  
22  with 18 U.S.C. § 3583(e)(1).

23       Considering the above, the court should find that the defendant's proffered evidence

24  has rebutted the rebuttable presumption that he is a flight risk. The court should also find

25  that Magistrate Judge Weksler's finding that "The defendant has not introduced sufficient

26  evidence to rebut the presumption above, and detention is ordered on that basis" (ECF No.

7

11) is clearly erroneous. As the Magistrate Judge details in the "OTHER REASONS OR FURTHER EXPLANATION," *Id.* Mr. Engstrom proffered the above rebuttal evidence at the his initial detention hearing on June 23, 2021. This information should be deemed sufficient to meet the burden of production required.

Additionally, the government has not sufficiently surrebutted defendant's evidence. The burden of persuading the Court that the defendant is a flight risk lies with the government. Defendant argues that the government has not established that defendant is a flight risk by the preponderance of the evidence.

**b.** **Consideration of 18 U.S.C. § 3142(g) Factors**

The Defendant argues that consideration of the factors enumerated under 18 U.S.C. § 3142(g) were unnecessary relative to the findings of Magistrate Judge Weksler. 18 U.S.C. § 3142(g) factors only become relevant if the court finds that a defendant has rebutted the rebuttable presumption enumerated in 18 U.S.C. § 3142(e)(3) and is found to be a flight risk or danger to the community precluding release under 18 U.S.C. § 3142(a)(1) and (b), therefore progressing to the possibility of release on a condition or combination of conditions in accordance with 18 U.S.C. § 3142(a)(2). See *supra.*

In this case, according to Magistrate Judge Weksler's findings, the consideration of the 18 U.S.C. § 3142(g) factors are not necessary for either risk of flight or danger to the community. Magistrate Judge Weksler found that Mr. Engstrom is not a danger to the community. See June 23, 2021 Detention Hearing and ECF No. 35 p. 6 footnote 4 (Government's Response to Opposition to Defendant's Motion to Reopen Detention). In regards to the question of risk of flight, Magistrate Judge Weksler found that "The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis" (ECF No. 11).

Judge Weksler's finding that Mr. Engstrom is not a danger to the community deems

8

him eligible for release on a personal recognizance or unsecured appearance bond in accordance with 18 U.S.C. § 3142(a)(1) and (b), subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000. As such, 18 U.S.C. § 3142(g) factors need not be considered insofar as they relate mitigating danger to the community.

Judge Weksler's finding that, as related to risk of flight, Mr. Engstrom had not introduced sufficient evidence to rebut the rebuttable presumption triggered in this case, stops the inquiry prior to the consideration of the possibility of release under 18 U.S.C. § 3142(a)(2), deeming consideration of the factors enumerated in 18 U.S.C. § 3142(g) unnecessary as they relate to risk of flight.

Defendant requests that, if this court determines that consideration of the factors enumerated in 18 U.S.C. § 3142(g) are necessary to determine his eligibility to be granted pretrial release, he be allowed to proffer additional evidence at a hearing or through a supplemental filing. The right to present such evidence at detention hearings is guaranteed by 18 U.S.C. § 3142(f)(2)(B), which allows that "The person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise."

c.    **Misplaced Burden of Persuasion Placed Upon Defendant**

The Magistrate Judge stated in their oral ruling denying defendant's Motion to Reopen Detention that the new information provided, specifically that defendant had not fled to a back office and had not barricaded himself (which were the specific actions the Magistrate Judge stated the defendant could not overcome that warranted detention in the initial detention hearing), but "While the new information has moved the needle somewhat

082

1   in favor of defendant, it has not moved it enough for the Court to find that government has

2   not met it's burden." See August 17, 2021 Detention Hearing at 3:54. It should be noted

3   that defendant stated at his initial detention hearing that he had followed the announced

4   instructions to "stay away from all doors and windows," was arrested without incident, and

5   denied that he had barricaded himself, but the Magistrate Judge relied on the hearsay

6   evidence presented by the DEA Agent in the complaint as being credible and relied on

7   AUSA's representation as told by the agent, stating "the Court relies on the US Attorney, as

8   an officer of the court, that the information is true." ECF No. 11. After being presented

9   with evidence at the second detention hearing that Mr. Engstrom did not flee, barricade

10  himself in a room, nor fail to follow instructions to leave the room, the Magistrate Judge

11  admonished the Government for arguing that defendant barricaded himself and the DEA

12  Agent for making false statements in the Criminal Complaint, a sworn declaration.

13          The "moved the needle" statement made by the Magistrate Judge implies that the

14  burden of persuasion to prove that release is warranted falls upon the defendant, but

15  established case law shows that is not the case. "Although the presumption shifts a burden

16  of production to the defendant, the burden of persuasion remains with the government."

17  *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). It is not defendant's burden to

18  persuade the court that release is appropriate, but the Government's burden to persuade that

19  detention is necessary. If the Magistrate Judge was relying on the defendant to "move the

20  needle" in favor of pretrial release, this implies that the Court was mistakenly requiring the

21  defendant to persuade the Court in favor of release.

22          There is also considerable caselaw supporting that, outside of a clearcut showing by

23  the Government that detention is warranted, the presumption is that the defendant should

24  be released. see *United States v. Gebro*, 948 F.2d at 1121 (9th Cir. 1991), quoting United

25  *States v. Motamedi*, 767 F.2d at 1405. (9th Cir. 1985) "Only in rare circumstances should

26

10

release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor."; see also *United States v. Hurtado*, 779 F.2d at 1470 n.4 (11th Cir. 1985) (if defendant has presented evidence to rebut section 3142(e) presumption, "when the government's showing is not clearcut, the presumption is that the defendant should not be detained"). The Supreme Court found that "doubts regarding the propriety of release should be resolved in the favor of the defendant" in *Herzog v. United States*, 99 L. Ed. 1299, 75 S. Ct. 349, 351 (1955). The Ninth Circuit cited this finding in *Motamedi*, 767 F.2d at 1405, establishing that this standard continues to apply post Bail Reform Act of 1984.

### d. Government's Reliance on Presumption Alone

Simple restatement of the elements of the underlying case that trigger the statutory rebuttable presumption, without rebutting the evidence the defense produces to rebut the presumption, is insufficient to carry the burden of persuasion. "Rebuttable presumption of 18 USCS § 3142 allowing pretrial detention of defendant charged with serious narcotic offense upon finding that defendant presents either risk of flight or danger to community places on defendant only burden of production of evidence tending to rebut presumptions and requires government to rebut defendant's evidence," and "government may not rely on presumption alone" to rebut defendant's evidence. *United States v. Moore*, 607 F. Supp. 489 (N.D. Cal. 1985). Outside of the argument that the defendant barricaded himself on the day of his arrest, which the Magistrate found to be false and accordingly admonished the government, the government's arguments in favor of the defendants pretrial detention consist of nothing more than restatement of the criteria which trigger the rebuttable presumption under 18 U.S.C. § 3142(e)(3).

### e. Due Process Violation

Magistrate Judge Weksler's finding that Mr. Engstrom might have ways to access the private keys necessary to transfer or spend his crypto holdings, despite Mr. Engstrom's

084

proffered testimony that he does not have access to the private keys and the Governments

admitted seizure of all of Mr. Engstrom's computers, USB drives and hardware wallets,

violates Mr. Engstrom's due process rights. Mr. Engstrom is entitled to a detention hearing

in front of a neutral decisionmaker. Magistrate Judge Weksler's finding that Mr. Engstrom

may still have access to his crypto keys was  made absent of any like argument by the

Government. This violates Mr. Engstrom's due process rights under the United States

Constitution, where, as stated in *United States v. Salerno*, 481 U.S. 739, 747, 95 L. Ed. 2d

697, 107 S. Ct. 2095 (1987), Mr. Engstrom is entitled to a hearing described as "a full-

blown adversary hearing, the Government must convince a neutral decisionmaker by clear

and convincing evidence that no conditions of release can reasonably assure the safety of

the community or any person." *Id.* 481 U.S. At 750. Simply put, Magistrate Judge Weksler

is charged with being a neutral decisionmaker, meant to make rulings based on arguments

that are presented by the two adversaries, the plaintiff and the defendant. By making a

finding based on an argument that was not presented by the Government, Magistrate Judge

Weksler has shown not to be the neutral decisionmaker that Mr. Engstrom is entitled, but

instead, an additional adversary.

On August 19, 2021 and August 23, 2021, Mr. Engstrom received Notices of

Administrative Forfeiture for numerous crypto coins that were seized by the DEA on June

21, 2021. This is further evidence that supports Mr. Engstrom's August 4, 2021 proffered

testimony that he no longer has access to his crypto holdings – furthering the argument to

show that the Government has seized control of Mr. Engstrom's crypto holdings.

**f.    Obstruction of Justice**

Magistrate Judge Weksler's finding that defendant **may** have obstructed justice by

flushing drugs after the onset of search warrant is an error of both law and fact. This

finding was stated in Judge Weksler's oral ruling on August 17, 2021, at 2:42 and used as a

basis for her finding that defendant's "arrest conduct" weighed in favor of detention.

## I. Error of Law

Obstruction of justice, if it occurs, is a consideration when determining if a defendant is a danger to community, not a flight risk. See *United States v. Mancuso*, 726 F. Supp. 1210 (D. Nev. 1989), " It appears that the Court may consider obstruction of justice and tampering with witnesses as factors in determining the issue of safety (see *United States v. Knight*, 636 F. Supp. 1462 at 1467 (S.D. Fla. 1986)), but that the law requires in addition to obstruction itself a finding of a threat to physical safety, physical or psychological coercion, threat of harm to property, economic harm or the like before the Court may find a danger to the safety of any other person or the community." Obstruction of justice, as considered in the context of whether a defendant is a danger to the community, requires the finding meet the clear and convincing standard of burden of proof. Magistrate Judge Weksler mistakenly applied the lesser preponderance of the evidence standard to her finding. A finding of obstruction, absent a finding that defendant is "likely to commit those same offenses again during the course of the proceedings," is insufficient to find that defendant poses a safety risk. *United States v. Demmler*, 523 F. Supp. 2d 677 (S.D. Ohio 2007). The showing of the Government that the defendant obstructed justice is not clearcut, therefore "The doubt must be resolved in his favor." *United States v. Gebro*, 948 F.2d at 1121 (9th Cir. 1991).

## II. Error of Fact

First and foremost, there is no evidence that drugs were in fact flushed down the toilet in question and the government has produced no evidence that Mr. Engstrom committed such an act. In the alternative, it seems more likely, considering the entirety of the evidence available, that the metal pan in question was jostled by the explosion of the charges that breached the front door, displacing it from where it was set on the tank of the

13

1 toilet, knocking it down to the bowl of the toilet and then to the ground. This would

2 explain how spoons ended up sitting in the toilet bowl, whereas they would have been

3 flushed down if the toilet had been flushed.

4      Magistrate Judge Weksler states in the August 17th ruling, "and as the Court

5 mentioned earlier there is credible evidence that the defendant was destroying evidence

6 after the polices arrival." at 3:06. It would be impossible for Mr. Engstrom to be in the

7 bathroom destroying evidence when the HPD took control of that area of the office twenty-

8 three seconds after entering the premises. Furthermore, Magistrate Judge Weksler's finding

9 that there was "credible evidence that the defendant was destroying evidence," fails to

10 reach the clear and convincing burden of proof required to find that obstruction of justice

11 occurred. See *United States v. Mancuso*, 726 F. Supp. 1210 at 1213 (D. Nev. 1989) "It

12 appears that the Court may consider obstruction of justice and tampering with witnesses as

13 factors in determining the issue of safety." Defendant argues that a finding of "credible

14 evidence" does not satisfy the clear and convincing burden of proof required to find that

15 Mr. Engstrom obstructed justice by flushing drugs. Therefore, this finding should be found

16 to be clearly erroneous and disregarded when considering Mr. Engstrom's release pending

17

18 trial.

19      Magistrate Judge Weksler's finding that Mr. Engstrom may have accessed to the

20 bathroom because one of the two doors leading to the room with access to it was locked

21 does not meet the burden of clear and convincing evidence, especially considering the

22 Magistrate also stated on the record that the defendant was likely in the office prior to the

23 arrival of officers serving the search warrant.

24      The government's assertion that because, prior to fleeing to the garage area, one or

25 both of defendants co-defendants attempted to open one of the doors leading to the room

26 that accessed the bathroom, finding it locked, leads to the conclusion that  Mr. Engstrom

had exclusive access to said bathroom, purposely misled the court. The government failed

to acknowledge or disclose that there was another door in the garage area that lead to the

same room, and provided a  closer path to the bathroom in question.

The Government failed to prove by clear and convincing evidence that obstruction

of justice occurred. Even assuming in arguendo that obstruction of justice did occur there

is not clear and convincing evidence that Mr. Engstrom is culpable.

**g.    Defendant's Arrest Conduct**

At the initial detention hearing on June 23, 2021, the record shows that Magistrate

Judge Weksler's finding that Mr. Engstrom was a flight risk and that no condition or

combination of conditions will reasonably assure the appearance of the person as required

is primarily based on Mr. Engstrom's arrest conduct as proffered by DEA Agent Daniel

Kurinec through the AUSA. Agent Kurinec, in his sworn criminal complaint states

"Engstrom fled to a back office, locked the door, and refused commands to exit the office."

(see 2:21-mj-00537-BNW ECF No. 1 at 11) and that "Engstrom was trying to hide from

law enforcement." *Id.* at 12. The Court noted (see ECF No. 11):

> •    The defendant's ties to the communities are strong and he has been in Las
> Vegas, NV since 2007. There is conflicting information as to where the
> defendant has been residing, but ultimately there is information that the
> defendant can return to his residence and he has a long-established
> residence here. The defendant owns and works at his own business and can
> return to work if released.

and,

> •    What cannot be overcome is the risk of flight given the arrest conduct by
> the defendant in this case, which includes that the defendant barricaded
> himself in his house. While the defendant denies the allegation, the DEA
> Agent that informed the court as to the co-defendants has provided an
> account that the Court deems credible and the Court relies on the US
> Attorney, as an officer of the court, that the information is true.

Based on this information, the Court found that Mr. Engstrom was a flight risk.

Specifically, the Court stated, "It's main concern was the arrest conduct of Mr. Engstrom

barricading himself in a room." (Detention Hearing 6/23/2021 at 15:20).

15

Defendant, through counsel, filed a Motion to Reopen to Detention on 7/29/2021 (ECF No. 30). This motion was granted to the extent that the detention hearing was reopened based on the new information presented that had a material bearing on the issue of whether the defendant was a flight risk. This new information consisted of video's showing that Mr. Engstrom did not flee to a back office, did not barricade himself, and did not refuse commands to exit the office, contradicting the assertions made by the DEA Agent and the AUSA at the initial detention hearing. At the reopened detention hearing on 8/4/2021 Magistrate Judge Weksler found that Mr. Engstrom did not flee to the office he was eventually found in, and was likely in that office prior to the arrival of the SWAT Team executing the search warrant; that he did not barricade himself in the office, specifically finding that there was no barricade and that the door was very possibly locked prior to the arrival of the SWAT Team; that it was not clear that Mr. Engstrom failed to follow instructions to exit the office, and was likely acquiescing to the repeated directions to "stay away from all doors and windows." At this hearing, after questioning the veracity of the DEA Agent's statements regarding Mr. Engstrom's conduct on the day of his arrest, and after finding that Mr. Engstrom did not barricade himself as represented by the DEA Agent and the AUSA at the initial hearing, the Court admonished both the AUSA and the DEA Agent.

Mr. Engstrom argues that there is nothing regarding his conduct on the day of his arrest that supports a finding that he is a flight risk. Mr. Engstrom was taken into custody without incident, did not resist arrest, and did not attempt to flee. Mr. Engstrom was following instructions that were repeatedly stated over loudspeaker to "stay away from all door and windows." After hearing multiple explosions Mr. Engstrom stood in the middle of the room in which he was located and waited for the SWAT Team. Being able to hear some instructions given to the other occupants of the building, Mr. Engstrom understood that the

16

1   SWAT Team to be occupied with taking Mr. Elliott and Mr. Cuomo, who were apparently

2   located in the garage, into custody. The video provided by the Government in discovery

3   labeled 21_11265_06_21_2021_13_47_48_Forest_Shields.mp4 (ECF No. 36 Ex. A)

4   reinforces this version of events, showing that after securing Cuomo and Elliott the

5   members of the Henderson SWAT Team turned their attention to "taking" the back office

6   where Mr. Engstrom was located. Although audio for this video doesn't start until 59

7   seconds have elapsed, there is 15 seconds of audio recorded prior to the breach of the back

8   office. In those 15 seconds the members of the SWAT Team make no commands to exit the

9   office, nor do they announce their intent to enter the office, prior to breaching the office

10   door with a sledgehammer (*Id.* at 0:01:18). After entering the office Mr. Engstrom is

11   removed without incident and handcuffed, with one of the SWAT Team members telling

12   Mr. Engstrom "Good Job" in regards to his compliance with their orders (*Id.* at 0:01:58).

13

       **h.**    **Use of Hearsay**

14

15       As in a preliminary hearing for probable cause, the government may proceed in a

16   detention hearing by proffer or hearsay. *United States v. Cardenas*, 784 F.2d 937, 938 (9th

17   Cir. 1986) In a detention hearing, the magistrate judge determines the weight of the proffer

18   or whether other information, evidence or testimony is warranted. *United States v.*

19   *Acevedo-Ramos*, 755 F.2d 203, 208 (1st Cir. 1985) "The rules concerning admissibility of

20   evidence in criminal trials do not apply to the presentation and consideration of

21   information at the hearing." 18 U.S.C. § 3142(f). However, the judicial officer should make

22   efforts to determine the reliability of such hearsay. *Acevedo-Ramos*, 755 F.2d at 207.

23   Without a proffer from the defendant that the government's proffered information is

24   incorrect, the magistrate judge is not required to allow the defendant to cross-examine the

25   investigators and police officers. *United States v. Winsor*, 785 F.2d at 755 (9th Cir. 1986).

26       The defendant denied the Government's version of events surrounding his arrest, as

1  offered by proffer at his initial detention hearing. Additionally, defendant offered evidence

2  that called into question the reliability or correctness of the Government's proffer. This

3  additional evidence directly contradicted the hearsay testimony that was proffered by the

4  AUSA as provided by DEA Agent Kurinec, some of which was provided to Kurinec by

5  various members of the Henderson Police Department SWAT Team. At the Detention

6  Hearing held on 8/4/2021, after directly questioning DEA Agent Kurinec, Magistrate Judge

7  Weksler found that the hearsay testimony provided at the initial detention hearing was not

8  reliable, and additionally found that DEA Agent Kurinec made false statements under oath

9  in the Criminal Complaint he swore out to Magistrate Judge Weksler on 6/22/2021. At this

10  hearing the Court admonished both the AUSA and the Agent Kurinec.

11       Nevertheless, at the detention hearing held on 8/4/2021 the Government continued

12  to rely on hearsay evidence from the same sources. Specifically, testimony provided to the

13  AUSA from Henderson SWAT Team members, regarding what occurred during the

14  execution of the search warrant and the arrest of Mr. Engstrom on 6/21/2021. This

15  testimony should be disregarded, not only because it has proven to be unreliable, but also

16  due to the fact that the proffered testimony is not supported by the bodycam videos

17  provided by the Government. These videos, which cover the entirety of the execution of

18  the search warrant of 6145 Harrison Drive, at no point provide evidence that Mr. Engstrom

19  was ordered or commanded to exit the office he was in, yet the Government proffered at

20  the 8/4/2021 hearing that one of the member of the SWAT Team had told either DEA Agent

21  Kurinec or the AUSA that he had made such a request. The AUSA conceded at the hearing

22  that the request to exit the office could not be heard on the provided bodycam footage, but

23  still asked the Court to accept the hearsay evidence that a request to exit the office had

24  occurred.

25       The defendant requests that the Court find all hearsay evidence provided by DEA

26

091

Agent Kurinec and the members of the Henderson SWAT Team unreliable and require any future testimony from those parties to be made live, under oath, and subject to cross-examination.

     **i.**     **Additional Objections to Magistrate Judge Weksler's August 17, 2021 Oral Ruling**

     **I.**     **Magistrate Judge Judge Weksler's Finding that Mr. Engstrom Was Ordered to Exit the Office From Which He Was Located is Clearly Erroneous**

There is a dispute of fact as to whether Mr. Engstrom was ever ordered or commanded to leave the room from which he was located when the Henderson Police Department SWAT Team performed their search warrant on 6145 Harrison Unit 4. This is conduct that Magistrate Judge Weksler has expressly stated was critical in her decision to detain Mr. Engstrom as a flight risk. See August 17th, 2021 hearing at 2:03 where Magistrate Judge Weksler states "The Court relies on the same rationale it did previously and continues to rely primarily on the arrest conduct for its decision," explaining her reason for finding that no conditions can be fashioned to reasonably assure Mr. Engstrom's appearance. Magistrate Judge Weksler also appears to make a finding of fact that Mr. Engstrom was ordered to leave the room he was in and failed to do so. See *Id.* at 2:26 "It is not clear why defendant did not come out of the room when ordered to do so." Mr. Engstrom objects to this finding, and argues that there is no evidence that Mr. Engstrom was ordered to leave the office he was in – and that he was in fact following instructions to stay away from doors and windows. Additionally, defendant argues that Magistrate Judge Weksler's finding in regards to why Mr. Engstrom did not exit the room he was in is speculative, not supported by fact, and in fact impossible.

19

## II. Mr. Engstrom was Not Commanded or Ordered to Exit the Office From Which He was Located

Mr. Engstrom proffers that the only commands he ever heard directed towards him during the service of the search warrant, prior to when the police breached the door to the office he was in, were to "stay away from the doors and windows," and "Occupants of unit four, step away from all windows and doors." These commands were stated over loudspeaker eight times, five times prior to the detonation of the charges that breached the front door and window, and three times after the front door was breached. See the Government provided bodycam footage titled 21_11265_439S (2).mp4 (ECF No. 36. Ex. A. 21_11265_439S (2).mp4) at 6:42 (three times), at 6:51 (two times), and at 7:19 (three times after the breach.). It is unclear what evidence Magistrate Judge Weksler relied upon to find that Mr. Engstrom was ordered to exit the office. At the hearing held on August 4th, 2021, for the Motion to Reopen Detention, the Government conceded that there were no discernible commands directed at Mr. Engstrom to exit the office on the bodycam video they provided. The proffered hearsay evidence that a Henderson Police Department (HPD) Officer had stated that he had made such a demand at around the 8:20 mark in one of the bodycam videos they provided, but also conceded that what the officer says is unintelligible in the video. Defendant was able to find what he believes to be the announcement the Government is relying on at 8:08 of the bodycam footage titled 21_11265_439S (2).mp4. Here, after breaching the first inner door that leads to the middle office, an HPD officer states "Search warrant, Henderson Police Department..." with the remainder of what was stated being spoken so fast it is unintelligible. It is not objectively reasonable to expect that Mr. Engstrom, who was behind a closed door in an office twenty to thirty feet away, was able to hear and discern what that officer said, when said statement is unclear in a recording that was made from only a few feet away. Therefore, Magistrate

20

093

1   Judge Weksler's finding of fact that Mr. Engstrom was ordered to exit the office is clearly

2   erroneous.

3   **III.  Magistrate Judge Weklser's Posited Reasons as to Why**

4   **Mr. Engstrom Did Not Exit the Office are Speculative,**

5   **Not Supported By Evidence, and are in Fact Impossible**

6   In the Courts oral order on August 17th, 2021, in regards to why Mr. Engstrom did

7   not exit the office, the Magistrate states at 2:33 "On one hand he may have been

8   responding to earlier commands to stay away from doors and windows. On the other hand,

9   the reason for non-compliance may have been that he was destroying evidence given there

10  was drug residue on the toilet seat from which it is believed drugs were flushed down." As

11  stated above, Mr. Engstrom asserts that he was never ordered to exit the office where he

12  was located. If, in arguendo, Mr. Engstrom was ordered to exit the office and he was able

13  to hear and discern that order, the only possible time that the Government argues that order

14  was made was after the HPD breached the first inner door and gained access to the middle

15  office area, which also gave HPD control over the bathroom in question. The HPD gained

16  access to the middle office area and bathroom twenty-three seconds after they make their

17  entrance into the property. See 21_11265_439S (2).mp4 at 8:03. The office Mr. Engstrom

18  was located in was breached by the HPD slightly over three minutes after they made their

19  entry into the building. As such, it would be impossible for Mr. Engstrom to have spent

20  that time flushing drugs down a bathroom that was inaccessible from the room in which he

21  was located, and where the HPD had taken control of the room that accessed the bathroom

22  three minutes prior to Mr. Engstrom being taken into custody. Therefore, Magistrate Judge

23  Weksler's finding that Mr. Engstrom may have been destroying evidence during the three

24  minutes he was waiting for the HPD to enter the room he was in is clearly erroneous.

25  Additionally, Magistrate Judge Weksler's postulated consideration of the reasons

26

1  that she believed Mr. Engstrom did not exit the office he was in are purely speculative. The

2  Court's argument of on one hand vs. on the other hand fails to meet the required burden of

3  proof. Also, considering that "Doubts regarding the propriety of release should be resolved

4  in favor of the defendant." *United States v. Motamedi*, 767 F.2d at 1405. (9th Cir. 1985),

5  quoting *Herzog v. United States*, 99 L. Ed. 1299, 75 S. Ct. 349, 351 (1955) (Douglas, J., in

6  chambers), defendant argues that controlling Ninth Circuit law supports a finding that Mr.

7  Engstrom's remaining in the room in which he was located, after being commanded eight

8  times to stay away from all doors and windows, can be construed as nothing but full

9  compliance with the officers performing the search warrant.

10

    **III.**     **Magistrate Judge Weksler's Finding That There is**

11

          **Evidence to Suggest That Defendant Locked Himself**

12

          **into the Room is Clearly Erroneous**

13

     The defendant objects to Magistrate Judge Weklser's finding that Mr. Engstrom

14

locked himself into the room he was in, implying that this occurred after the arrival of the

15

police. Magistrate Judge Weksler stated in her ruling at the August 17th, 2021 hearing that

16

"there is evidence that defendant did lock himself into that room," (at 2:53) and "First, the

17

co-defendants attempted to enter into that room once the police arrived which indicates

18

that the room typically would have been unlocked." *Id.* at 2:59. First, there is no evidence

19

that the co-defendants attempted to enter the room that Mr. Engstrom was located.

20

Defendant provided video in conjunction with his Motion to Reopen Detention (ECF No.

21

30) that may show one or both of the co-defendants attempting to open the first inner door

22

immediately after the SWAT team commences their announcements. Magistrate Judge

23

Weksler has apparently mistaken the first inner door with the door to the office where

24

defendant was located. Additionally, without any evidence presented as to the normal state

25

of the door in question, there is no basis to determine whether a door is usually locked or

26

22

unlocked. Absent such evidence, Magistrate Judge Weksler's finding that the co-defendant(s) finding the first door locked was indicative that it would usually be unlocked is speculative and not supported by evidence.

The Magistrate Judge's apparent error in identifying the door that the co-defendant(s) attempted to open, as opposed to the door to the office that Mr. Engstrom was located constitutes a clear error in the Magistrate Judge's ruling.

**D.      Conclusion**

The defendant has satisfied the burden of producing evidence to rebut the presumption that he is a flight risk. The Government has failed to surrebut the evidence produced, and has not met the burden of showing by the preponderance of the evidence that the defendant 1) is a flight risk or 2) that no conditions or combination of conditions will reasonably assure the appearance of the person as required. For all of the foregoing reasons, defendant requests that the Court REVOKE the Detention Order and find that there are conditions that can be fashioned to ensure his appearance in court, releasing Mr. Engstrom pending trial, subject to whatever conditions the Court finds appropriate to reasonably ensure his appearance and the safety of the community as required.

DATED this 3rd day of October, 2021.

Respectfully Submitted,

Paul Engstrom
*In Proper Person*

23

096

Paul Engstrom 0627004l
Nevada Southern Detention Center
2490 E Mesquite Ave
Pahrump, NV 89060

```
_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
        COUNSEL/PARTIES OF RECORD

         OCT - 6 2021

   CLERK US DISTRICT COURT
      DISTRICT OF NEVADA

BY: _____ DEPUTY
```

United States District Court
Attn: Clerk
333 Las Vegas Boulevard South
Room 1334
Las Vegas, NV 89101

XRAYED US MARSHALS SERVICE



CHRISTOPHER CHIOU
Acting United States Attorney
Nevada Bar No. 14853
SUSAN CUSHMAN
CHRISTOPHER BURTON
Nevada Bar No. 12940
DANIEL CLARKSON
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Susan.Cushman@usdoj.gov
Chris.Burton4@usdoj.gov
Daniel.Clarkson@usdoj.gov
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>        v.<br><br>PAUL ENGSTROM,<br><br>                Defendant. | Case No. 2:21-cr-00190-APG-EJY<br><br>**Government's Response in Opposition to Defendant Engstrom's Motion for District Judge Review of Magistrate Judge's Detention Order [ECF No. 63]** |

**CERTIFICATION:  This Response is timely filed.**

Defendant Paul Engstrom is both a risk of flight and a danger to the community. He was the leader of a drug trafficking and money laundering organization ("DTMLO") that sold and distributed large amounts of cocaine across the country in exchange for cryptocurrency payments processed through the dark web. Engstrom was caught red-handed surrounded by several kilograms of cocaine during a takedown of a stash house used by the DTMLO. He has multiple prior felony convictions, including a prior federal controlled substances conviction in this district. Magistrate Judge Brenda Weksler ordered

that Engstrom be detained pending trial on two separate occasions. Nothing presented by

Engstrom in his *pro se* Motion for District Judge Review of Magistrate Judge's Detention

Order (the "Motion") merits his release pending trial. This Court should deny the Motion.

## FACTUAL BACKGROUND

Defendant Paul Engstrom was arrested on June 21, 2021, during a takedown of a

large-scale drug trafficking and money laundering operation, of which Engstrom was

determined to be the leader (the "Engstrom DTMLO"). On that date, police officers

executed search warrants at several premises, one of which was used by Engstrom and his

co-defendants as a stash house to store, package, and distribute large amounts of cocaine.

This takedown was the culmination of a months-long investigation into the Engstrom

DTMLO, which yielded overwhelming evidence that Engstrom and his co-defendants were

using a dark web marketplace to take orders for cocaine from numerous customers,

processing and packaging those orders in Las Vegas, sending cocaine nationwide using

U.S. Priority Mail, and then laundering the criminal proceeds through a series of

cryptocurrency transactions.

On several occasions during the investigation, law enforcement agents surveilled

defendants Engstrom, Cuomo, Elliott, as they arrived and entered stash houses used by the

DTMLO. After the defendants remained in the stash houses together for some time, one of

the defendants would exit the premises and hand off cocaine-filled Priority Mail envelopes

to a runner (co-defendant Joseph Krieger), who would deposit the envelopes at different

post offices in the Las Vegas area. *See* ECF No. 1, Complaint ¶¶ 3-9. During the

investigation, law enforcement agents seized 44 such envelopes that they surveilled the

Engstrom DTMLO deposit in post office drop boxes; *all* 44 seized envelopes contained

2

1   heavily wrapped white powder that field tested positive for cocaine. *Id.* ¶ 10. And all the

2   Priority Mail envelopes seized by law enforcement during the investigation bore the same

3   characteristics in terms of how they were labeled, the type of envelope used, and the way

4   the postage was paid for. *Id.* ¶ 5, 12.

5          The DEA also conducted three undercover purchases of cocaine from an online

6   moniker ("Insta") associated with the Engstrom DTMLO through an illicit dark web

7   marketplace called White House Market. Law enforcement had identified "Insta" from an

8   earlier investigation as an entity that was using Priority Mail to distribute cocaine across

9   the country from the Las Vegas area. Due to similarities between the location and methods

10  of distribution used by "Insta" and the Engstrom DTMLO, the DEA suspected that the

11  Engstrom DTMLO was behind the "Insta" moniker. Confirming this suspicion, in each

12  instance when the DEA placed an undercover purchase through "Insta," Priority Mail

13  envelopes containing the purchased amount of cocaine were sent to the undercover address

14  provided by the DEA when making the purchase. In two of these instances, law

15  enforcement agents surveilled the Engstrom DTMLO deposit the cocaine-filled envelopes

16  addressed to the DEA-provided location and seized them before they were mailed. *Id.* ¶ 12

17  (describing the first two of the three undercover transactions).

18         In addition, through investigation of financial records and publicly available

19  cryptocurrency transaction records, the DEA identified Engstrom as the defendant who

20  was receiving cryptocurrency payments made through the dark web and then conducting a

21  series of transactions to launder those proceeds. Those transactions included the use of

22  "mixers" and "tumblers," which are tools that help holders of cryptocurrencies mask the

23  source of their funds. *Id.* ¶ 7. Based on an analysis of the "Insta" account as well as the

3

physical surveillance of the Engstrom DTMLO, agents estimated that, in just a five-month period in early 2021, the Engstrom DTMLO had distributed over 20 kilograms of cocaine. *Id.* ¶ 14.

Law enforcement executed a search warrant on June 21, 2021, at multiple locations associated with the Engstrom DTMLO. One of the locations searched was a stash house located at 6145 Harrison Drive, #4. Defendants Engstrom, Cuomo, and Elliott were all present in that stash house when the warrant was executed, ostensibly filling dark web orders for cocaine. During their search of the Harrison Drive location, law enforcement recovered over six kilograms of white powder that field tested positive for cocaine. Most of the cocaine was found in the back office where Engstrom had locked himself, including multiple bricks of cocaine stored in a lockable freezer.[1] A key to this freezer was found in the same room on a keychain that also held Engstrom's car keys. The stash house also contained filing cabinets with numerous Priority Mail envelopes, sealed containers labeled with various amounts of cocaine, and other indicia of the Engstrom DTMLO and drug trafficking, such as scales. Agents found four Blink security cameras located throughout the premises, including one camera in the office where Engstrom was apprehended.

The initial entry and securing of the Harrison Drive stash house was conducted by the Henderson Police Department (HPD).[2] HPD's entry into the facility required the use of

---

[1] Since Engstrom's most recent detention hearing, the DEA has completed laboratory testing on approximately 20 samples of the white powder recovered from the stash house, including several of the large bricks found in Engstrom's office. To date, all samples tested have returned positive results for cocaine.

[2] The government obtained body camera footage from several members of the HPD team that entered and secured the premises. The government filed those videos manually with the Court prior to the August 4 hearing on Engstrom's Motion to Reopen Detention Hearing.

detonation charges, due to the presence of a tinted security film on the front entrance. Due to the amount of time it took HPD to place the charges, announce their presence, and enter the premises, the defendants had significant time to react to HPD's arrival before they were taken into custody. When HPD officers entered the building, defendants Cuomo and Elliot had already fled.[3] HPD officers attempted to open an internal door across from the front entrance and found it locked. HPD officers then battered open this door. After gaining entry to the room beyond that door, HPD found another locked door to a back office. HPD officers once again announced their presence and ordered anyone in the back office to exit; no one came out. Officers then used the battering tool for a second time and found Engstrom behind the door, along with a large amount of cocaine.

In the area between the first locked interior door and the second locked door, there was a room with a toilet. It appeared that cocaine had recently been flushed down the toilet, as officers found a white powdery substance around the toilet bowl, two spoons in the toilet, and a metal tray with white powdery residue on the floor near the toilet.

As discussed in more detail below, this is not the first time Engstrom has been charged federally with felony violations of the Controlled Substances Act. In Case No. 2:15-cr-00255-JAD-PAL, Engstrom pleaded guilty to possession of a controlled substance with intent to distribute. Notably, Engstrom sought early termination of supervised release in that case. Case No. 2:15-cr-00255-JAD-PAL, ECF No. 126. His request was granted on January 3, 2019. Case No. 2:15-cr-00255-JAD-PAL, ECF No. 130. A matter of months

---

[3] Cuomo and Elliott were apprehended by HPD after they fled the premises, retreated into the garage when confronted by officers outside the building, and then hid under vehicles.

later, the first controlled purchase of cocaine from Engstrom, acting as "Insta," was conducted in this case. *See* ECF No. 17.

## PROCEDURAL BACKGROUND

On June 23, 2021, Engstrom made his initial appearance before Magistrate Judge Brenda Weksler on a Criminal Complaint charging him with one count of Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) and one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). Judge Weksler held a detention hearing at which the government moved for Engstrom's detention pending trial. Judge Weksler found that that the government showed by a preponderance of the evidence that no condition or combination of conditions of release would reasonably assure Engstrom's appearance in court and ordered his detention. ECF No. 11 (Detention Order). Judge Weksler found that the government had not shown by clear and convincing evidence that Engstrom was a danger to the community. *Id.*

The grand jury subsequently returned a nine-count Indictment, which charged Engstrom with eight counts relating to illegal distribution of cocaine and one count of Conspiracy to Commit Money Laundering. ECF No. 17. Multiple charges against Engstrom carry a mandatory minimum sentence of ten years in prison if he is convicted. *See* Indictment, Counts One and Eight.

On July 29, Engstrom filed a Motion to Reopen Detention Hearing. ECF No. 30. In support of his motion, Engstrom filed two short video clips, apparently obtained from a Blink security camera in the front room of the Harrison Drive stash house. The first clip, which starts after HPD had already placed charges on the front entrance and begun announcing their presence, shows co-defendant Elliott attempt to open the door from the

6

front room to the secondary room that contained the doorway to Engstrom's office. After finding that door locked, both Elliott and Cuomo exit through a side door to the garage. The second video shows HPD entering the premises and then using a battering tool to force open the locked door that Elliott and Cuomo had been unable to open. After receiving these two partial videos, the government requested additional video from defense counsel that depicted the entire sequence of events surrounding the takedown. Defense counsel informed that no additional video was available. Engstrom also did not provide the government or the Court with any videos from other Blink cameras on the premises, including the camera located in the office where he was apprehended.

Engstrom claimed his video clips contradicted representations made by the government at his detention hearing that he had barricaded himself into a back office when HPD entered the Harrison Drive location. The government filed an opposition, arguing why the clips did not contradict the government's representations and did not materially change the factual basis for Engstrom's detention. ECF No. 35. The government further argued that, even if the Court considered the videos and reopened the detention hearing, the government had still met its burden to justify pretrial detention. Judge Weksler held a hearing on August 4 and reserved decision on Engstrom's motion.

After the hearing, in an attempt to provide a full account of Engstrom's movements during the takedown, the government obtained a search warrant for the cloud-based account that stored the video footage from the Blink security cameras located at 6145 Harrison Drive. Case No. 2:21-mj-0664-NJK. In response to that search warrant, the government learned that no videos remained stored on that account, including the two videos that Engstrom had provided as part of his Motion.

On August 17, Judge Weksler held a follow-up hearing regarding Engstrom's Motion. At that hearing, Judge Weksler orally denied Engstrom's renewed request for pretrial release. ECF No. 46. Engstrom filed the *pro se* Motion now before the Court on October 6. ECF No. 63. This response follows.[4]

## LEGAL STANDARD

This Court reviews the Magistrate Judge's order of detention or release *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). *See also United States v. King*, 849 F.2d 485, 491 (11th Cir. 1988); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). This Court can review the evidence presented to the magistrate judge and makes its own independent determination. *Koenig*, 912 F.2d at 1193. This Court can also hear additional evidence and argument if it chooses. *Id.*

Title 18, United States Code, Section 3142(g), specifies the factors that a Court must consider in determining whether conditions exist that will reasonably assure the appearance of the defendant and the safety of the community. Those factors are:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including -
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of the current offense or arrest, the person

---

[4] Engstrom previously filed a similar *pro se* motion seeking review of the Magistrate Judge's detention order, but that motion was dismissed without prejudice because, at the time it was filed, Engstrom was still represented by counsel. ECF Nos. 49, 51. The government filed an opposition to that motion. ECF No. 52.

8

was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(d); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Cardenas*, 784 F.2d 937, 939 (9th Cir. 1986); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

On a motion for pretrial detention, the government bears the burden of showing, by a preponderance of the evidence, that the defendant is a risk of non-appearance or, by clear and convincing evidence, that the defendant is a danger to the community. 18 U.S.C. § 3142(f)(2)(B); *Motamedi*, 767 F.2d at 1406-07. When there is probable cause that the defendant has committed "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(2), (3)(A). Although the presumption shifts a burden of production to the defendant, the burden of persuasion remains with the government. *See United States v. Rodriguez,* 950 F.2d 85, 88 (2d Cir. 1991). Where § 3142(e) imposes the burden of production, the defendant must come forward with some evidence to rebut the presumption. *Id.* But even if the defendant meets that burden of production, the presumption "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir. 1986).

9

**ARGUMENT**

Here, there is a presumption in favor of detention, as Engstrom is charged by Indictment with several violations of the Controlled Substances Act that carry maximum sentences of over ten years. Engstrom cannot rebut the presumption that no condition or combination of conditions reasonably assures the safety of the community and his future appearance.[5] In addition to this presumption,[6] Engstrom's criminal history, the nature of the allegations against him, and overwhelming evidence in this case demonstrate he is not amenable to supervision. Engstrom's Motion – which focuses heavily on his interpretation of his arrest conduct and barely addresses the nature of the charged crime, his criminal history, or the evidence against him – does nothing to demonstrate that this Court should reverse the Magistrate Judge's finding and grant pretrial release.

**A.      The Nature of the Crime**

The first factor for the Court to assess is the nature and circumstances of the crime charged, including "whether the offense [] involves a narcotic drug." Engstrom is charged with leading a large-scale drug trafficking operation, through which he and his co-defendants sold cocaine over the dark web and then sent it to numerous recipients across the country. The charges relate to criminal conduct starting at least as early as August 2019

---

[5] This Court's *de novo* review permits it to find that Engstrom is a danger to the community despite that the Magistrate Judge did not do so. However, Engstrom's request for another hearing before this Court makes such a finding is flawed. Engstrom has had two detention hearings and been given full opportunity to be heard on the issue of detention, and specifically danger to the community. The parties are not seeking to include any additional facts as related to danger to the community and therefore, this Court can decide the issue without conducting an unnecessary third hearing.

[6] Despite Engstrom's claim that the government relied exclusively on this presumption in its argument, the record below and the instant response show that the government provided numerous arguments warranting detention.

10

and continuing until Engstrom was arrested in June 2021. In addition, Engstrom is

charged with conspiring to distribute more than five kilograms of cocaine, a violation that

carries a ten-year mandatory minimum sentence if he is convicted. Engstrom is also

charged with laundering his operation's drug trafficking proceeds through a series of

sophisticated cryptocurrency transactions that allowed him to convert the payments he

received over the dark web from one type of cryptocurrency into other cryptocurrencies –

masking the origins of those payments – and eventually to convert the money into U.S.

currency. Because Engstrom is charged with distributing large amounts of narcotics and

using sophisticated efforts to conceal his operation, the nature and circumstances of the

crimes weigh in favor of detention.

Engstrom's arrest conduct also indicates that he is a risk of flight and danger to the

community.[7] When agents searched the stash house at 6145 Harrison Drive, they

discovered evidence that cocaine had recently been flushed down the toilet. As detailed

above, that toilet was in a room that only Engstrom appeared to have access to, given that

his co-defendants were unable to open the door that led to the room before they fled

through the garage, and Engstrom was found in an adjoining room behind a second locked

door. This supports the inference that Engstrom destroyed evidence of his crimes when

---

[7] The Magistrate Judge found Engstrom's arrest conduct to be of primary concern in denying him pretrial release, and Engstrom devotes much of his Motion to arguing that his arrest conduct does not weigh in favor of detention and that the Magistrate Judge mischaracterized his arrest conduct. The government submits that Engstrom's arrest conduct weighs in favor of detention. Moreover, while the Magistrate Judge focused significantly on Engstrom's arrest conduct, the government contends that Engstrom's actions in the underlying case and prior criminal history also strongly militate in favor of detention.

11

HPD arrived at the stash house and makes it unlikely that Engstrom would comply with conditions if released pending trial.

Engstrom attempts to refute this inference by arguing that (1) HPD gained access to the secondary room with access to the toilet only 23 seconds after breaching the front entrance, thus not giving Engstrom sufficient time to flush drugs down the toilet, and (2) there was another doorway from the garage that provided access to the secondary room where the toilet was located, presumably insinuating that his co-defendants could have reentered that room and flushed cocaine down the toilet. The government submits that Engstrom remains the likely culprit for this action, given that the co-defendants fled into the garage and were taken into custody by law enforcement in the garage. Moreover, the 23-second time frame referenced by Engstrom is misleading. As Engstrom acknowledges, it took significantly longer than 23 seconds for HPD to enter the second room *from the time they initially announced their presence*. Thus, Engstrom had sufficient time to destroy evidence from when he learned of HPD's presence.

## B. Engstrom's Criminal History and Characteristics

As for Engstrom's criminal history, he was convicted in this Court of another controlled substances crime only a few years ago. *See* Case No. 2:15-cr-00255-JAD-PAL. During the investigation that led to those charges, an undercover officer made several purchases of MDMA from Engstrom's co-defendant. PSR ¶¶ 5-13. When the undercover officer inquired about purchasing a larger amount of MDMA (five ounces), the co-defendant responded that he could not complete such a transaction without involving his supplier (later identified as Engstrom). When this larger transaction was arranged, Engstrom arrived at the scene in his vehicle. When Engstrom was arrested at the scene, he

12

had approximately five ounces (142.0 grams) of gross weight MDMA in his vehicle. PSR ¶¶ 14-20. Engstrom was charged with conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C), and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Case No. 2:15-cr-255-JAD-PAL, ECF No. 15.

Notably, in that case, the Magistrate Judge detained Engstrom pending trial as both a danger to the community and a risk of non-appearance. *Id.* at ECF No. 13 (Detention Order). The Court found that Engstrom had a prior felony conviction (for bank robbery), a prior revocation of his supervised release, and an outstanding warrant for his arrest in another state at that time (for identity theft). *Id.* Consequently, the Court found that Engstrom had not rebutted the presumption in favor of detention and that no conditions would ensure the safety of the community and Engstrom's appearance at future proceedings. *Id.* These findings were justified and appropriate, and the government submits that nothing has changed in Engstrom's favor to show he is less of a danger to the community or risk of non-appearance than he was in 2015. Indeed, Engstrom has escalated his criminal conduct, committing more serious and sophisticated drug trafficking crimes, which carry significantly greater potential penalties than his criminal conduct in 2015. Engstrom's escalation in drug trafficking demonstrates that he remains both a danger and a risk of non-appearance.

In the above case, Engstrom pleaded guilty without a plea agreement to the charges against him and was sentenced to 24 months in prison and three years of supervised release. Engstrom later moved for early termination of his supervised release, which was granted by the Court. Case No. 2:15-cr-255-JAD-PAL, ECF No. 126. Just a few months

later, in August 2019, the U.S. Postal Inspection Service (USPIS) made a successful

undercover purchase of cocaine through the dark web moniker "Insta." A few days after

placing the order, USPIS received a Priority Mail envelope to the specified address

containing the purchased cocaine.

As described above, subsequent investigation has shown that "Insta" was the

moniker used by the Engstrom DTMLO. *See* ECF No. 17 (Count Two of the Indictment

charging cocaine distribution relating to USPIS's purchase in August 2019). By August

2019, "Insta" was already an established presence on the dark web, known for distributing

cocaine. The account profile on the dark web marketplace where USPIS placed its order

indicated that "Insta" already had over 1,000 user reviews and had joined the service in

March 2019. In other words, the evidence indicates that Engstrom likely started his drug

trafficking operation either while on supervised release for his prior drug conviction or, at

the very latest, within a couple months after the supervised release was terminated early.

This demonstrates Engstrom's ability and willingness to manipulate the criminal justice

system. When his prior drug trafficking conduct is viewed in conjunction with Engstrom's

other criminal history, which includes a federal felony conviction for Bank Robbery

(leading to a later revocation of his supervised release) and a gross misdemeanor

conviction for identity theft, this factor weighs in favor of detention.

## C. Weight of Evidence Against Engstrom

Although the strength of evidence is the least important factor to be considered in

determining detention, the Court must take it into account. *See United States v. Gebro*, 948

F.2d 1118, 1121 (9th Cir. 1991); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986);

*See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). The evidence against

Engstrom is extremely strong and has grown even stronger since Engstrom's most recent

detention hearing. Most importantly, when law enforcement executed a search warrant of

one of the stash houses used by the Engstrom DTMLO, they found Engstrom and two of

his co-defendants physically present inside the premises. The premises contained *over six*

*kilograms of cocaine*. Most of the cocaine was discovered in the same back office where

Engstrom had locked himself during HPD's takedown of the premises. Multiple bricks of

cocaine were stored in a lockable freezer in that office, and one of the keys to that freezer

was discovered on a keychain belonging to Engstrom in the same office, as indicated by

the presence of his car key on the chain.[8] Law enforcement also found cocaine throughout

the premises contained in various containers including plastic bags and cups. Since

Engstrom's most recent detention hearing, the DEA has completed laboratory testing on

approximately 20 samples of the suspected cocaine seized from the stash house, including

three large bricks weighing approximately one kilogram each. All of these samples were

confirmed to contain cocaine.

The premises also contained many other indicia of the defendants' drug trafficking

operation, including numerous Priority Mail envelopes, postage stamps, and drug scales.

There were also several electronic devices, including cellular phones and computers. Given

the amount of cocaine discovered in the stash house where Engstrom was physically

present, this evidence alone is likely sufficient to convict Engstrom of violations that carry

a ten-year mandatory minimum sentence. In addition, the location of most of the cocaine

and several cellular phones and computers in the locked office where Engstrom was

---

[8] A second key to the freezer was in the lock itself.

1    apprehended further support the conclusion reached by the DEA during their investigation

2    that Engstrom was the leader of the operation.

3        In addition to the evidence obtained during the takedown, there is substantial other

4    evidence of Engstrom's guilt. In the days after Engstrom and his co-defendants were

5    arrested on June 21, 2021, the DEA observed several user comments on dark web forums

6    indicating that "Insta" was no longer in operation and no longer responding to orders. This

7    further confirms that Engstrom's DTMLO was behind the "Insta" moniker.

8        In the months prior to the takedown, agents surveilled Engstrom on numerous

9    occasions during the investigation enter stash houses along with his co-defendants and

10   remain in those stash houses for a period of time. Then agents surveilled handoffs of

11   cocaine-filled Priority Mail envelopes to a runner, who would deposit the envelopes at

12   various post offices. Every envelope seized by the DEA after such surveillance (44 in total

13   from several different interdictions) contained cocaine and bore the hallmarks of the

14   Engstrom DTMLO (*e.g.*, Priority Mail envelopes, printed mailing labels, return addresses

15   to different businesses in Las Vegas, and prepaid postage stamps).

16       The DEA also conducted three undercover purchases of cocaine from "Insta," the

17   dark web moniker associated with the Engstrom DTMLO. In each instance, the DEA

18   received Priority Mail envelopes at the specified address containing the purchased amount

19   of cocaine. In two of these instances, law enforcement agents actually surveilled the

20   Engstrom DTMLO deposit the cocaine-filled envelopes in question seized them before they

21   were mailed.

22       Moreover, through investigation of financial records and publicly available

23   cryptocurrency transaction records, the DEA was able to identify Engstrom as the

24

113

defendant who was receiving cryptocurrency payments made through the dark web and then conducting a series of transactions to launder those proceeds. Those transactions included the use of "mixers" and "tumblers," which are tools that help holders of cryptocurrencies mask the source of their funds. *Id.* ¶ 7. They also involved Engstrom conducting cryptocurrency-for-cash exchanges with a third-party exchanger based in Las Vegas.

In sum, the takedown, surveillance operations, undercover purchases, drug seizures, and financial analysis provide ample evidence against Engstrom. Thus, the weight of the evidence favors detention.

### D. Engstrom's Remaining Legal Arguments are Flawed

Engstrom spends little time in his Motion assessing the 3142(g) factors discussed above. Instead, he focuses extensively on rehashing arguments about his arrest conduct and advancing several flawed legal arguments, which the government addresses below.

First, Engstrom claims that the Magistrate Judge misplaced the burden of persuasion on him at his detention hearings. That is not the case. Engstrom's argument is based purely on the Magistrate Judge's comment that the new information presented to the Court "moved the needle," but not sufficiently to justify Engstrom's release. But as Engstrom concedes in his Motion, the Court stated in full: "While the new information has moved the needle somewhat in favor of defendant, it has not moved it enough for the Court to find that government *has not met it's burden.*" Motion at 9-10 (emphasis added). Thus, the Magistrate Judge clearly understood that the government bore to burden to show that detention was appropriate, and was simply acknowledging that, even after considering the videos, the government had still met that burden.

17

Second, Engstrom contends that the government's arguments for detention "consist of nothing more than restatement of the criteria which trigger the rebuttable presumption." Motion at 11. But that argument is also untrue. As is clear from the detailed arguments presented above – which were also presented to the Magistrate Judge – the government has carefully assessed the 3142(g) factors as they apply to the facts of this case and Engstrom's criminal history, and explained why they support detention pending trial.

Third, Engstrom claims that he was denied due process. Motion at 11-12. Again, this argument is flawed. Engstrom's contention appears to be based entirely on his view that Magistrate Judge Weksler was not a "neutral decisionmaker" because she was not convinced by Engstrom's assertion that he had no way to access his cryptocurrency holdings if released. But simply rejecting an unconvincing assertion made by a party is no basis to find a violation of due process.

Fourth, Engstrom cites to a district court decision from the 1980s for the purported proposition that the Court cannot consider Engstrom's destruction of evidence as a factor in assessing his risk of non-appearance, and the Magistrate Judge erred in doing so. Motion at 13. But the cited decision, even if it were binding on this Court – which it is not – does not stand for that dubious proposition. The *Mancuso* court found only that, in the context of assessing danger to the community, obstruction of justice should be considered only when accompanied by a threat of harm. *United States v. Mancuso*, 726 F. Supp. 1210, 1214 (D. Nev. 1989). Nothing in the text of Section 3142 indicates that a defendant's destruction of evidence cannot be considered when assessing that defendant's likelihood of complying with conditions of release and appearing in court. To the contrary, such evidence is clearly relevant

18

to the nature and circumstances of the offense as well as the characteristics of the defendant, both of which are specifically included under Section 3142(g).

In sum, none of Engstrom's tenuous legal arguments merit his release pending trial. The Court should reject them and find that Engstrom is both a danger to the community and a risk of non-appearance.

### E.   No Conditions Are Sufficient to Ensure Engstrom's Appearance and the Safety of the Community

To rebut the presumption and the evidence justifying detention, Engstrom contended at his two detention hearings and continues to contend in his Motion that he has strong ties to Las Vegas and could reside with his ex-wife pending trial. He also claimed to have business ties to the community, given his ownership of a company called "Vegas Assets Ltd." Engstrom argued that conditions such as a third-party custodian and GPS monitoring would adequately protect the community and ensure his appearance in Court.

The government submits that these conditions are not sufficient to reasonably assure the safety of the community and Engstrom's appearance. As reflected in the Pretrial Services Report, it is not clear where Engstrom was residing during his recent time in Las Vegas. Engstrom reported to Pretrial Services that he had only been living with his ex-wife at her residence for a few months and had resided primarily with Cuomo, his co-defendant, prior to that.[9] Notably, during their investigation, the DEA surveilled Engstrom on multiple occasions leaving the residence he occupied with Cuomo and going to stash

---

[9] Agents executed a search warrant at this property on June 21, 2021, as well. Inside, agents found several firearms and other indicia of Engstrom's drug trafficking (*e.g.*, Priority Mail envelopes and a money counter).

houses used to package and distribute cocaine. In addition, when executing a search

warrant at the residence that Engstrom supposedly shared with his ex-wife, agents found

approximately $15,000 in a tin located in a bedroom closet. When agents asked

Engstrom's ex-wife about the money, she flatly denied any knowledge of the cash. The

agents also discovered a duffel bag on a coffee table containing a notebook with

cryptocurrency recovery seeds and other financial documents. This supports the inference

that, although it appears Engstrom may not have been living with his ex-wife, he may have

been using the residence to store illegal proceeds. Thus, ordering Engstrom to reside at

either of these residences would not likely ensure his appearance or the safety of the

community.

In addition, the DEA's investigation revealed no legitimate sources of income for

Engstrom. While Engstrom reported to Pretrial Services that he is self-employed and owns

an entity called "Vegas Assets LTD," the mere existence of a corporate entity that

Engstrom supposedly owns does not establish a significant tie to the community.

Engstrom reported to Pretrial Services that he has substantial assets, including eight to ten

million dollars of cryptocurrency and several hundred thousand dollars in other assets.

Cryptocurrencies can be easily transferred and/or liquidated outside of the jurisdiction and

Pretrial Services is limited in its ability to monitor any such transactions.[10] This indicates

---

[10] The government acknowledges that Engstrom claimed he could not access his extensive cryptocurrency assets because investigators had seized all of his cryptocurrency wallets, which are used to store cryptocurrency. But the government cannot confirm that it has seized all of Engstrom's cryptocurrency and notes that some cryptocurrency wallets can be reconstituted without direct access to the original wallet. *See, e.g.*, Wallet Recovery Services, https://www.walletrecoveryservices.com/ (last accessed September 13, 2021).

that Engstrom has the means to flee the jurisdiction and not return. GPS monitoring is not sufficient to prevent such flight.

In short, Engstrom was the leader of a large-scale, nationwide drug trafficking and money laundering operation, an operation he started very shortly after completing his sentence for a prior federal conviction for similar drug-related conduct. His criminal history and the allegations in this case demonstrate he is an unsupervisable danger to the community and flight risk. As a result, this Court should deny his Motion.

## CONCLUSION

Based on the foregoing, the Government respectfully requests this Court deny Engstrom's *pro se* Motion for District Judge Review of Magistrate Judge's Detention Order.

**DATED** this 20th day of October, 2021.

Respectfully submitted,

CHRISTOPHER CHIOU
Acting United States Attorney

 /s/ *Daniel Clarkson*
DANIEL CLARKSON
Assistant United States Attorney

21

118

FILED _____ RECEIVED _____
_____ ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD

NOV - 1 2021

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

Paul Engstrom
2190 E. Mesquite Ave
Pahrump, NV 89060
*In Proper Person*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CASE NO: 2:21-cr-00190-APG-EJY |
| Plaintiff, | |
| VS. | **Defendant's Reply in Support of Motion for District Court Review of Magistrate Judge's Detention Order (ECF No. 63)** |
| **PAUL ENGSTROM** | |
| Defendant, | |

CERTIFICATION: This Reply is timely filed. (Reply due by November 5, 2021 by Order of Judge Youchah (ECF No. 77))

The Government's Response in Opposition to Defendant Engstrom's Motion for District Judge Review of Magistrate Judge's Detention Order (the "Response"), fails to address many material issues that are presented in Mr. Engstrom's motion, including failing to address Mr. Engstrom's objections to Judge Weksler's factual findings. Additionally, the government misrepresents facts of the case; attempts to pass on allegations, assertions, and conclusory statements as evidence; and commits numerous violations of statute, Federal Rules of Criminal Procedure, and Local Rules; all in an effort to keep Mr. Engstrom detained pending trial. What is lacking in the record, and the government's response, is any evidence that Mr. Engstrom poses a flight risk or a danger to the community going forward. Therefore, this court should find that the government has not met their burden of proving by the preponderance of the evidence that Mr. Engstrom is a flight

risk, or their burden of proving by clear and convincing evidence that Mr. Engstrom is a danger to the community, ultimately warranting revocation of the Magistrate Judge's Detention Order.

### MEMORANDUM OF POINTS AND AUTHORITIES

Defendant's reply to the specific portions of the government's response are addressed below.

**1. Government misstates that a "presumption in favor of detention" applies (Response p. 10)**

In their argument the government states, "Here, there is a presumption in favor of detention." Defendant submits that this is a misstatement of law, that there is a presumption in favor of bail deeply ingrained in United States criminal law, and that presumptive pretrial release is a right protected by and continued in the Bail Reform Act of 1984.

The Bail Reform Act of 1984 (BRA) left the presumption in favor of pretrial release undisturbed. See *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D. Nev. 1993) (The presumption of innocence guarantees that defendants pending trial are entitled to a concomitant presumption in favor of bail in this country. The Bail Reform Act "mandates release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure the appearance of the person as required." quoting *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)) The Eighth Circuit addressed the presumption of release as it relates to the BRA in *United States v. Orta*, 760 F.2d 887 at n. 14 (8th Cir. 1985), stating:

> The difference between the legal standard set forth in subsection (b) and that found in subsections (c), (e), (f), and (g) reemphasizes congressional intent to preserve the statutory bias favoring pretrial release for most defendants. Subsection (b) directs release unless release "will not reasonably assure" the defendant's appearance, or "will endanger" the community's safety. 18 U.S.C. § 3142(b). Although the judicial officer may impose further restrictions upon a finding that the legal standard for either the flight or the danger concern is not met, a determination that a defendant's release "will endanger" the community will be rare. In contrast, subsections (c), (e), (f), and (g) change the legal standard to require release if any set of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community * * *." 18 U.S.C. § 3142 (c), (e), (f), (g). The change from the negative to the positive in the flight determination standard and from "will" to "will reasonably assure" in the dangerousness evaluation criterion renders it more difficult to find the defendant a flight and safety risk.

It appears that the government is confusing cases, where, when a detention hearing is warranted, there exists a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community, with other instances where congress has in fact created a presumption of detention. Compare 18 U.S.C. § 3142 (pretrial release) with 18 U.S.C. § 3143(a)(2) (post-conviction detention mandatory) and 8 U.S.C. § 1226(c)(1)(A)-(D) ("The Attorney General shall take into custody any alien," when an enumerated factor applies).

Comparing 18 U.S.C. § 3142(b) and 18 U.S.C. § 3143(a)(2) makes congressional intent obvious, where the former requires that "The judicial officer shall order the pretrial release of the person," while the latter requires "The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained."

The rebuttable presumption provisions of 18 U.S.C. § 3142(e) do not alter the presumption of bail. First, 18 U.S.C. § 3142(f)(1) requires a detention hearing to be held only upon motion of the attorney for the Government in cases that where the underlying offense is enumerated in 18 U.S.C. § 3142(f)(1) (A)-(E). 18 U.S.C. § 3142(f)(2) requires a detention hearing to be held upon motion of the attorney for the Government or upon the judicial officer's own motion in cases where there is a serious risk a person will flee or obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. In either of these cases, no detention hearing is automatically triggered by the underlying offense. Outside of a motion by the government or the court, the default result would always be pretrial release, even for cases that involve offenses that are enumerated in 18 U.S.C. § 3142(f)(1) (A)-(E). By statute, the triggering of the rebuttable presumption provisions of 18 U.S.C. § 3142(e)(2)-(3) therefore occurs at the discretion of the government or the judge. This fact alone belies any contention that congress intended there to be a presumption of detention, for if presumptive detention was their intention it would not be discretionary. The nature of a rebuttable presumption leaves the judge with the

3

discretion to credit or reject the inference, without shifting the burden of proof to the defendant. See *United States v. Hernandez-Escarsega*, 886 F.2d 1560 at n. 10 (9th Cir. 1989). The defendant argues that only after the judge exercises the required discretionary function of crediting or rejecting the inference transcribed by congress can the propriety of release or detention be determined.

Mr. Engstrom also submits that the drug offender / flight problem may be overstated in general. The congressional findings related to the increased risk of flight for drug offenders is discussed in Appendix B of *United States v. Jessup*, 757 F.2d 378 (1st Cir. 1985). Courts have interpreted these findings to support a belief that drug offenders fail to appear at an astonishing high rate, but that simply is not the case. For example, in *United States v. Orta-Castro*, 104 F. Supp. 3d 190, 195 (D.P.R. 2015) the court cites "Bail Reform" Hearings Before the Sub-committee of the Senate Judiciary Committee, 97th Cong., 1st. Sess., Sept. 17, Oct. 21, 1981 at 67, 70 (graphs 1, 2)(Comm. Print 1982), stating that in the ten districts studied, drug offenders account for approximately 1/6 of all crimes charged but 1/2 of all bail jumping. The charts cited are included in Appendix B of *Jessup*, and the data does not support that conclusion. First, Chart 1 in *Jessup* discusses the percentage of all defendants prosecuted who were charged with drug offenses, it breaks these numbers down into two subsets and two times periods. South District of Florida and Nationally are the subsets, and 1-Year Ending June 30, 1979 and 1-Year Period Ending June 30, 1980 are the specified time periods

| Graph 1 – Percent of all defendants prosecuted who were charged with drug offenses | | |
|---|---|---|
| | 1-Year Period Ending June 30, 1979 | 1-Year Period Ending June 30, 1980 |
| Southern District of Florida | 54.1% | 48.8% |
| Nationally | 17.1% | 17.6% |

Chart 2 memorializes the percentage of defendants who are released and fail to appear, comparing the total percentage of failure to appears with the percentage failure to appears of drug defendants in both Southern Florida and 10 other Pretrial Services districts, all for a time period of

4

122

July 1, 1978 to June 30, 1980.

| Graph 2 – Failure to Appear from July 1, 1978 to June 30, 1980 | | |
|---|---|---|
| | Drug Defendants | All Defendants |
| Southern District of Florida | 12.9% | 8.0% |
| 10 Pretrial Services Districts | 2.3% | 1.2% |

This is the data that the court in *Orta-Castro* relied upon to come to the conclusion that drug offenders account for 1/6 of all offenders yet account for 1/2 of all bail jumping in the 10 pretrial service districts surveyed. Upon inspection, the data supports that drug offenders account for 1/6 of all offenders, but the data does not support that drug offenders account for 1/2 of all bail jumping. It isn't clear how courts arrived at their erred mathematical conclusions, but after normalizing the data to a per 1000 basis, it becomes apparent that the drug offender / flight risk problem doesn't shock the senses, at least outside the Southern District of Florida[1].

In the time period in question, in the 10 Pretrial Districts surveyed, 173.5 out of every 1000 cases would be drug related, the remaining 826.5 offenders would have been arrested for something other than drug crimes. The total percentage of failure to appears is 1.2%, so out of those 1000 · offenders 12 people would fail to appear. The failure to appear rate for drug offenders is 2.3%, so if 2.3% of the 173.5 drug offenders would fail to appear, you would expect 3.99 failure to appears. Ultimately, out of every 1000 offenders only 12 would fail to appear, 4 of these would be drug offenders and 8 would be persons charged with some other type of offense. The real numbers, therefore, are that drug offenders account for 1/6 of all crimes charged but 1/3 of all bail jumping, a number still disproportionately high but quite possibly not a statistically significant deviation. One could also argue that a probability of 97.7% of all drug offenders appearing as necessary is sufficient to meet the standard of reasonable assurance.

---

[1] The numbers in the Southern District of Florida were much worse. There, in the same time period, 51.45% of all offenses were drug offenses, and 12.9% of drug offenders failed to appear. So, 514.5 out of every 1000 offenders were drug offenders and 66.37 of those offenders would fail to appear. These numbers suggest that the drug offender / flight risk problem may very well have been a late 70's early 80's drug offender problem that was isolated to the Southern District of Florida.

5

### 2. Government's subsection "A. Nature of the Crime" (Response p. 10)

Mr. Engstrom argues that the government misrepresents him as a leader of the alleged operation. This alleged leadership role is not supported by any evidence. For example, the government has not produced, or even proffered to the existence of, any witness testimony indicating Engstrom's involvement in the alleged activities. The record is equally void of any witness testimony establishing that Mr. Engstrom acted as a leader. The government has failed to produce, or proffer to the existence of, any text messages, recorded phone conversations, audio surveillance, or any other evidence that supports the conclusory statement that Mr. Engstrom was the "leader."

Mr. Engstrom argues that the government has not established a nexus connecting any cryptocurrency transactions attributable to Mr. Engstrom with dark web or other illicit activity, and in fact is aware that Mr. Engstrom has had significant cryptocurrency holdings dating back years prior to the activity alleged in this case. The governments conclusory statement, "Therefore, Engstrom's exchanges and deposits are proceeds from cocaine sales over the dark web," (ECF No. 1, p. 14 at 5-6), is purposefully and recklessly false. Mr. Engstrom submits that the government continues to misrepresent their knowledge of Mr. Engstrom's pre-2015 cryptocurrency holdings to the court. This assertion is supported by the fact that the government was aware of Mr. Engstrom's significant cryptocurrency holdings in 2015. There is evidence in the record of the government's prior knowledge of Mr. Engstrom's cryptocurrency holdings. AUSA Cushman undoubtedly had knowledge of these holdings in 2015, as Mr. Engstrom's made the required disclosures during his pretrial services interview related to his request for bail, disclosed his holdings again in his 2017 PSR (a document which the government cites in their response), with the holdings again disclosed and verified by US Probation prior to their agreeing to support his Motion for Early Termination of Supervision, (Case No. 2:15-cr-255-JAD-PAL, ECF No. 126), another document the government cites in their response. This prior knowledge contradicts the government's claim that "the DEA's investigation revealed no legitimate source of income for Engstrom." Response p. 20 at 11-12.

Mr. Engstrom submits that the nature and circumstances of the offenses charged, while

involving a controlled substance, do not included any other aggravating factors, e.g. there are no allegations of threats, violence or use of firearms or other weapons. The indicted counts, standing alone, do not support a finding of dangerousness sufficient to support detention. Defendant discusses this in depth in this reply's conclusion infra.

### 3. Government's subsection "B. Engstrom's Criminal History and Characteristics" (Response p. 12)

While the government states in their response, "the government has carefully assessed the 3142(g) factors as they apply to the facts of this case and Engstrom's criminal history, and explained why they support detention pending trial," (Response p. 18 at 4-6) this is clearly not the case. The government's submission as it relates to 3142(g)(3) "the history and characteristics of the person," is limited to a brief restatement of Mr. Engstrom's criminal history, mention of an administrative violation of supervision that occurred over twenty-years ago, leading into another recitation of the allegations of the instant offense. The government fails to disclose any information, negative or otherwise, in regard to a majority of the factors listed in 3142(g)(3)(a), e.g the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, history relating to drug or alcohol abuse, and record concerning appearance at court proceedings. The only factors addressed by the government are what negative information the government could glean from Mr. Engstrom's past conduct and his criminal history, where the government also fails to mention that he was granted pretrial release for his case in the 1990's and self-surrendered to serve his custodial sentence. Mr. Engstrom submits that the record of his June 23 and August 4 detention hearings establishes that a majority of the factors that the government fails to address are favorable to Mr. Engstrom, both militating against detention and rebutting the presumption that no conditions can be fashioned to reasonably assure defendant's appearance and the safety of the community.

The government then asserts that a Magistrate Judge's order of detention in Mr. Engstrom's 2015 case supports their position that Mr. Engstrom should be detained pending trial. Further stating

that, "nothing has changed in Mr. Engstrom's favor to show he is less of a danger to the community or risk of non-appearance than he was in 2015." Both of these assertions are erred.

First, detention hearings are sui generis, and must be decided on the basis of the particular record adduced. See *United States v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986) and *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990). Mr. Engstrom's arguments in favor of pretrial release in this case are distinguishable from his arguments in the 2015 case, with the same to be said of the government's arguments in favor of detention. In 2015, after Mr. Engstrom was arrested, he was made aware of a sealed arrest warrant out of Minnesota dating back to 2006 or 2007. Mr. Engstrom continued his detention hearing five days in an effort to obtain counsel in Minnesota and quash the warrant, as the Magistrate Judge indicated pretrial release would not be granted when there was an outstanding arrest warrant from outside of the District of Nevada. In those five days, Mr. Engstrom retained local counsel in Minnesota, but could not get the warrant quashed. Mr. Engstrom was thereafter ordered to be detained pending trial.

Mr. Engstrom submits, contrary to the government's position, that there are substantial changes in his favor since 2015. First, Mr. Engstrom has no outstanding warrants. Immediately upon release from his previous case Mr. Engstrom traveled to Minnesota on multiple occasions to address the charges outstanding against him. Ultimately, Mr. Engstrom pled guilty to a gross misdemeanor, while agreeing to pay immediate restitution of ~$1600, the amount alleged to have been unpaid when a post-dated check was not honored. Mr. Engstrom's willingness to travel to Minnesota to answer the charges there indicate that he will appear as necessary in front of this Court as well. It should also be noted that, although Mr. Engstrom is no stranger to the criminal justice system, he has never had a failure to appear. The absence of any failure to appears on his record also weighs in Mr. Engstrom's favor. Mr. Engstrom also believes that this Court could find instructive that after being detained pending trial in his 2015, as both a flight risk and danger to the community, he was classified as minimum security by the Bureau of Prisons and designated to Taft CI - Camp, a minimum security facility with no walls – the private equivalent of a Federal Prison Camp – where Mr. Engstrom

8

126

served his custodial sentence without incident. Following his custodial sentence, he was sent to the halfway house in Las Vegas, completing that program without incident. Mr. Engstrom then was slated to serve a three-year term of Supervised Release, where he performed so exceptionally well that he was granted early termination on the merits of his case. Since 2015, Mr. Engstrom's family and community ties have also strengthened. He enrolled in UNLV, where he is a senior with a 4.0 GPA. Additionally, with the help of his friend and mentor Frank Famiano, he has started an ATM business that he hopes to pass on to his son one day. All of these factors weigh in Mr. Engstrom's favor while belying the government's assertions that detention is warranted.

**4. Government's subsection "C. Weight of Evidence Against Engstrom" (Response p. 14)**

The weight of the evidence, which the defendant has been told is the least important factor, also appears to be where the defendant's and the government's positions are the most divergent. The government has purported the evidence to be "overwhelming" (Response p. 2 at 11) further labeling Mr. Engstrom the "leader" without presenting any evidence in support of this assertion. Mr. Engstrom view of the evidence is quite different.

The majority of the evidence the government relies on against Mr. Engstrom are seven instances from December 29, 2020 to March 29, 2021, where Mr. Engstrom, or his car, were observed in the vicinity of 304 E Silverado Ranch Boulevard. The DEA has labeled this location a "stash house." See ECF No. 1, p. 7 at 20-22. The problem with the determination that this was a "stash house" becomes apparent after it was searched pursuant to a search warrant on June 21, 2021, (Case No. 2:21-mj-515-DJA) where no evidence of illicit activity was found. The government has offered no additional evidence supporting their determination that this was a "stash house", leaving the only possible conclusion that this was not a "stash house" after all, yet the "stash house" designation persists in subsequent filings. The remainder of the evidence the government relies on against Mr. Engstrom are a handful of instances where he is observed at the property located at 6145 Harrison Ave, including the day of his arrest. Mr. Engstrom's argues that the government's evidence against him is limited to his proximity to cocaine found during the search of 6145 Harrison Ave,

9

where a finding of guilt would require the government to prove that Mr. Engstrom had constructive

possession of contraband that was located in a property that wasn't under his control and where the

contraband was not in plain sight in the room where he was located. Mr. Engstrom argues that the

government's evidence against him is tenuous at best, and unlikely to survive the adversarial process.

### 5. Use of Mr. Engstrom's PSR from a previous case violates Local Rule LCR 32-2

Mr. Engstrom objects to the government's use of the Presentence Investigation Report (PSR)

from his previous case in their response (see Response p. 12 at 19 and p. 13 at 1-2). Local Rule LCR

32-2(a) dictates that the PSR is confidential and is not to be reproduced or distributed to other

agencies or other individuals without permission of a determining official (defined as a district court

judge, magistrate judge, or the Chief Probation Officer (after consultation with the Chief Judge) of

the District of Nevada). Local Rule LCR 32-2(c) further requires that one must apply for Disclosure

of Presentence Investigation Reports for Purposes other than sentencing, and that this application

must be made by, submitting to a determining official, a written application accompanied by an

affidavit describing the records sought, explaining their relevance to the proceedings, and stating the

reasons the information contained in the records is not readily available from other sources or other

means. Mr. Engstrom sees no evidence that the government has made an effort to comply with the

requirements of Local Rule LCR 32-2(c).

The citation of the PSR also fails to comply with Local Rule LR IA 7-3, Citations of

Authority. The PSR is not a document available in the court's electronic filing system, and the

citation of "PSR" does not adequately notice defendant or the court to the source of the information

referenced. If the government wishes to cite portions of Mr. Engstrom's previous PSR, assuming the

disclosure meets the requirement of Local Rule LCR 32-2, the PSR should be included as an exhibit.

Mr. Engstrom does ask the court to find the fact that the government has disclosed access to

the PSR as per se proof that the government is aware of the factual findings of the PSR, to be used

for impeachment purposes in this and other hearings.

10

### 6.   Government citation to http://walletrecoveryservices.com violates LR IA 7-3

The government submits a website address, http://walletrecoveryservices.com (see Response p. 20 n. 10), as evidence that Mr. Engstrom may be able to access the cryptocurrency private keys that were seized by the government. Mr. Engstrom objects to the government's inclusion of this address, and any reliance on it by the court, as it's reference violates Local Rule IA 7-3(c)(2), which states "that neither a hyperlink nor any site to which it refers will be considered part of the official record", and "if a party wishes to make any hyperlinked material part of the record, the party mush attach the material as an exhibit." No exhibit is attached.

Mr. Engstrom further submits that there is no basis to the governments suggestion that it would be possible for Mr. Engstrom to access his cryptocurrency holdings without access to the associated private keys. Mr. Engstrom would be able to present expert witnesses that would testify that the cryptographic blockchain technology that cryptocurrencies are based on is secure against the type of brute force attack suggested by the government. This security is the underpinning of blockchain technology, where it would take the cumulative of all the computing power on earth hundreds of thousands of years to access any single bitcoin address.

### 7.   Government's mention of firearms in Response (Response p. 19 at n. 9)

The government mentions, for the first time in their response, that there were firearms found during their search of 487 Petal Dew Avenue. This is not new information, as the firearms found were legally owned by Vincent Cuomo, who, although a defendant in this case, is not a prohibited person. This is the first instance that firearms have been mentioned in relation to Mr. Engstrom. It is unclear if the government is inferring that these firearms, which have no connection to the underlying allegations, should be considered by the court as a factor in Mr. Engstrom's request for pretrial release. Mr. Engstrom holds that mention of these firearms, which the government has provided no evidence have any connection to Mr. Engstrom whatsoever, should not be considered by the court in their release determination.

**8. Government's allegations that Mr. Engstrom stored illegal proceeds (Response p. 20)**

The government argues that Mr. Engstrom release to the house he shared with his long-time significant other is inappropriate because there was $15,000 found at that location and these were "illegal proceeds." Defendant submits that, while true that there were $15,000 in US Notes found during the search of 305 Saint Augustine, these were collectible notes, consisting of retired US Notes, US "Star" Notes, and one-hundred uncirculated, sequential, one hundred-dollar notes. These were not illegal proceeds but collectibles. There is no nexus between these notes and the alleged crimes.

**9. Use of Obstruction as a factor in assessing risk of non-appearance**

The government argues in their response that it is appropriate that the court consider obstruction of justice as a 3142(g) factor. First, the defendant contends that this point is moot, there is no evidence that evidence was flushed as the government contends. Assuming in arguendo that the government could establish that evidence was destroyed, there is no evidence that Mr. Engstrom was the perpetrator. Second, obstruction is not a 3142(g) factor but a criteria in itself that warrants detention under 3142(f)(2)(B). The 3142(f)(2)(B) factor requires that the judicial officer find that there exists "a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." The government must prove by clear and convincing evidence not only that defendant obstructed justice but that there is a serious risk of obstruction in the future. See *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009).

**10. The government and magistrate judge violated defendant Due Process rights**

The government, in their response, discloses that after the defendant's August 4, 2021 detention hearing, "in an attempt to provide a full account of Mr. Engstrom's movements during the takedown," they obtained a search warrant for the cloud-based account that stored the video footage from the blink security cameras located at 6145 Harrison Drive (Case No. 2:21-mj-0664-NJK[2]).

---

[2] Defendant requested a copy of this warrant, the affidavit in support of the warrant, and the return of the

12

First, Mr. Engstrom questions the constitutionality of obtaining a warrant for the purpose stated by the government. Specifically questioning if, "in an attempt to provide a full account of Mr. Engstrom's movements during the takedown," lacks the requisite probable cause, as required in accord with Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) when obtaining a search warrant, that there exists "a fair probability that contraband or evidence of a crime will be found in a particular place."

Mr. Engstrom also objects to the continuation of his detention hearing. This continuation, which presumably occurred so that the government could pursue the above warrant, constituted a violation of Mr. Engstrom's substantive and procedural due process rights, at a time where his significant liberty interests were at stake. Mr. Engstrom, through counsel, filed a Motion to Reopen Detention (ECF No. 30) on July 29, 2021. That day, in a Minute Order from Chambers (ECF No. 33), Judge Weksler set a hearing on the matter for August 4, 2021 at 3:00pm. The prompt setting of the hearing implies that the reopening of a detention hearing, in accordance with 18 U.S.C. § 3142(f), should be considered a continuance of the original hearing, where the promptness required in both Fed. R. Crim. P. Rule 5 and 18 U.S.C. § 3142 remain in effect. At the August 4, 2021 hearing, Magistrate Judge Weksler stated orally that she would make a ruling "by the end of the week." On August 9, 2021, in a Minute Order in Chambers, Judge Weksler set a return hearing for August 11, 2021 at 9:00am (ECF No. 39). On August 10, 2021, the August 11, 2021 hearing was vacated "Due to an unexpected conflict with the Court's calendar." (ECF No. 40). On August 16, 2021, Judge Weksler scheduled a return hearing for Mr. Engstrom's Motion to Reopen Detention (ECF No. 30) for August 17, 2021, at 11:00am.

There is no provision in 18 U.S.C. § 3142 that allows for a the court to continue a detention hearing on their own motion. See United States v. Al-Azzawy, 768 F.2d 1141, 1146 (9th Cir. 1985) ("There is no provision for continuances on the court's own motion, even though subsection (f) does

---

warrant in an October 4, 2021 "meet and confer" letter sent to AUSA Clarkson. As of the filing of this reply the government has not responded to this request.

permit the court, sua sponte, to make other motions, e.g., to order a medical exam."); *United States v. Maull*, 773 F.2d 1479, 1483 (8th Cir. 1985) (en banc) ("the import of the clause [18 U.S.C. § 3142 (f)] is to call for a prompt hearing on the issue of detention."); *United States v. Hurtado*, 779 F.2d 1467, 1475 (11th Cir. 1985) ("Section 3142(f) by its terms makes no provision for a sua sponte finding of good cause to extend the time for holding the detention hearing."). The court's stated reason for vacating the August 11, 2021 hearing, "Due to an unexpected conflict with the Court's calendar," is a reason disapproved of in the Ninth Circuit. See *United States v. Al-Azzawy*, 768 F.2d 1141, 1146 (9th Cir. 1985) ("The liberty interests of the individual who has yet to be tried should not be subordinated to scheduling problems of counsel or the court."). Mr. Engstrom posits that the actual reason that his detention hearing was delayed for thirteen days was to allow time for the government to seek the before mentioned search warrant. If this is the case, it infers that there was much more than an improper sua sponte continuance. Mr. Engstrom asks that this court determine the reason that his detention hearing was continued for thirteen days. If the reason for the continuance was due to a scheduling conflict with Judge Weksler's court calendar, then the inquiry would stop there. If there was no actual conflict with Judge Weksler's calendar, then Mr. Engstrom would like further disclosure as to the actual reasons behind the continuance, in order to determine if Mr. Engstrom was prejudiced by the continuance.

Regardless of the underlying reason, Mr. Engstrom argues that the continuance of his detention hearing for thirteen days, without cause, constitutes a violation of his procedural and substantive due process rights and asks that this be considered a factor in favor of his release.

### Conclusion

Ultimately the propriety of Mr. Engstrom's release depends on multiple factors. First, the question is whether Mr. Engstrom has rebutted the section § 3142(e)(3) rebuttable presumptions of flight and danger to the community. Mr. Engstrom submits that he has satisfied the burden of production required to rebut these presumptions. Next the Court must determine if the government has proven by a preponderance of the evidence that Mr. Engstrom is a flight risk and that no

14

1   condition or combination of conditions will reasonably assure his appearance as required, or has

2   proven by clear and convincing evidence that Mr. Engstrom is a danger to the community and that no

3   condition or combination of conditions will reasonably assure the safety of the community. Mr.

4   Engstrom argues that the government has not met their burden for flight or danger.

### Flight

6   As it relates to flight, Mr. Engstrom does not have the foreign contacts and resources that

7   were congress's concern when finding that those charged with drug crimes constituted a special risk

8   of flight. It is these two criteria that courts have found relevant in the determination of flight risk. See

9   *United States v. Giordano*, 370 F.Supp.2d 1256, 1264 (S.D.Fla. 2005) ("examination requires a court

10  to take into account whether a defendant has substantial foreign ties, has access to considerable funds

11  to finance flight from the jurisdiction, or has manifested or demonstrated an intent to flee if

12  arrested."); *United States v. Arndt*, 329 F. Supp. 2d 182, 186 n.6 (D. Mass. 2004) ("The presumption

13  reflects Congressional findings that persons who deal in drugs often have the necessary resources

14  and foreign ties to escape to other countries." quoting *United States v. Palmer-Contreras*, 835 F.2d

15  15, 17 (1st Cir. 1987) ); and *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) (Congress

16  concluded that "flight to avoid prosecution is particularly high among persons charged with major

17  drug offenses." S. Rep. No. 225, 98th Cong., 1st Sess. 19 (1983) at 20. It found that "drug traffickers

18  often have established ties outside the United States . . . [and] have both the resources and foreign

19  contacts to escape to other countries. . . ." *Id*. Congress then wrote its drug offender/flight

20  presumption.). Mr. Engstrom submits that he lacks the resources to flee, where the government has

21  seized almost all of his assets. Mr. Engstrom also submits that he does not have foreign contacts, has

22  never left the United States, and has never been issued a passport. The Ninth Circuit has held the

23  community refers to the entirety of the United States, not just the charging district. See *United States

24  v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("If the defendant is a United States resident, the

25  community to be considered must be at least as broad as in the United States." Mr. Engstrom's only

26  ties are to the United States, further weighing in favor of his release. Mr. Engstrom also has strong

15

local ties, where he has lived in Las Vegas since 2007, attends UNLV, owns a business, and where his significant other since 2009 is a lifelong resident. In regards to flight, the Court should find that Mr. Engstrom has adequately rebutted the rebuttable presumption, demonstrating that he is not the type of offender congress had in mind when it created the presumption, leaving very little residual effect of the presumption. See *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985) ("The less those features resemble the congressional paradigm, the less weight the magistrate will likely give to Congress's concern for flight.")

The government's argument on flight centers around Mr. Engstrom's past behavior, inferring that someone who has prior convictions is a per se flight risk. This reasoning has been foreclosed by various courts. The Third Circuit has found that the purpose of a flight-risk determination "is not to detain habitual criminals or deceitful persons; it is to secure the appearance of the accused at trial," *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). Mr. Engstrom submits that he has never failed to appear, often traveling distance at his own expense to appear as required. Mr. Engstrom also submits that it is informative that the Bureau of Prisons, an organization with significant experience in evaluating risk, deemed Mr. Engstrom such a low level of risk that they placed him in a Federal Prison Camp in 2017. The government fails to bring forth any evidence that Mr. Engstrom poses a serious flight risk going forward. Mr. Engstrom relies on *United States v. Dunlap*, 3 F. Supp 772, 790 (C. D. Cal. 2014) where the court found that "The [Bail Reform Act], by its nature, is always looking forward. To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward." (quoting *United States v. Barner*, 743 F. Supp. 2d 225, 228 (W.D.N.Y. 2010). Though not binding on this court, the *Dunlap* finding that the government must prove forward looking risk is well founded in 18 U.S.C. § 3142. Absence evidence that a serious risk of flight exists, this Court should find there exists a reasonable assurance that Mr. Engstrom will appear as necessary, necessitating a finding that pretrial release is appropriate.

Mr. Engstrom further submits that it is not infrequent that arrestees who are similarly situated,

or facing more serious charges, are granted pretrial release. Two of defendant's codefendants in this case have been released pending trial, both of whom have more significant criminal histories. Other examples where arrestees facing serious charges were granted pretrial release include; *United States v. Traitz*, 807 F.2d 322 (3rd Cir. 1986) (three defendants accused of extortion, racketeering, and bribery of a federal official granted pretrial release); *United States v. Leyba*, 104 F. Supp. 2d 1182 (S. D. Iowa 2000) (defendant charged with violating 841(a) and 924(c) granted pretrial release); *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) (defendant charged with violation of 841(a) and firearm violations granted pretrial release); *United States v. Romo-Sanchez*, 170 F. Supp, 2d 1127, 2001 U.S. Dist. LEXIS 8304 (D. Kan 2001) (Non-US citizen charged with selling forty pounds of cocaine granted pretrial release); *United States v. Eischeid*, 315 F Supp. 2d 1003 (D. Ariz. 2003) (Hell's Angel Motorcycle Club member charged with Violent Crime in Aid of Racketeering, murder, granted pretrial release); *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108 (D. Minn. 2009) (alien charged with 841 rebuttable presumption case granted pretrial release); and *United States v. Enix*, 209 F. Supp. 3d 557, 2016 U.S. Dist. LEXIS 95319 (W.D.N.Y. 2016) (defendant charged with RICO counts, possession of a firearm in furtherance of a crime of violence, and possession of firearms in furtherance of drug trafficking granted pretrial release).

## Danger to the Community

Mr. Engstrom submits that he has sufficiently rebutted the rebuttable presumption in regards to danger. The lack of any violence in Mr. Engstrom's recent history, his exemplary conduct while on supervision, and his strong ties to the community are sufficient to meet the burden of production required. Mr. Engstrom also submits that his release would not pose a danger to the community. First, although the crimes with which he is charged are sufficient to trigger the rebuttable presumption of § 3142(e)(3), there are no aggravating factors such as threats, violence or the use of weapons. Congresses intentions in enacting the rebuttable presumption for danger as it relates to controlled substances offenses are less clear than those dealing with risk of flight, but we are not totally left without guidance. One need only look to the legislative history of the Bail Reform Act for

17

guidance on congressional intent for a finding of dangerousness, which states:

> Because of the importance of the interests of the defendant which are implicated in a pretrial detention hearing, the Committee has specifically provided that the facts on which the judicial officer bases a finding that no form of conditional release is adequate reasonably to assure the safety of any other person and the community, must be supported by clear and convincing evidence. This provision emphasizes the requirement that there be an evidentiary basis for the facts that lead the judicial officer to conclude that a pretrial detention is necessary. . . . [Thus], if the dangerous nature of the current offense is to be a basis of detention, then there should be evidence of the specific elements or circumstances of the offense, such as possession or use of a weapon or threats to a witness, that tend to indicate that the defendant will pose a danger to the safety of the community if released.  S.Rep. No. 225, 98th Cong., 1st Sess. 5, reprinted in 9A, 1984 U.S. Code Cong. & Adm. News, Legislative History at 22.

The government, for their part, have also failed to provide any evidence that Mr. Engstrom's release would pose a danger to the community. The record is void of any argument from the government as to the fourth factor of 3142(g) "(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release," and the government has not expressed any concerns that Mr. Engstrom would commit additional crimes if released.

Defendant argues that there are a very large number of cases charged under 21 U.S.C. 841(a) each annum, where many of the individuals charged in these cases have previous convictions. If a previous conviction, standing alone, could be said to constitute clear and convincing evidence sufficient to support the entry of a detention order on grounds of dangerousness, a large number of persons accused of violations of 21 U.S.C. 841(a) would be subject to pretrial detention as a matter of course. Such a conclusion is contrary to the legislative history of the BRA, 18 U.S.C. §§ 3141-3150, which states that "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial." (S. Rep. No. 225, 98th Cong. 1st Sess. 6-7 (1983), reprinted in 1984 U.S. Code Cong. & Ad. News 3189). The above argument is analogous to the finding in *United States v. Ridinger*, 623 F. Supp. 1386,

18

1394-95 (W.D. Mo. 1985) that the presence of firearms in conjunction with a charged drug offense is not sufficient, standing alone, to constitute clear and convincing evidence sufficient to support the entry of a detention order. Further, the Eight Circuit has held that, "The passage of the pretrial detention provision of the 1984 Act did not, however, signal a congressional intent to incarcerate wholesale the category of accused persons awaiting trial," and "The legislative history stresses that "the decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. * * * It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants." Id., at 7, 12 reprinted in 1984 U.S. Code Cong. & Ad. News 9A at 9, 15." *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985). The Second Circuit has held, "it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). Mr. Engstrom argues that he is not one of the "small but identifiable group of particularly dangerous defendants" whom congress intended be detained pending trial.

### Summary

Mr. Engstrom asks the court to consider the information in herein, in conjunction with the record and Mr. Engstrom's Motion, and find that the government has failed to prove by a preponderance of the evidence that  no conditions or combination of conditions will reasonably assure the appearance of the defendant as required and that the government has failed to prove by clear and convincing evidence that  no condition or combination of conditions will reasonably assure the safety of the community, thereby REVOKING the Magistrate Judge's Detention order, releasing Mr. Engstrom pending trial, subject to whatever conditions the Court finds appropriate.

19

137

DATED this 27th day of October, 2021.

Respectfully Submitted,

Paul Engstrom
*In Proper Person*

20

Legal Mail

Paul Engstrom 06570041
Nevada Southern Detention Center
2190 E Mesquite Ave
Pahrump, NV 89060



FILE☐    REF.☐ IVED
ENTERED    SERVED ON
COUNSEL/PARTIES OF RECORD

NOV - 1 2021

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY:                    DEP☐.

United States District Court
Attn: Clerk
333 Las Vegas Boulevard South
Room 1334
Los Vegas, NV 89101



Las Vegas PRDC 89199
FRI 29 OCT 2021 PM

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

                Plaintiff,

v.

PAUL ENGSTROM,

                Defendant.

Case No. 2:21-cr-00190-APG-EJY

**ORDER DENYING MOTION FOR REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER**

(ECF No. 63)

      Defendant Paul Engstrom moves for review of Magistrate Judge Weksler's detention order. I must conduct a *de novo* review of the evidence before Judge Weksler (and any additional evidence submitted by the parties) and make my own independent determination with no deference. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990).

      In determining whether conditions can be fashioned to assure the defendant's appearance and protect the public, I must consider four factors: (1) the nature and circumstances of the offense charged, including whether it is a crime of violence or involves drugs; (2) the weight of the evidence;[1] (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community should the defendant be released. 18 U.S.C. § 3142(g).

      The Government bears the burden to show by a preponderance of the evidence that Engstrom is a risk of non-appearance; or it may show by clear and convincing evidence that he is a danger to the community. 18 U.S.C. § 3142(f); *Motamedi*, 767 F.2d at 1406-07. Engstrom is

---

[1] This factor "is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). It "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.*

charged with nine felonies, including possession and distribution of cocaine and conspiracy. ECF No. 17. There is probable cause to believe he has committed drug offenses for which the penalty is at least ten years' imprisonment. Thus, a rebuttable presumption exists that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). Although this presumption shifts a burden to Engstrom to "introduce some evidence contrary to the presumed fact," the burden of persuasion remains with the Government. *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). If rebutted, the presumption "continues to be weighed along with other factors to be considered when deciding whether to release" Engstrom. *Id.*

The Government alleges Engstrom ran a sophisticated, lengthy, and highly profitable scheme to sell cocaine throughout the United States and to launder the proceeds through cryptocurrency transactions, all on the dark web. The evidence against Engstrom is substantial. Agents investigated and surveilled him and his co-defendants for months. They seized at least 44 envelopes containing cocaine that the conspirators tried to send through the mail. Agents determined that Engstrom received and laundered through dark web sites cryptocurrency payments for cocaine shipments. Engstrom was arrested in a room with a freezer containing a large amount of cocaine. The key to that freezer was on a keychain with his car key on it. Bags of cocaine were also out in the open in an adjacent room that Engstrom had access to before police came in. There are indications that cocaine was flushed down a toilet in another adjacent room Engstrom had access to while police were entering the premises.

Engstrom is a danger to the community. He previously pleaded guilty to possession with intent to distribute a controlled substance and conspiracy, and he was sentenced to 24 months in prison. *U.S. v. Engstrom*, Case No. 2:15-cr-00255-JAD-PAL, ECF No. 118. He was granted

1 early termination of his supervised release on January 3, 2019. *Id.* at ECF No. 130.  The

2 Government's investigation indicates Engstrom became involved in this scheme within eight

3 months (if not sooner), by no later than August 2019. ECF No. 17 at 2.  That he allegedly

4 resumed drug trafficking so soon after termination of supervision—and at such a large scale—is

5 clear and convincing evidence that he is a danger to the community.

6       Engstrom told the Pretrial Services Officer that he owns $8,000,000 - 10,000,000 in

7 cryptocurrency.  Engstrom points out that the Government has seized his personal computers and

8 crypto wallets so he cannot access those funds.  But to the extent his cryptocurrency is not stored

9 on his personal computers, he could access those funds through the internet if the keys are stored

10 or copied somewhere else.  I agree with Judge Weksler that Engstrom's facility with the dark

11 web and access to millions of dollars' worth of cryptocurrency show by a preponderance of the

12 evidence that he is a flight risk.

13      Engstrom has not rebutted the presumption that there are no conditions that would

14 reasonably protect the community against the risk of danger he poses and to assure his

15 appearance.

16      I THEREFORE ORDER that Engstrom's motion for review of the detention order **(ECF**

17 **No. 63) is DENIED**.

18      DATED THIS 24th day of November, 2021.

19

20      _____
        UNITED STATES DISTRICT JUDGE

21

22

23

3

Paul Engstrom
2190 E. Mesquite Ave
Pahrump, NV 89060
*In Proper Person*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>VS.<br><br>**PAUL ENGSTROM**<br><br>Defendant, | CASE NO: 2:21-cr-00190-APG-EJY<br><br>**MOTION TO RECONSIDER ORDER DENYING MOTION FOR REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER**<br><br>(ECF No. 89) |

CERTIFICATION: This motion is timely.

This motion is filed by Paul Engstrom, in proper person, for the purpose of requesting the Court to reconsider their Order Denying Motion for Review of Magistrate Judge's Detention Order (ECF No. 89) pursuant to Federal Rule of Civil Procedure 59(e) or Federal Rule of Civil Procedure 60(b), and Local Rule II 59-1(b). Mr. Engstrom requests that the court reconsider it's ruling based on five points of law or fact that the court has overlooked or misunderstood as argued herein. Additionally, the transcripts from Mr. Engstrom's June 23rd, August 4th, and August 17, 2021, hearings were made available after the filing of Mr. Engstrom's motion and reply. There is additional information in the transcripts that may be considered new information, if that information has not been considered by the court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.    Procedural Background

On June 23, 2021, Mr. Engstrom made his initial appearance on a Criminal Complaint charging him with one count of Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) and one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). At this hearing the Magistrate Judge found that Mr. Engstrom was not a danger to the community, but that there were no conditions or combination of conditions that would reasonably assure his appearance as required, therefore detaining Mr. Engstrom pending trial. On July 6, 2021, the grand jury returned a nine-count indictment, closely following the allegations in the criminal complaint.

On July 29, 2021, Mr. Engstrom, through counsel, filed a Motion to Reopen Detention (ECF No. 30) based on new information, i.e. videos obtained by defendant that contradicted the government's account of defendant's conduct on the day of his arrest. Magistrate Judge Weksler found that there was new information presented that had a material bearing on the issue of whether Mr. Engstrom was a flight risk and reopened detention, setting a hearing for August 4, 2021. After considering the new information, Magistrate Judge Weksler ruled on August 17, 2021, orally denying the motion and found that the Government had continued to prove, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure the appearance of the person as required.

On October 6, 2021, Mr. Engstrom filed a  Motion for District Court Review of Magistrate Judge's Detention (ECF No. 63), to which the government responded (ECF No. 76) and Mr. Engstrom replied (ECF No. 82). On November 24, 2021, District Court Judge Andrew Gordon denied Mr. Engstrom's motion (ECF No. 89). This motion to reconsider follows.

### B.    Legal Standard

While the Federal Rules of Criminal Procedure do not contain a provision specifically

allowing motions for reconsideration, numerous circuit courts have held that motions for

reconsideration may be filed in criminal cases. See *United States v. Martin*, 226 F.3d 1042, 1047 n. 7

(9th Cir. 2000) (post-judgment motion for reconsideration may be filed in a criminal case and

governed by Fed.R.Civ.P. 59(e)); *United States v. Fiorelli*, 337 F.3d 282, 286 (3d Cir. 2003) (motion

for reconsideration allowed in criminal case and governed by Fed.R.Civ.P. 59(e) or Fed.R.Civ.P.

60(b)); *United States v. Clark*, 984 F.2d 31, 33-34 (2d Cir. 1993) (motion for reconsideration filed in

criminal case within 10 days of subject order is treated under Fed.R.Civ.P. 59(e)). Motions for

reconsideration in criminal cases are governed by the rules that govern equivalent motions in civil

proceedings. See *United States v. Hector*, 368 F. Supp. 2d 1060, 1062-63 (C.D. Cal. 2005) rev'd on

other grounds, 474 F.3d 1150 (9th Cir. 2007); see also *United States v. Fiorelli*, 337 F.3d 282, 286

(3d Cir. 2003) (motion for reconsideration allowed in criminal case and governed by Fed. R. Civ. P.

59(e) or Fed. R. Civ. P. 60(b)).

Reconsideration is appropriate if the Court: (1) is presented with newly discovered evidence;

(2) committed clear error, or the initial decision was manifestly unjust; or (3) if there is an

intervening change in controlling law. *Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir.

2003). Motions for reconsideration are disfavored. Local Rule II 59-1(b). Reconsideration is "an

extraordinary remedy, to be used sparingly and in the interests of finality and conservation of

judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

Local Rule II 59-1(a) states, "A party seeking reconsideration under this rule must state with

particularity the points of law or fact that the court has overlooked or misunderstood. Changes in

legal or factual circumstances that may entitle the movant to relief also must be stated with

particularity."

## C.    Argument

Mr. Engstrom argues that, in the order denying Mr. Engstrom's motion, there are five points

of law or fact that the court has overlooked or misunderstood, that these points constitute clear error,

1    and that the resulting denial of the motion is manifestly unjust.

2         The five points of law or fact are:

3    **1. Judge Gordon's finding that Mr. Engstrom's keychain held a key to the freezer**

4    **is not evidence that was presented at previous detention hearings and should not**

5    **be considered without allowing defendant the opportunity to confront that**

6    **evidence at an adversarial evidentiary hearing.**

7         The government states in their reply, "The parties are not seeking to include any additional

8    facts related to danger to the community and therefore, this Court can decide the issue without

9    conducting an unnecessary third hearing," ECF No. 76 p. 10 at n. 5. This statement contradicts the

10   substance of the government's reply, where their arguments in favor of detention include multiple

11   allegations that were not argued at either of the defendant's previous detention hearings. Statements

12   such as, "Since Engstrom's most recent detention hearing, the DEA has completed laboratory testing

13   on approximately 20 samples of the white powder recovered..." (*Id.* p. 4 n. 1) and the the

14   government's new allegation regarding the defendant's possession of a key to a freezer (*Id.* p. 15),

15   are examples of the government's inclusion of new facts that had not been litigated at previous

16   hearings before the Magistrate Judge. The Court specifically cites the alleged possession of the key

17   in their order (ECF No. 89 p. 2), making a factual finding that the key to the freezer was on Mr.

18   Engstrom's car keys.

19        Mr. Engstrom argues that new information submitted by the government should not have

20   been considered by the Court in its de novo review absent an evidentiary hearing. See *United States*

21   *v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) ("under the proper "de novo" requirement, the district

22   court, while empowered to do so, is not required to hold an evidentiary hearing when no evidence is

23   offered that was not before the magistrate"). Consideration of new information without allowing the

24   defendant to confront that information is a violation of defendant's rights under the confrontation

25   clause of the Sixth Amendment of the United States Constitution.

**2. Judge Gordon's finding that a prior conviction and Mr. Engstrom's alleged involvement in the charged offenses constitutes clear and convincing evidence that he is a danger to the community is not sufficient to support such a finding.**

In their ruling the Court finds that Mr. Engstrom is a danger to the community based on a prior conviction and the allegations that he was involved in the charged offense eight months after termination of supervision from a previous case. ECF No. 89 p. 2-3. Defendant argues that these circumstances alone do not support a finding that Mr. Engstrom is one of the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." *United States v. Koon*, 6 F.3d 561, 566 (9th Cir. 1993).

Mr. Engstrom argues that his previous conduct on supervision, where his exemplary conduct led to the court granting his request for early termination, indicates that he is amicable to supervision and will abide by any conditions imposed by the Court.

Additionally, Mr. Engstrom argues that the offenses charged in the indictment, at this time, are nothing more than allegations supported by probable cause. As stated in the *Ninth Circuit Model Criminal Jury Instructions 1.2*, "The indictment is not evidence and does not prove anything." It could also be argued that probable cause as required to obtain an indictment is watered-down even further, considering that the prosecution is not required to disclose exculpatory evidence in its possession when seeking an indictment. See *United States v. Williams*, 504 U.S. 36, 46, 112 S. Ct. 1735, 1741, 118 L. Ed. 2D 352 (1992). The ease of obtaining indictments is acknowledged by the Ninth Circuit in *United States v. Navarro-Vargas*, 408 F.3d 1184, 1199 (9th Cir. 2004) where the appellate court states that the skepticism that the grand jury is no more than a "rubber stamp" for the prosecutor is best summarized by the Chief Judge of New York State, when he publicly stated that "a Grand Jury would indict a 'ham sandwich'." Quoting *In re Grand Jury Subpoena of Stewart*, 144 Misc. 2d 1012, 545 N.Y.S.2d 974, 977 n.1 (Sup. Ct.), aff'd as modified, 156 A.D.2d 294, 548

N.Y.S.2d 679 (App. Div. 1989). The Seventh Circuit has also held that the ham sandwich aphorism is not far from the truth. See Tyson v. Trigg, 50 F.3d 436, 441 (7th Cir. 1995) ("Instances in which grand juries refuse to return indictments at the behest of the prosecutor are almost as rare as hen's teeth."). As such, the defendant argues that the allegations in the indictment, which are supported only by probable cause, can not rise to the level necessary to constitute the clear and convincing evidence required to support a finding of dangerousness, especially considering that the government has not submitted any forward looking evidence that Mr. Engstrom's release would endanger the community.

Furthermore, this Court's recent ruling denying the government's motion to revoke the release of one of Mr. Engstrom's co-defendants further confounds the issue of dangerousness. Mr. Elliott was ordered release pending trial by Magistrate Judge Weksler on October 8, 2021 (ECF No. 67), the government requested the District Court revoke the order for release (ECF No. 66), and this Court denied the Government's motion (ECF No. 90). It is illogical that this Court find Mr. Elliott to have rebutted the presumption of dangerousness, while making a contrary finding in regards to Mr. Engstrom. This Court found that Mr. Elliott "has prior arrests and convictions for felonies and misdemeanors. He violated conditions of pretrial release and probation in prior cases." ECF No. 90 p. 2. The government establishes in their Motion for Revocation of Magistrate Judge's Release Order (ECF No. 66) that Mr. Elliott has five previous felony convictions, including a recent conviction for which he was sentenced to 84 months imprisonment and was on Federal Supervised Release until November 5, 2019–more than three months after the alleged conspiracy commenced in this case–and has a history of committing new crimes while on pretrial release and post-conviction supervision. *Id.* p. 14. This arbitrary and disparate treatment of co-defendants who are facing roughly the same charges and potential sentences, in orders issued by this Court on the same day, is confusing to say the least. Where Mr. Engstrom's past criminal history is significantly less serious than Mr. Elliott's; Mr. Engstrom's exemplary conduct while on supervision is objectively better than

Mr. Elliott's conduct to a great degree; and Mr. Elliott was on Federal Supervised Release at the time of the offenses alleged in the instant offense, where Mr. Engstrom was not; logic would follow that if Mr. Elliott is not a danger to the community than neither should be Mr. Engstrom.

It should also be noted, it appears that the only grounds for detention the government argued at defendant's June 23, 2021, detention hearing was flight risk. Stating at oral argument, "We believe this makes Mr. Engstrom a significant risk of flight and risk of nonappearance, and so we would move for his detention." See June 23, 2021, hearing transcript p. 11 at 7-8.

**3. Judge Gordon's finding in regards to Mr. Engstrom's access to cryptocurrency, specifically that "he could access those funds if the keys are stored or copied somewhere else," is not so much a finding of fact as a finding of supposition, unsupported by evidence.**

It is undisputed that prior to June 21, 2021, Mr. Engstrom's had significant cryptocurrency holdings. He voluntarily disclosed these assets during his pre-trial interview on June 23, 2021, and proffered to the court at both his June 23, 2021, and August 4, 2021, detention hearings that the government seizure of all of his electronic devices on June 21, 2021, has effectively made access to those holdings impossible. This issue was litigated at both the June 23, 2021, and August 4, 2021, detention hearings. The government did not provide any evidence to contradict Mr. Engstrom's claim that their seizures of June 21, 2021, denied Mr. Engstrom's access to these holdings.

This Courts finding that "he could access those funds if the keys are stored or copied somewhere else," is not supported by evidence. Mr. Engstrom has been unable to find any case law that supports a finding that a theoretical "if" is sufficient to deny someones liberty and hold them in pretrial detention. Courts in the Ninth Circuit have found the opposite, " it is true that a mere theoretical opportunity for flight is not sufficient grounds for pretrial detention." See *United States v. Simon*, 2006 U.S. Dist. LEXIS 52979 (D. Nev., July 27, 2006) quoting *United States v. Himler*, 797 F.2d 156, 162 (5th Cir. 1986) and United States v. Channon, 2020 U.S. Dist. LEXIS 127556 (W.

Dis. Wash. 2020) ("a mere risk of flight does not warrant pretrial detention; there must be no conditions that 'reasonably assure' the defendant's appearance.").

In this case, the government has had ample opportunity to submit evidence that Mr. Engstrom would have access to any of his cryptocurrency holdings if granted pretrial release, and has failed to do so. The government has also failed to submit evidence that Mr. Engstrom has an intent to flee, has any foreign contacts, or is otherwise predisposed to flight. Mr. Engstrom's history of appearing as required for all court hearings, and the fact that he has no record of failing to appear should weigh in the favor of pretrial release.

### 4. Judge Gordon's finding that Mr. Engstrom has not rebutted the rebuttable presumption is an error of fact and law.

Judge Gordon's finding that Mr. Engstrom has not rebutted the rebuttable presumption present in this case is an error of law.

> This presumption "shifts a burden of production to the defendant," United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008), which requires the defendant to produce "some evidence" that there are conditions that would reasonably assure his or her appearance and the community's safety, United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985). "The burden of production is not a heavy one to meet" and "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of . . . the presumption." United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986).

*United States v. Rhule*, 2020 U.S. Dist. LEXIS 187335 (W. Dis. Wash. 2020). Mr. Engstrom argues that he has submitted "some evidence" to rebut the presumption. Although Magistrate Judge Weksler checked the box on Mr. Engstrom's Order of Detention stating that "The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis," (ECF No. 11 p. 2) the record of the June 23, 2021, hearing states otherwise. See June 23, 2021, transcript p. 16 at 8-9, where the court states "I do agree here with Ms. Brooks that he has met his burden of production, and I'll list some of those factors in a moment." Regardless of Magistrate Judge Weksler's finding, the record from the June 23, 2021, and August 4, 2021, detention hearings

strongly support the finding that Mr. Engstrom met his burden of production in rebutting the presumptions. Transcripts of these hearings are now available for the Courts review. See Docket.

Mr. Engstrom's Motion for District Court Review was filed prior to his receipt of the transcripts of his June 23, 2021, detention hearing, and as such Mr. Engstrom believed that Magistrate Judge Weksler had found that he did not rebut the presumptions. The oral record proves otherwise and Mr. Engstrom asks the court to find that he did in fact rebut the presumptions, which shifts the burden of persuasion to the government, and allows the court to consider the statutory scheme of 18 U.S.C. § 3142(a), which provides alternatives to a finding of detention.

5. **Judge Gordon's order that "Engstrom has not rebutted the presumption that there are no conditions that would...assure his appearance," constitutes and error of interpretation of the Bail Reform Act of 1984.**

Judge Gordon's finding that "Engstrom has not rebutted the presumption that there are no conditions that would reasonably protect the community against the risk of danger he poses and *to assure his appearance*," (ECF No. 89 p.3) implies that Mr. Engstrom must be detained absent a finding that his appearance is assured, or guaranteed. This is an error of law. See *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) ("the district court erred in interpreting the "reasonably assure" standard set forth in the statute as a requirement that release conditions 'guarantee' community safety and the defendant's appearance."). The finding that Mr. Engstrom's appearance must be "assured" may also create an undo burden for the defendant's production of evidence to rebut the presumptions and may lower standard of persuasion required of the government in proving flight risk by a preponderance of the evidence.

**CONCLUSION**

For all of the foregoing reasons, defendant requests that the court RECONSIDER its order DENYING defendant's motion (ECF No. 89), REVOKE the Detention Order and find that there are conditions that can be fashioned to ensure his appearance in court, releasing Mr. Engstrom pending trial, subject to whatever conditions the Court finds appropriate to reasonably ensure his appearance and the safety of the community as required.

DATED this 7th day of December, 2021.

Respectfully Submitted,

Paul Engstrom
*In Proper Person*

1  CHRISTOPHER CHIOU
   Acting United States Attorney
2  Nevada Bar No. 14853
   SUSAN CUSHMAN
3  CHRISTOPHER BURTON
   Nevada Bar No. 12940
4  KIMBERLY SOKOLICH
   501 Las Vegas Boulevard South, Suite 1100
5  Las Vegas, Nevada 89101
   Tel: (702) 388-6336
6  Susan.Cushman@usdoj.gov
   Chris.Burton4@usdoj.gov
7  Kimberly.Sokolich@usdoj.gov
   *Attorneys for the United States*

8

9              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**

10

11  United States of America,              )
                                           )   Case No.: 2:21-cr-00190-APG-EJY
12              Plaintiff,                  )
                                           )
13        v.                                )   **Government's Response in Opposition**
                                           )   **to Defendant's "Motion to Reconsider**
14  PAUL ENGSTROM,                          )   **Order Denying Motion for Review of**
                                           )   **Magistrate Judge's Detention Order"**
15              Defendant.                  )   **[ECF No. 97]**
                                           )
16  _____ )

17  CERTIFICATION: This response is timely.

18                    **INTRODUCTION**

19        Defendant Paul Engstrom has requested release from detention three times. All

20  three times, his request has been denied. Now, Engstrom seeks release yet again, asking

21  this Court to reconsider its previous finding that he is a danger to the community and a risk

22  of flight. Because this Court's decision was, and is correct, Engstrom's motion should be

23  denied.

24

## PROCEDURAL HISTORY

On June 23, 2021, after holding a detention hearing, the Honorable Magistrate Judge Brenda Weksler ordered Engstrom detained pursuant to 18 U.S.C. § 3142, based on a finding that no condition or combination of conditions would reasonably assure Engstrom's appearance as required. ECF No. 11.

On July 29, 2021, Engstrom filed a Motion to Reopen Detention Hearing. ECF No. 30. The government filed its opposition. ECF No. 35. After a hearing on August 17, 2021, Judge Weksler denied Engstrom's renewed request for pretrial release. ECF No. 46.

On October 6, 2021, Engstrom appealed his detention order to the District Court.[1] ECF No. 64. The government filed a response and Engstrom filed a reply. ECF Nos. 76 and 82. On November 24, 2021, this Court ruled on the briefings, finding that detention was appropriate. ECF No. 89.

In making its determination, this Court noted that this case involves a rebuttable presumption and considered each of the four factors under 18 U.S.C. § 3142(g). *Id.* at 2. Specifically, this Court found that Engstrom is alleged to have conducted a sophisticated, lengthy, and highly profitable scheme to sell cocaine throughout the United States and then launder the proceeds on the dark web. *Id.* The Court further noted that the evidence against Engstrom is substantial and the alleged conduct began soon after, if not during, Engstrom's supervision for a prior federal drug conviction. *Id.* at 2–3. This Court agreed with the Magistrate Court that Engstrom's use of the dark web and access to millions of dollars'

---

[1]    Engstrom previously filed a similar *pro se* motion seeking review of the Magistrate Judge's detention order, but that motion was dismissed without prejudice because, at the time it was filed, Engstrom was still represented by counsel. ECF Nos. 49, 51.

worth of cryptocurrency showed a risk of flight. *Id.* at 3. After considering all the factors, this Court found that Engstrom had not rebutted the presumption that there are no conditions that would reasonably protect the community against the risk of danger he poses and to assure his appearance. *Id.*

After his third request for release was denied, Engstrom simultaneously filed the instant motion and a Motion to Extend Time to file an Appeal. ECF No. 99. The latter is unnecessary. The time by which an appeal must be filed does not begin to run until after a decision is final. *See United States v. Dieter*, 429 U.S. 6, 7–9 (1976); *United States v. Ibarra*, 502 U.S. 1, 6–7 (1991). Engstrom will not have to file an appeal until after the instant Motion for Reconsideration is resolved.[2] The government hereby responds.

## POINTS AND AUTHORITIES

A motion for reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (quoting 12 James Wm. Moore et al., Moore's Federal Practice § 59.30[4] (3d ed. 2000)). "Indeed, a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (internal citation omitted); *see also* LR 59-1(b) (noting motions for reconsideration are disfavored in this district). Reconsideration is unwarranted here because the Court's decision was, and is, correct.

---

[2]     As Engstrom's motion to extend is unnecessary at this time under the controlling authorities, the government asks that this Court deny it as moot.

Engstrom's proffered reasons for reconsideration do not satisfy any of the grounds upon which this extraordinary and disfavored remedy may be granted. First, Engstrom claims that he was denied the opportunity to confront the government's additional proffered evidence, violating his Sixth Amendment Rights. ECF No. 97 at 4. He is wrong. A detention hearing is not a criminal prosecution to which the Sixth Amendment right of confrontation applies. *See United States v. Salerno*, 481 U.S. 739, 746–73 (1987) (emphasizing the regulatory purpose of pre-trial detention). The government may proceed by proffer and an adversarial evidentiary hearing, as Engstrom demands, is not required. *See United States v. Winsor*, 785 F.2d 755, 756–57 (9th Cir. 1986) (defendant has no right to cross-examine witnesses not called to testify in detention hearing); *United States v. Delker*, 757 F.2d 1390, 1935–36 (3rd Cir. 1985); *United States v. Acevedo-Ramos*, 755 F.2d 203, 207–07 (1st Cir. 1985) (detention hearings are typically informal affairs, not substitutes for trial). Additionally, Engstrom's claim that he was denied the ability to "confront that information" is simply not true. Engstrom had an opportunity to respond. Nowhere in his 21-page reply brief does he contest this fact. ECF No. 82. A motion to reconsider is not a vehicle to make arguments or present evidence that could have been included in the original briefs. *Kona Enterprises, Inc.*, 229 F.3d at 890.

Engstrom also alleges that this Court erred in finding that he had not rebutted the presumption based the transcripts from the hearings before the Magistrate Court. ECF No. 97 at 8–9. Again, this argument is flawed. This Court reviews the Magistrate Judge's order of detention *de novo* and makes its own independent determination. *United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990). As this Court is aware, it is not required to make the same findings as the Magistrate Judge.

4

The remainder of Engstrom's motion rehashes previous arguments made in his prior requests for release. This motion is simply a continuation of Engstrom's unwillingness to accept the Court's Orders and renewed disagreement is not a legitimate ground for reconsideration.

5

157

**CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.

           */s/ Kimberly Sokolich*
           KIMBERLY SOKOLICH
           CHRISTOPHER BURTON
           Assistant United States Attorneys

158

_____ FILED            _____ RECEIVED
_____ ENTERED         _____ SERVED ON
            COUNSEL/PARTIES OF RECORD

JAN 05 2022

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

Paul Engstrom
2190 E. Mesquite Ave
Pahrump, NV 89060
*In Proper Person*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CASE NO: 2:21-cr-00190-APG-EJY |
| Plaintiff, | **Reply to Government's Response in Opposition to Defendant's Motion to Reconsider Order Denying Motion for Review of Magistrate Judge's Detention Order (ECF No. 102)** |
| VS. | |
| **PAUL ENGSTROM** | |
| Defendant, | |

**CERTIFICATION: This Reply is Timely** (Deadline to reply is extended three days when service is made by mail. See Fed. R. Crim. P. 49(a)(4)(C) and Fed. R. Crim. P. 45(c).)

The government has filed a response (ECF No. 102) in opposition to Mr. Engstrom's Motion to Reconsider Order Denying Motion for Review of Magistrate Judge's Detention Order (ECF No. 97). This reply addresses arguments advanced by the government in that response and additional relevant information from an intervening ruling in this case, Order re ECF No. 83. ECF No. 93. The service of the government's response was made by mail, extending the deadline for defendant's reply by three days. Fed. R. Crim. P. 49(a)(4)(C) and Fed. R. Crim. P. 45(c).

## PROCEDURAL HISTORY

In their response, the government correctly states that Mr. Engstrom has been denied pretrial release on three separate occasions, portraying Mr. Engstrom as a petulant child who maintains an "unwillingness to accept the Court's Order's," (ECF No. 102 p. 5), further stating that "renewed disagreement is not a legitimate ground for reconsideration." *Id.* What the government fails to acknowledge is, it is the fact that the ethical compass of the United States Attorney's Office for the District of Nevada has seemingly gone astray that has prompted the filing of repeated requests for review of previous Court orders of detention for Messrs. Engstrom, Elliott, and, Cuomo, where reopened detention hearings resulted in both Messrs. Elliott and Cuomo being granted pre-trial release.

### Magistrate Judge Weksler's Recent December 6, 2021 Ruling ECF No. 93

After mailing, but prior to the filing, of Mr. Engstrom's Motion for Reconsideration, Magistrate Judge Weksler issued an order granting the pre-trial release of co-defendant Cuomo. ECF No. 93. This six page order, in addition to granting Mr. Cuomo's release, details the Magistrate Judge's finding regarding the credibility of the United States Attorney Office and DEA Agent Kurinec. This finding is new information not considered by Judge Gordon in his denial of Mr. Engstrom's request for review of the Magistrate Judge's Detention Order, and thus should be considered by the Court in the context of Mr. Engstrom's request for reconsideration.

Magistrate Judge Weksler's recent ruling is especially relevant as it relates to the reliance on the government's proffers of evidence, which is the entirety of the evidence the government has asked the Court to rely upon in keeping Mr. Engstrom detained. Where Magistrate Judge Weksler has subsequently found, in regards to both Messrs. Engstrom and Elliott's hearings on their motions to re-open detention (ECF Nos. 38, 65) that, "What has emerged from these two hearings is a pattern regarding the Government's proffers that have a left a lot to be desired—both because of their inaccuracy and their contradictory nature." ECF No. 93 p. 2. Magistrate Judge Weksler also stated,

as it relates to the government's proffer of evidence at Mr. Cuomo's hearing to re-open detention

(ECF No. 92), "At this juncture, the Court has no confidence in the Government's representations

regarding this specific matter," and "Given the enormous power entrusted to the prosecutors, and

how this power can affect a person's liberty interests, this Court admonishes the United States

Attorney's Office that it will not tolerate this kind of recklessness." ECF No. 93 p. 5.

Mr. Engstrom, who was the first of the three co-defendant's to move for a reopening of

detention, was initially detained as a flight risk based on his "arrest conduct." With Magistrate Judge

Weksler finding in favor of the government, over Mr. Engstrom's denial, that the government's

assertion that Mr. Engstrom had barricaded himself was credible, stating, "What cannot be

overcome is the risk of flight given the arrest conduct by the defendant in this case, which includes

that the defendant barricaded himself in his house. While the defendant denies the allegation, the

DEA Agent that informed the court as to the co-defendants has provided an account that the Court

deems credible and the Court relies on the US Attorney, as an officer of the court, that the

information is true." ECF No. 11. Magistrate Weksler later found that Mr. Engstrom did not

barricade himself. This finding is explained in Magistrate Judge Weksler's December 6, 2021, ruling,

where she states, "While the government represented during Mr. Engstrom's initial appearance that

he had "*barricaded himself*" once police entered the premises, during the hearing on the motion to

re-open detention (on August , 2021), it became clear that was not the case. Audio recording for Mr.

Engstrom's hearing on motion to re-open detention hearing on August 4, 2021, 3:16:48-3:20:06."

ECF No. 93 p. 2.

Notwithstanding finding that Mr. Engstrom had not barricaded himself, Magistrate Judge

Weksler denied Mr. Engstrom's request for pre-trial release. This ruling was based, at least in part,

on evidenced proffered by the government at the August 4, 2021, hearing that Mr. Engstrom had

destroyed evidence by flushing drugs down a toilet. The assertion that Mr. Engstrom had flushed

drugs down a toilet is contradicted by the evidence that the government proffered at Mr. Engstrom's

1   initial detention hearing on June 23, 2021, where the government stated that "The SWAT team also
2   appeared to find him basically working with some computers and phones back there, potentially to
3   hid certain evidence is what their belief is." Transcript from June 23, 2021, p. 8 at 23-25[1]. This is
4   another example of the contradictory and inaccurate information the government proffers as
5   evidence, which the government knows the Court will rely upon in making their determinations
6   regarding the restriction of a persons liberty, without concern as to whether the information has a
7   factual basis.

8         Mr. Engstrom argues that the government misconduct, as it relates to their proffered
9   evidence, in his detention hearing and the subsequent hearings for Messrs. Elliott and Cuomo, as
10  detailed in Magistrate Judge Weksler's recent ruling (ECF No. 93) establishing a pattern of
11  inaccurate and contradictory information contained in the government's proffers of evidence, further
12  supports that this Court should reconsider their ruling detaining Mr. Engstrom pending trial,
13  especially insomuch as the Court relies on the government's proffers.

14  <center>**POINTS AND AUTHORITIES**</center>
15  **Defendant's Reply to Government's Response to Defendant's Point #1 – New Evidence**
16        In their response, the government argues that "Engstrom claims that he was denied the
17  opportunity to confront the government's additional proffered evidence, violating his Sixth
18  Amendment Rights. He is wrong." ECF No. 102 p. 4. The government also states, "A detention
19  hearing is not a criminal prosecution to which the Sixth Amendment right of confrontation applies,"
20  *Id*. Further arguing, "The government may proceed by proffer and an adversarial evidentiary
21  hearing, as Engstrom demands, is not required." *Id*. Mr. Engstrom asserts that all three of these
22  arguments are without merit.

23

24

25    [1]   The transcripts for Mr. Engstrom's June 23, 2021, August 4, 2021, and August 17, 2021 detention hearings were
26  provided after Mr. Engstrom filed his Motion for District Court Review of the Magistrate Judge's Detention Order.

<center>4</center>

1       The "de novo" standard of review applicable to a Motion for District Court Review is

2   detailed in *United States v Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) ("It [the District Court]

3   should review the evidence before the magistrate and make its own independent determination

4   whether the magistrate's findings are correct, with no deference.") This supports Mr. Engstrom's

5   position that, absent a hearing, the District Court Judge's de novo review is limited to the evidence

6   before the magistrate.  Other circuits have found the same. "In conducting the review [of a detention

7   order], the district court may rely entirely on the pleadings and the evidence developed at the

8   magistrate judge's detention hearing, or it may conclude that additional evidence is necessary and

9   conduct its own evidentiary hearing." *United States v. Ansah*, No. 1:17-CR-381-WSD, 2018 U.S.

10  Dist. LEXIS 22057, 2018 WL 817241, at 2 (N.D. Ga. Feb. 9, 2018) (citing *United States v. King*,

11  849 F.2d 485, 490 (11th Cir. 1988)). The government's response to Mr. Engstrom's Motion for

12  District Court Review of the Magistrate Judge's Detention Order indicates that it is not their

13  intention to introduce new evidence, while also implying that including additional facts would

14  require a hearing, where the government states "[t]he parties are not seeking to include any

15  additional facts related to danger to the community and therefore, this Court can decide the issue

16  without conducting an unnecessary third hearing."  ECF No. 76 p. 10 at n. 5.

17

18      The government appears to believe that it was proper to introduce new proffered evidence,

19  not at a hearing, but in their response to a Motion for District Court Review. They are wrong. In the

20  context of detention, the procedure for submitting evidence, whether by live testimony, hearsay, or

21  proffer, requires a detention hearing. As in a preliminary hearing for probable cause, the government

22  may proceed in a *detention hearing* by proffer or hearsay.  *United States v. Winsor*, 785 F.2d 755,

23  756 (9th Cir. 1986); *United States v. Cardenas*, 784 F.2d 937, 938 (9th Cir. 1986); *United States v.*

24  *Delker*, 757 F.2d 1390, 1395-96 (3d Cir. 1985); *Acevedo-Ramos*, 755 F.2d at 206-07. The Bail

25  Reform Act (BRA) states, "The rules concerning admissibility of evidence in criminal trials do not

26  apply to the presentation and consideration of information at the *hearing*." (18 U.S.C. § 3142(f)(2)).

1   The government has cited no authority to support that they are entitled to proffer evidence outside
2   the confines of a detention hearing.

3       The government's contention that "The government may proceed by proffer and an
4   adversarial evidentiary hearing, as Engstrom demands, is not required," (ECF No. 102 p. 4) is
5   contradicted by both statute and controlling law. The BRA is specific on the requirements of a
6   detention hearing, stating "[a]t the hearing, the person has the right to be represented by counsel,
7   and, if financially unable to obtain adequate representation, to have counsel appointed. The person
8   shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who
9   appear at the hearing, and to present information by proffer or otherwise." 18 U.S.C. § 3142(f)(2).
10  The government cites *United States v. Salerno*, 481 U.S. 739, 746-73 (1987) in support of their
11  position that the Sixth Amendment right of confrontation does not apply to detention hearings, but
12  this reliance is misplaced, as Salerno is silent as to the Sixth Amendment. What *Salerno*, 481 U.S.
13  739 at 750, does necessitate is the adversary hearing that the government argues is not required,
14  stating "[i]n a full-blown adversary hearing, the Government must convince a neutral decisionmaker
15  by clear and convincing evidence that no conditions of release can reasonably assure the safety of
16  the community or any person." While it could be argued that the confrontation clause of the Sixth
17  Amendment is limited as it applies to detention hearings, where the defendant has no right to cross-
18  examine witnesses not called to testify. *Winsor*, 785 F.2d 755 at 756-57. The Ninth Circuit found in
19  *Winsor* that "[w]ithout a proffer from [defendant] that the government's proffered information was
20  incorrect, the magistrate judge was not required to allow him to cross-examine the investigators and
21  police officers." *Id*. At 757. This implies that there are instances where the confrontation clause of
22  the Sixth Amendment is applicable in the context of detention hearings, specifically when the
23  defense proffers that the government proffered information is incorrect. The Third Circuit has ruled
24  the same, "although the Act permits the government to proceed by hearsay, it clearly contemplates
25  that the defendant will have some opportunity to confront the evidence offered against him." *United*

*States v. Accetturo*, 783 F.2d 382 (3rd Cir. 1986).

The government finally argues that Mr. Engstrom's claim that he was denied the ability to confront the new information is not true, suggesting that he could have done so in his reply brief. ECF No. 102 p. 4. Mr. Engstrom asserts the following. 1) New evidence introduced for the first time in the government's response should not be considered by the Court as it is outside of the bounds of the detention hearing and as such has not been properly submitted; 2) Mr. Engstrom cannot be expected to address evidence that has not been properly submitted; and 3) The Court should invoke judicial estoppel principles, where the government's simultaneous contradictory positions that they are not seeking to include any new evidence, while in the same pleading attempting to include new evidence, is the exact type of behavior that the judicial estoppel doctrine is meant to protect against. Judicial estoppel, also known as the doctrine of preclusion of inconsistent positions, is an equitable doctrine invoked by a court at its discretion. *United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)). The doctrine prohibits a party from gaining an advantage by taking one position and then seeking a second advantage by taking a different position that is incompatible with the first. See *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir. 1997) (citing *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996)). The doctrine is intended to protect the integrity of judicial proceedings by preventing a litigant from "playing fast and loose with the courts." Id. (citing *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (stating "[t]he integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual and legal")).

### Defendant's Reply to Government's Response to Defendant's Point #4 – Rebuttable Presumption

The government argues that Mr. Engstrom's argument that the Court erred in finding that he

had not rebutted the rebuttable presumption is flawed, stating "[t]his Court reviews the Magistrate Judge's order of detention de novo and makes its own independent determination," citing *United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990). Here, the government's citation of *Koenig* is incorrect. In *Koenig* the Ninth Circuit ruled that, "[the District Court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id*. at 1193.

Mr. Engstrom stands by his position that the record as adduced at his June 23, 2021, and August 4, 2021, detention hearings supports a finding that he has met the burden of producing "some evidence" to rebut the 18 USCS § 3142(e) rebuttable presumptions. The "some evidence" threshold as it applies to the defendant's burden of production is summarized in *United States v. Castaneda*, 2018 U.S. Dist. LEXIS 25266, at n.1 (N.D. Cal. Feb. 14, 2018) ("Jessup is considered to be the leading authority regarding § 3142(e), and numerous other circuit courts as well as district courts within the Ninth Circuit have adopted its holding that only the burden of production shifts to the defendant who can rebut the presumption by producing "some evidence" to the contrary.") (citing *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985)); see also *United States v. Ward*, 63 F. Supp. 2d 1203 (C.D. Cal. 1999); *United States v. Thomas*, 667 F. Supp. 727, 728 (D. Or. 1987). The rebuttal evidence adduced at Mr. Engstrom's detention hearings includes:

1. Mr. Engstrom's ties to the communities are strong and he has been in Las Vegas, NV since 2007. Detention Order ECF No. 11 p.3

2. Mr. Engstrom can return to his residence that that he has a long established residence here. *Id*.

3. Mr. Engstrom owns and works at his own business and can return to his work if released. *Id*.

4. Mr. Engstrom does not have a passport. June 23, 2021, Detention Hearing Transcripts p. 13.

5. Mr. Engstrom has never attempted to flee and has no failure to appears. *Id.*

6. Mr. Engstrom does not have any connections to any other country. *Id.*

7. Mr. Engstrom's ex-wife, has agreed to act as a third-party custodian. Pretrial Services has deemed her to be a suitable third-party custodian. *Id.*

8. Mr. Engstrom is a senior at University of Nevada – Las Vegas (UNLV). August 4, 2021, Detention Hearing Transcripts p. 25.

Mr. Engstrom further argues that at both his June 23, 2021, and August 4, 2021, detention hearings, the government argued only that Mr. Engstrom should be detained as a flight risk, never alleging that Mr. Engstrom poses a danger to the community. At the June 23, 2021, detention hearing the government closed their argument in favor of detention by stating, "We believe that all makes Mr. Engstrom a significant risk of flight and risk of nonappearance, and so we would move for his detention." June 23, 2021, Detention Hearing Transcripts p. 11. At the August 4, 2021 detention hearing the government states, "Your Honor, for all those reasons, we believe that the government has still met by a preponderance its burden that Mr. Engstrom is a risk of flight and that he should be detained pending his trial." August 4, 2021, Detention Hearing Transcripts p. 16. Where the government only argued for detention based on risk of flight, and failed to present any evidence that Mr. Engstrom was a danger to the community, the record fails to support a finding by clear and convincing evidence that Mr. Engstrom is a danger to the community.

**Defendant's Reply to Government's Response to Defendant's Points # 2, 3, and 5**

The government states in their response that the remainder of Mr. Engstrom's motion rehashes previous arguments made in prior requests for release. This simply is not the case. The arguments made in points # 2, 3, and 5 are novel arguments specific to Judge Gordon's Order. Mr. Engstrom asks the Court to evaluate these arguments on their merits.

9

**CONCLUSION**

Based on the foregoing reasons, and considering Magistrate Judge Weksler's recent ruling regarding the pattern of "inaccuracy and their contradictory nature" of the government proffers, which undermines the credibility of all proffered and hearsay evidence presented by the government, the Court should RECONSIDER its previous order denying defendant's motion (ECF No. 89), REVOKE the Detention Order and release Mr. Engstrom pending trial.

DATED this 2nd day of January, 2022.

Respectfully Submitted,

Paul Engstrom
*In Proper Person*

168

10

2190 E Mesquite Ave
Pahrump, NV 89060



United States District Court
Attn: Clerk
333 Las Vegas Boulevard South
Room 1334
Las Vegas, NV 89101

FILED
ENTERED

JAN 15 2022

RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

This correspondence originated from a detention facility. The facility is not responsible for the contents herein.

XXAYED US MARSHALS SERVICE

Las Vegas PM&DC 89199
FROM US JAN 2022 PM

169

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA,

Plaintiff,

v.

PAUL ENGSTROM,

Defendant.

Case No. 2:21-cr-00190-APG-EJY

**ORDER REGARDING PENDING MOTIONS**

(ECF Nos. 97, 98, 99, 105, 109, 110)

I previously denied defendant Paul Engstrom's motion for review of Magistrate Judge Weksler's detention order. ECF No. 89. Engstrom now moves for reconsideration of my decision. ECF No. 97. Having considered the papers, I see no reason to reconsider.[1] I deny the motion.

Engstrom moves for an extension of the deadline by which he must appeal my order on detention. ECF No. 98. The government responds that this motion is unnecessary because Engstrom will not have to file an appeal until after I rule on his motion for reconsideration. ECF No, 102 at 3. I thus deny the motion for extension as moot, without prejudice.

Engstrom moves to extend the deadline to file pretrial motions. ECF No. 99. I previously extended the deadline for the other parties, and I will do so for Engstrom as well. ECF No. 100. The deadline to file pretrial motions is extended to April 1, 2022.

The government moved for permission to file a surreply to address allegations in Engstrom's reply in support of his motion to extend the pretrial motion deadline. ECF No. 105.

---

[1] Engstrom argues I should ignore the government's allegation that his keychain held a key to the freezer containing cocaine. ECF No. 97 at 4. Even doing so, my conclusion does not change.

Engstrom opposed that motion and moved to strike the government's surreply and its notice of compliance with Rule 16. ECF Nos. 109, 110. I grant the motion for a surreply and deny Engstrom's motion to strike.

I THEREFORE ORDER that Engstrom's motion for reconsideration of my detention order **(ECF No. 97) is denied**.

I FURTHER ORDER that Engstrom's motion to extend the appeal deadline **(ECF No. 98) is denied without prejudice as moot**.

I FURTHER ORDER that Engstrom's motion to extend the deadline to file pretrial motions **(ECF No. 99) is granted**. The deadline to file pretrial motions is extended to **April 1, 2022**.

I FURTHER ORDER that the government's motion for permission to file a surreply **(ECF No. 105) is granted**, and Engstrom's motions to strike the government's surreply and notice of compliance with Rule 16 **(ECF Nos. 109, 110) are denied.**

DATED THIS 31st day of January, 2022.

_____
UNITED STATES DISTRICT JUDGE

171

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ABRAHAM ELLIOTT,

    Defendant.

Case No. 2:21-cr-00190-APG-EJY

**ORDER DENYING MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER**

(ECF No. 66)

The Government moves for revocation of Magistrate Judge Weksler's order placing defendant Abraham Elliott on pretrial release. I must conduct a *de novo* review of the evidence before Judge Weksler (and any additional evidence submitted by the parties) and make my own independent determination with no deference. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). I have reviewed the audio tape of the October 6, 2021 hearing before Judge Weksler, read the transcript of the October 8, 2021 hearing (ECF No. 73), watched the videos submitted by the parties, and read the parties' briefs.

In determining whether conditions can be fashioned to assure the defendant's appearance and protect the public, I must consider four factors: (1) the nature and circumstances of the offense charged, including whether it is a crime of violence or involves drugs; (2) the weight of the evidence;[1] (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community should the defendant be released. 18 U.S.C. § 3142(g).

---

[1] This factor "is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). It "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.*

The Government bears the burden to show by a preponderance of the evidence that Elliott is a risk of non-appearance; or it may show by clear and convincing evidence that he is a danger to the community. 18 U.S.C. § 3142(f); *Motamedi*, 767 F.2d at 1406-07. Elliott is charged with several felonies, including possession and distribution of cocaine and conspiracy. ECF No. 17. There is probable cause to believe he has committed drug offenses for which the penalty is at least ten years' imprisonment. Thus, a rebuttable presumption exists that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). Although this presumption shifts to Elliott a burden to "introduce some evidence contrary to the presumed fact," the burden of persuasion remains with the Government. *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). If rebutted, the presumption "continues to be weighed along with other factors to be considered when deciding whether to release" Elliott. *Id.*

The Government alleges Elliott was part of a sophisticated scheme to sell cocaine throughout the United States. The evidence against Elliott is substantial. Agents investigated and surveilled him and his co-defendants for months. They seized at least 44 envelopes containing cocaine that the conspirators tried to send through the mail. Elliott was arrested in an office suite where there was a large amount of cocaine and packaging materials present.

Elliott has prior arrests and convictions for felonies and misdemeanors. He violated conditions of pretrial release and probation in prior cases. However, he has no history of attempted flight from prosecution or supervision. He self-surrendered to serve time for a prior conviction. He was twice furloughed from federal custody without supervision to attend his parents' funerals and voluntarily returned.

2

1    Elliott has rebutted the presumption that there are no that would reasonably assure his

2  appearance and protect the public.

3    I adopt Magistrate Judge Weksler's findings. *Koenig*, 912 F.2d at 1193.  The conditions

4  she fashioned (ECF No. 69) reasonably protect the community against the risk of flight and any

5  danger posed by Elliott.

6    I THEREFORE ORDER that the Government's motion for revocation of the release

7  order **(ECF No. 66) is DENIED**.

8    DATED THIS 24th day of November, 2021.

9

10  _____

    UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

United States of America,

              Plaintiff,

   v.

Vincent Cuomo,

              Defendant.

Case No. 2:21-cr-00190-APG-EJY

**ORDER re ECF No. 83**

      Before the Court is Defendant Vincent Cuomo's motion to re-open the detention hearing. ECF No. 83. The Government opposes this request. ECF No. 87. The Court held a hearing on this matter on November 30, 2021. ECF No. 92. As will be explained in more detail below, the Court finds new information exists that was not known to the movant at the time of the hearing that has a material bearing as to whether there are conditions of release that can be fashioned to reasonably assure Mr. Cuomo's appearance and the safety of any other person and the community. In addition, the Court finds that conditions of release can be fashioned in this case. As a result, the Court will grant ECF No. 83, and Mr. Cuomo will be released under the supervision of the Office of Pretrial Services subject to the conditions set forth in the latest Pretrial Services Report.

**I.    Background**

      Mr. Cuomo made his initial appearance on June 23, 2021. ECF No. 5. There are three co-defendants in this case. The gist of the Government's representations regarding the arrest conduct

as to three co-defendants (Messrs. Cuomo, Elliot, and Engstrom) follows. Once police breached the entry into the premises, Mr. Engstrom barricaded himself (and then started disposing of evidence by flushing it down the toilet). Audio Recording for Mr. Engstrom's Initial Appearance on June 23, 2021, 4:26:00–4:26:13. Both Messrs. Elliot and Cuomo went into the garage. Both tried to flee by opening a door that faced the outside and were directed (by SWAT who were surveilling that door) to get back inside. Audio Recording for Mr. Cuomo's Initial Appearance on June 23, 2021, 3:50–3:51 and 3:53–3:54; Audio Recording for Mr. Elliot's Initial Appearance on June 23, 2021, 4:06:50–4:07:10. Both tried to hide underneath cars parked in the garage. Audio Recording for Mr. Cuomo's Initial Appearance on June 23, 2021, 3:53–3:54; Audio Recording for Mr. Elliot's Initial Appearance on June 23, 2021, 4:06:50–4:07:12.

The Court ordered Mr. Cuomo detained for several reasons: the nature of the case, the 10-year mandatory minimum sentence, the evidence against him, the lack of any verifiable information based on his failure to interview with the Office of Pretrial Services, and—most importantly—the fact that he had attempted to flee (the Court stated it would be impossible for Mr. Cuomo to overcome that). Audio Recording for Mr. Cuomo's Initial Appearance on June 23, 2021, 4:06:50–4:07:35.

### A. Events since Mr. Cuomo's detention on June 23, 2021

Since Mr. Cuomo's initial appearance, the Court has also held hearings on Messrs. Engstrom's and Elliot's motions to re-open the detention hearing (ECF Nos. 38, 65). What has emerged from these two hearings is a pattern regarding the Government's proffers that have left a lot to be desired—both because of their inaccuracy and their contradictory nature.

The Court begins with Mr. Engstrom's hearing on the motion to re-open detention. ECF No. 38. While the government represented during Mr. Engstrom's initial appearance that he had "*barricaded himself*" once police entered the premises, during the hearing on the motion to re-open detention (on August 4, 2021), it became clear that was not the case. Audio recording for Mr. Engstrom's hearing on motion to reopen detention hearing on August 4, 2021, 3:16:48–3:20:06. While Mr. Engstrom was behind locked doors (which he likely himself locked), the Government explained it did not mean to suggest that he had barricaded himself in the literal

sense. *Id*. In addition, the complaint alleged that Mr. Engstrom had "*fled* to the back office" once the police entered the premises, when there was no evidence to support that. *Id*. The Court had a conversation with both the prosecutor and the FBI agent regarding this matter. The Court specifically explained to the Government the importance of the meaning that certain words convey and asked that it be careful in the future as to its choice of words. *Id*. The Court also had a similar conversation with the FBI agent and reminded him of the importance of providing accurate information to prosecutors and the Court. *Id*. at 3:20:00–3:27:12.

On October 6, 2021, the Court held a hearing on Mr. Elliot's motion to reopen detention. ECF No. 65. At that time, it became clear that *only one individual* (either Mr. Elliot or Mr. Cuomo, but not both as previously represented) had attempted to flee through the door facing the outside. During that hearing, the Government took the position that it could not ascertain whether it was Mr. Elliot or Mr. Cuomo that was attempting to flee. In addition, the FBI special agent explained that, contrary to prior assertions, it was not clear whether Mr. Elliot was in fact under the car, crouched, or standing. The Court again cautioned both the Government and the FBI agent regarding the representations made in court.

Next, Mr. Cuomo filed a second motion to re-open bail (the instant motion). ECF No. 83. In response, and contrary to the position that it had taken during Mr. Elliot's hearing on October 6, 2021, the Government now stated that Mr. Cuomo was the one who attempted to flee by leaving through the door that faced the outside. ECF No. 87 at 4, 9. When confronted with this contradiction, the Government requested that the Court strike those portions of its response.

### B.     Motion to re-open detention hearing

The essence of Mr. Cuomo's motion is that he has now interviewed with the Office of Pretrial Services and that the Court has information on which it can rely to show that conditions can be fashioned to mitigate any risk of flight Mr. Cuomo might pose. ECF No. 83. The Government argues this is not a proper basis to re-open the detention hearing as this was information known to the "movant" all along. ECF No. 87. This is a complicated question in light of the fact that Mr. Cuomo relied on (former) counsel when "choosing" not to interview with the Office of Pretrial Services. The Court finds it unnecessary to resolve that particular question, as

the Government's inconsistent positions regarding Messrs. Cuomo's and Elliot's attempted flight constitute new evidence not known to the movant that has a material bearing on whether conditions of release can be fashioned to reasonably assure Mr. Cuomo's presence and the safety of the community.

### C. Conditions can be fashioned

Under the Bail Reform Act, the presumption is that the individual will be released unless the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). *United States v. Hir*, 517 F3d 1081, 1086 (9th Cir. 2008). This is a rebuttable presumption case under 18 U.S.C. § 3142(e)(3)(A). The presumption shifts the burden of production to the defendant, but the burden of persuasion remains with the government. *Id.* at 1086. The Court previously found, and continues to find, that Mr. Cuomo met his burden of production. Given this, the Court considers the factors under 18 U.S.C. § 3142(g). Lastly, presumption cases provide an additional factor to consider militating against release. *Id.*

This is a serious offense, involving the sale of large quantities of cocaine, use of the dark web, cryptocurrency, and money laundering. The case carries a mandatory minimum sentence of 10 years.

The weight of the evidence (while the least important factor) is strong. Agents covertly placed orders, there has been surveillance, and substantial evidence of the offense charges was found during the search executed the day Mr. Cuomo was arrested.

Mr. Cuomo's history and characteristics strongly favor release. Mr. Cuomo is an honorably discharged veteran. He has resided in Las Vegas since 2005. He has strong family ties, although his family is not located in Las Vegas. In addition, many of his friends have been present in court to show their support. He can reside with Dr. Noborikawa, a residence that has been confirmed by the Office of Pretrial Services. He has no prior criminal convictions and one arrest from 2006 for Battery, which was dismissed. He was self-employed as a massage therapist and can continue working in that capacity.

The Court finds that any danger Mr. Cuomo might pose to the community if released will be mitigated by the conditions suggested by the Office of Pretrial Services. In addition, the court had previously found that the Government had not proved by clear and convicting evidence that Mr. Cuomo should be detained on the basis of danger.

As explained above, the main reason this Court detained Mr. Cuomo was based on the Government's representation regarding his attempt to flee though the door facing the outside. At this juncture, the Court has no confidence in the Government's representations regarding this specific matter. When Mr. Elliot asked the Court to reconsider his release, the Government would not agree to the proposition that it was Mr. Cuomo who was trying to flee through the door facing the outside. After Mr. Elliot was released, the Government took the position that it was Mr. Cuomo who had attempted to flee through that door. It is clear one of them attempted to flee, but the Government has no evidence to *now* support it was Mr. Cuomo when weeks ago it declared it could have also been Mr. Elliot. Whether Mr. Cuomo was attempting to hide underneath the car is also a matter that is far from clear, given the contradictory representations in this case and the fact that he was immediately spotted and told to get up.

The notion that the Government would shift its position in this manner is frightening given its duty, the interests at stake, and especially after having been (recently) warned of the importance of making accurate representations to the Court. Given the enormous power entrusted to prosecutors, and how this power can affect a person's liberty interests, this Court admonishes the United States Attorney's Office that it will not tolerate this kind of recklessness.

On balance, and given the weight that this Court had previously (and erroneously) placed on Mr. Cuomo's arrest behavior, the Court finds the conditions suggested by the Office of Pretrial Services mitigate any concerns regarding flight risk and danger to the community.

**II.    Conclusion and Order**

The Court continues to find that the Government has not met its burden to show by clear and convincing evidence that no conditions can be fashioned to reasonably assure the safety of the community. The Court *now* finds that the Government has not met its burden to show by a preponderance of the evidence that no condition or combination of conditions can be fashioned to

reasonable assure Mr. Cuomo's appearance. Thus, Mr. Cuomo is ordered released on the conditions suggested by the Office of Pretrial Services.

Accordingly, **IT IS HEREBY ORDERED** that Defendant's motion to reopen detention hearing (ECF No. 83) is GRANTED.

**IT IS FURTHER ORDERED** that Mr. Cuomo is ordered released on the conditions suggested by the Office of Pretrial Services.

DATED: December 6, 2021.

_____
BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE

Paul Engstrom
2190 E. Mesquite Ave
Pahrump, NV 89060
*In Proper Person*

```
_____ FILED       __ _RECEIVED
_____ ENTERED     _____SERVED ON
         COUNSEL/PARTIES OF RECORD

         FEB 2 2 2022

      CLERK US DISTRICT COURT
        DISTRICT OF NEVADA
_____ DEPUTY
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

          Plaintiff,

          VS.

PAUL ENGSTROM

          Defendant,

CASE NO: 2:21-cr-00190-APG-EJY

**Notice of Appeal**
**(ECF Nos. 89 and 114)**

Notice is hereby given that Paul Engstrom, defendant in the above named case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final order of detention entered in this action on the 31st day of January, 2022.

     DATED this 14th day of February, 2022.

                         Respectfully Submitted,

                         Paul Engstrom

                         *In Proper Person*

**Declaration of Mailing**

This declaration is made in accordance with Federal Rules of Appellate Procedure Rule 4(c)(1)

(A)(i) and 28 U.S.C. § 1746.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 14, 2022.

1. I, Paul Engstrom, on February 14, 2022, deposited as legal mail at Nevada Southern Detention
   Center a Notice of Appeal, relating to Judge Gordon's Orders issued on November 24, 2021,
   ECF No. 89 and January 31, 2022, ECF No. 114.

2. The notice referenced in paragraph 1 was sent in one envelope, with first-class postage prepaid
   in the form of two (2) forever stamps affixed to the envelope.

Paul Engstrom

FOREVER / USA

FOREVER / USA

Las Vegas P&DC 89199
MON 14 FEB 2022 PM

United States District Court
Attn: Clerk
333 Las Vegas Boulevard South
Room 1334
Las Vegas, NV 89101

LEGAL SERVICE

____ RECEIVED
____ SERVED ON
COUNSEL/PARTIES OF RECORD

FILED
ENTERED

FEB 22 2022

DEPUTY

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

This correspondence is originated
from a detention facility.
The facility is not responsible
for the contents herein.

183

Ave
89060

# United States District Court
## District of Nevada (Las Vegas)
## CRIMINAL DOCKET FOR CASE #: 2:21-cr-00190-APG-EJY-1

Case title: USA v. Engstrom et al                    Date Filed: 07/06/2021
Magistrate judge case number: 2:21-mj-00536-BNW

---

Assigned to: Judge Andrew P. Gordon
Referred to: Magistrate Judge Elayna J.
Youchah

Appeals court case number: 22-10049 Ninth
Circuit

### Defendant (1)

**Paul Engstrom**                    represented by    **Paul Engstrom**
06870041
Nevada Southern Detention Center
2190 East Mesquite Ave
Pahrump, NV 89060
PRO SE

**Jawara Griffin**
Federal Public Defender
411 E Bonneville
Suite 250
Las Vegas, NV 89101-
702-388-6577
Fax: 702-388-6261
Email: Jawara_Griffin@fd.org
*TERMINATED: 09/22/2021*
*Designation: FPD*

**Nisha Brooks-Whittington**
Federal Public Defenders Office
411 E. Bonneville Ave
Las Vegas, NV 89101
702-388-6577
Email: nisha_brooks-whittington@fd.org
*TERMINATED: 07/06/2021*
*Designation: FPD*

### Pending Counts                                   **Disposition**

21:846, 841(a)(1), and 841(b)(1)(A)(ii) -
Conspiracy to Distribute a Controlled
Substance
(1)

21:841(a)(1) and 841(b)(1)(C) - Distribution

of a Controlled Substance
(2)

21:841(a)(1), 841(b)(1)(C); 18:2 -
Distribution of a Controlled Substance;
Aiding and Abetting
(3-7)

21:841(a)(1), 841(b)(1)(A)(ii); 18:2 -
Possession with Intent to Distribute of a
Controlled Substance; Aiding and Abetting
(8)

18:1956(h) - Money Laundering Conspiracy
(9)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| Count 1: 21:846 and 841(a)(1), (b)(1)(A)(ii) - Conspiracy to Distribute a Controlled Substance - Cocaine. | |
| Count 2: 18:1956(a)(1)(A)(i) and (h) - Money Laundering Conspiracy. | |

---

**Plaintiff**

**USA**                                          represented by  **Daniel Clarkson**
US Attorney's Office
501 Las Vegas Blvd. South
Las Vegas, NV 89101
702-388-6375
Email: daniel.clarkson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Kimberly Anne Sokolich**
US Attorney's Office
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101
702-388-6287
Email: Kimberly.Sokolich@usdoj.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Susan Cushman**
U.S. Attorney's Office
501 Las Vegas Blvd., South
Suite 1100
Las Vegas, NV 89101
702-388-6311
Email: susan.cushman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Christopher Burton**
U.S. Attorney's Office
501 Las Vegas Blvd. So., Ste. 1100
Las Vegas, NV 89101
702-388-6336
Email: Christopher.Burton4@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: USA*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2021 | | Case assigned to Magistrate Judge Brenda Weksler. (DCh) [2:21-mj-00536-BNW] (Entered: 06/22/2021) |
| 06/22/2021 | 1 | COMPLAINT as to Paul Engstrom (1). (JQC) [2:21-mj-00536-BNW] (Entered: 06/22/2021) |
| 06/23/2021 | 4 | ORDER APPOINTING COUNSEL as to Paul Engstrom. FPD for Paul Engstrom appointed as counsel, Subpoenas issued upon request, with exception to out-of-state subpoenas which will require court approval. Signed by Magistrate Judge Brenda Weksler on 6/23/2021. (Copies have been distributed pursuant to the NEF - YAW) [2:21-mj-00536-BNW] (Entered: 06/25/2021) |
| 06/23/2021 | 5 | NOTICE of Assertion of Right to be Present in Court Unshackled and Preservation of Appellate Rights as to Paul Engstrom. (YAW) [2:21-mj-00536-BNW] (Entered: 06/25/2021) |
| 06/23/2021 | 6 | NOTICE of Assertion of Right to Counsel, the Right to Remain Silent, and Request to Have Counsel Present During Questioning as to Paul Engstrom. (YAW) [2:21-mj-00536-BNW] (Entered: 06/25/2021) |
| 06/23/2021 | 7 | MINUTES OF PROCEEDINGS - Initial Appearance as to Paul Engstrom held on 6/23/2021 before Magistrate Judge Brenda Weksler. Crtrm Administrator: *Jeff Miller*; AUSA: *Daniel Clarkson*; Def Counsel: *Nisha Brooks-Whittington, FPD*; PTS: *Alicia Shiveley*; Court Reporter/Recorder: *Liberty/CRD*; Recording start and end times: *4:19:36 - 4:40:54*; Courtroom: *3B*; Defendant is present. Due to ongoing concerns for health and safety during the Covid-19 pandemic, Defendant and Defense Counsel appear via videoconference at these proceedings. Defendant waives right to appear in person and consents to appearing via videoconference. Financial Affidavit filed. Federal Public Defender's Office is appointed as defense counsel. <u>Preliminary Examination set for 7/6/2021 at 4:00 PM in LV Courtroom 3B before Magistrate Judge Brenda Weksler.</u> The |

| | | |
|---|---|---|
| | | Court issues an oral order to the parties confirming the United States' *Brady* obligations. Government moves for detention. Defense Counsel argues for release. Defendant ORDERED detained. Defendant is remanded to custody. Separate Detention Order shall issue. **(no image attached)** (Copies have been distributed pursuant to the NEF - JAM) [2:21-mj-00536-BNW] (Entered: 06/28/2021) |
| 06/23/2021 | 8 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 6/23/2021. By Deputy Clerk: Jeff Miller. Under federal law, including Rule 5(f) of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), and all applicable decisions from the Supreme Court and the Ninth Circuit interpreting *Brady*, the government has a continuing obligation to produce all information or evidence known to the government relating to guilt or punishment that might reasonably be considered favorable to the defendant's case, even if the evidence is not admissible so long as it is reasonably likely to lead to admissible evidence. *See United States v. Price*, 566 F.3d 900,913 n.14 (9th Cir. 2009). Accordingly, the court orders the government to produce to the defendant in a timely manner all such information or evidence.<br><br>Information or evidence may be favorable to a defendant's case if it either may help bolster the defendant's case or impeach a prosecutor's witness or other government evidence. If doubt exists, it should be resolved in favor of the defendant with full disclosure being made.<br><br>If the government believes that a required disclosure would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, the government may apply to the Court for a modification of the requirements of this Disclosure Order, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information.<br><br>This Disclosure Order is entered under Rule 5(f) and does not relieve any party in this matter of any other discovery obligation. The consequences for violating either this Disclosure Order or the government's obligations under *Brady* include, but are not limited to, the following: contempt, sanction, referral to a disciplinary authority, adverse jury instruction, exclusion of evidence, and dismissal of charges. Nothing in this Disclosure Order enlarges or diminishes the government's obligation to disclose information and evidence to a defendant under *Brady*, as interpreted and applied under Supreme Court and Ninth Circuit precedent. As the Supreme Court noted, "the government violates the Constitution's Due Process Clause 'if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.'" *Turner v. United States*, 137 S. Ct. 1885, 1888 (2017), quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012). **(no image attached)** (Copies have been distributed pursuant to the NEF - JAM) [2:21-mj-00536-BNW] (Entered: 06/28/2021) |
| 06/23/2021 | 11 | ORDER OF DETENTION as to Paul Engstrom. Defendant shall be detained pending trial. Signed by Magistrate Judge Brenda Weksler on 6/23/21. (Copies have been distributed pursuant to the NEF - JQC) [2:21-mj-00536-BNW] (Entered: 06/30/2021) |
| 06/29/2021 | 9 | Arrest Warrant Returned Executed on 6/22/21 in case as to Paul Engstrom re 2 Warrant Issued. (JQC) [2:21-mj-00536-BNW] (Entered: 06/29/2021) |
| 06/30/2021 | 10 | NOTICE OF ATTORNEY APPEARANCE: Jawara Griffin appearing for Paul Engstrom (Griffin, Jawara) [2:21-mj-00536-BNW] (Entered: 06/30/2021) |
| 07/02/2021 | 12 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 7/2/2021. |

| | | |
|---|---|---|
| | | On the basis of good cause, IT IS ORDERED that the Preliminary Examination set for 7/6/2021 at 4:00 PM is **ADVANCED** in time only to 03:00 PM in LV Courtroom 3B before Magistrate Judge Brenda Weksler. <br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - DCh) [2:21-mj-00536-BNW] (Entered: 07/02/2021) |
| 07/06/2021 | | Case randomly assigned to Judge Andrew P. Gordon and Magistrate Judge Elayna J. Youchah. (HAM) (Entered: 07/06/2021) |
| 07/06/2021 | 13 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 7/6/2021. Magistrate Judge case, pending deadlines, motions, hearings, and excludables terminated in case as to Paul Engstrom. Preliminary Hearing set for 7/6/2021 at 3:00 PM is vacated and converted to Arraignment & Plea on 7/16/2021 at 1:00 PM in criminal case number **2:21-cr-00190-APG-EJY-1**. For all further proceedings, please see the criminal case. **(no image attached)** (Copies have been distributed pursuant to the NEF - MR) (Entered: 07/06/2021) |
| 07/06/2021 | 17 | INDICTMENT as to Paul Engstrom (1) Counts 1-9; Vincent Cuomo (2) Counts 1, 3-8; Abraham Elliott (3) Counts 1, 3-8; Joseph Krieger (4) Counts 1, 3-7. (MR) (Entered: 07/06/2021) |
| 07/06/2021 | 18 | AO 257 to 17 Indictment as to Paul Engstrom. (MR) (Entered: 07/06/2021) |
| 07/06/2021 | 22 | MINUTES OF PROCEEDINGS - Grand Jury Return as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger held on 7/6/2021 before Magistrate Judge Elayna J. Youchah. Crtrm Administrator: *Elvia Garcia*; AUSA: *Susan Cushman*; Court Reporter/Recorder: *Natasha Bachman*; Time of Hearing: *11:37 - 11:39 AM*; Courtroom: *3D*; Defendants are in custody. Preliminary Examination is converted to Arraignment and Plea. Arraignment/Plea set for 7/16/2021 at 01:00 PM in LV Courtroom 3D before Magistrate Judge Cam Ferenbach. (Copies have been distributed pursuant to the NEF - MR) (Entered: 07/06/2021) |
| 07/16/2021 | 25 | MINUTES OF PROCEEDINGS - Arraignment/Plea as to Paul Engstrom held on 7/16/2021 before Magistrate Judge Cam Ferenbach. Crtrm Administrator: *T. Renfro*; AUSA: *Daniel Clarkson*; Def Counsel: *Jawara Griffin*; Recording start and end times: *1:17 - 1:26 pm*; Courtroom: *3D*; <br><br>The Court canvasses the Defendant regarding appearing via videoconference, and the Defendant consents to doing so. All parties appeared via videoconference. Defendant is arraigned on Indictment. Defendant pleads NOT GUILTY to counts 1 - 9. Order regarding Pretrial Procedure is entered and will be served on counsel via CMECF. The U.S. Probation Office is directed to prepare a report detailing the defendant's criminal history, if any. Defendant is remanded to custody. <br><br>Calendar Call is set for September 7, 2021 at 8:45 am in LV Courtroom 6C before Judge Andrew P. Gordon. <br><br>Trial is set for September 13, 2021 at 9:00 am in LV Courtroom 6C before Judge Andrew P. Gordon. <br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - TR) (Entered: 07/19/2021) |
| 07/16/2021 | 28 | ORDER REGARDING PRETRIAL PROCEDURE as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger. Responses to motions to be filed and served |

| | | |
|---|---|---|
| | | within 14 calendar days from the date of service of the motion, and reply brief to be served within 7 calendar days from the date of service of the response. Motions due by 8/15/2021. Signed by Magistrate Judge Cam Ferenbach on 7/16/2021. (Copies have been distributed pursuant to the NEF - MR) (Entered: 07/20/2021) |
| 07/27/2021 | 29 | MINUTE ORDER IN CHAMBERS of the Honorable Judge Andrew P. Gordon, as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger on 7/27/2021. By Deputy Clerk: M. Johansen. |
| | | The Court has resumed jury trials. As cases resolve or move off that trial stack, your placement on that stack will move up. |
| | | IT IS HEREBY ORDERED that trial counsel in this matter must appear on **Monday, August 23, 2021, at 10:00 a.m.** by Zoom video conferencing (the link will be provided shortly before the hearing) for a Master Trial Calendar Scheduling Conference with United States District Judge Jennifer A. Dorsey for all remaining cases on the division-wide September 13th/September 14th stack. |
| | | No plaintiffs or defendants will be present because all parties' presence is waived. |
| | | At that conference, Judge Dorsey will announce the trial priority for the September 13th/September 14th stack as of that date. Counsel is advised to confer immediately with their respective clients and each other about whether this case will be trial-ready for the trial stack and to take appropriate action. |
| | | Stipulations to continue matters on this stack must be filed **before noon on Thursday, August 19, 2021,** for counsel to be excused from an appearance at this Master Trial Calendar Scheduling Conference. |
| | | **(no image attached)** (Copies have been distributed pursuant to the NEF - MAJ) (Entered: 07/27/2021) |
| 07/29/2021 | 30 | MOTION to Reopen Detention Hearing by Paul Engstrom. (Griffin, Jawara) (Entered: 07/29/2021) |
| 07/29/2021 | 31 | NOTICE of Manual Filing by Paul Engstrom re 30 Motion to Reopen Detention Hearing. CD Exhibits 1 and 2 manually filed with the Clerk's Office. (Griffin, Jawara) (Entered: 07/29/2021) |
| 07/29/2021 | 32 | Docket Notes: Clerk's Office received (2) copies of 31 Notice of Manual Filing with 2 CD's marked Exhibit 1 and Exhibit 2 obo Defendant Paul Engstrom. One copy can be located on Admin Shelf for the year 2021 and other placed in Judge Andrew P. Gordon's Box. (JQC) (Entered: 07/29/2021) |
| 07/29/2021 | 33 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 7/29/2021. RE: 30 Motion to Reopen Detention Hearing. Any response is due by 8/2/2021 at 5:00 p.m. Motion hearing set for 8/4/2021 at 3:00 PM in LV Courtroom 3B before Magistrate Judge Brenda Weksler. The parties and participants in this hearing may appear in person, telephonically, or via videoconference utilizing Zoom. To appear telephonically, the parties are directed to dial 877-810-9415 and enter access code 2365998 when prompted. To appear via Zoom, the parties are directed to contact Courtroom Administrator Jeff Miller at Jeff_Miller@nvd.uscourts.gov no later than noon the day before the hearing to provide email addresses where their Zoom Conference invitations can be sent. **(no image attached)** (Copies have been distributed pursuant to the NEF - EG) (Entered: 07/29/2021) |
| 08/02/2021 | 34 | Government's Disclosure Statement by USA as to Paul Engstrom, Vincent Cuomo, |

| | | Abraham Elliott, Joseph Krieger.. (Clarkson, Daniel) (Entered: 08/02/2021) |
|---|---|---|
| 08/02/2021 | 35 | RESPONSE to 30 Motion to Reopen Detention Hearing by USA as to Paul Engstrom. *Governments Response in Opposition to Defendants Motion to Reopen Detention Hearing [ECF No. 30]* Replies due by 8/9/2021. (Clarkson, Daniel) (Entered: 08/02/2021) |
| 08/02/2021 | 36 | NOTICE of Manual Filing by USA as to Paul Engstrom re 35 Response to Motion. Disc Containing Exhibit A Disc Containing Exhibit A manually filed with the Clerk's Office. (Attachments: # 1 Supplement Main Doc)(Clarkson, Daniel) (Entered: 08/02/2021) |
| 08/03/2021 | 37 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 8/3/2021. IT IS ORDERED that the government shall ensure that Special Agent Daniel Kurinec appear at the hearing set for 8/4/2021 at 3:00 PM in LV Courtroom 3B before Magistrate Judge Brenda Weksler. He shall appear via Zoom. **(no image attached)** (Copies have been distributed pursuant to the NEF - EG) (Entered: 08/03/2021) |
| 08/04/2021 | 38 | MINUTES OF PROCEEDINGS - Motion Hearing as to Paul Engstrom held on 8/4/2021 before Magistrate Judge Brenda Weksler. Crtrm Administrator: *Jeff Miller*; AUSA: *Christopher Burton, Daniel Clarkson*; Def Counsel: *Jawara Griffin, FPD*; PTS: *Erin Oliver, Armando Ayala*; Court Reporter/Recorder: *Liberty/CRD*; Recording start and end times: *3:13:22 - 3:40:34, 3:50:06 - 3:58:17*; Courtroom: *3B*; Due to ongoing concerns for health and safety during the Covid-19 pandemic, all parties appear via videoconference at these proceedings. Special Agent Daniel Kurinec appears via videoconference. The Court scheduled these proceedings regarding Defendant's Motion to Reopen Detention 30 . The Court summarizes the Motion and related briefing. The Court finds there is enough new material to reopen the issue of detention. The Court hears remarks from Government Counsel. The Court hears from Special Agent Kurinec. The Court admonishes the Government as to the crafting of their initial detention argument. The Court hears arguments of Defense Counsel. Court recesses at 3:40:34. Court resumes at 3:50:06. The Court hears additional arguments from the parties. The Court will take these arguments under submission and will take further action on this matter as soon as is possible. Defendant is remanded to custody. (Copies have been distributed pursuant to the NEF - JAM) (Entered: 08/04/2021) |
| 08/09/2021 | 39 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 8/9/2021. By Deputy Clerk: Jeff Miller. **IT IS ORDERED:** Issuance of Oral Ruling on Defendant's Motion to Reopen Detention Hearing 30 set for 8/11/2021 at 9:00 AM in LV Courtroom 3B before Magistrate Judge Brenda Weksler. **(no image attached)** (Copies have been distributed pursuant to the NEF - JAM) (Entered: 08/09/2021) |
| 08/10/2021 | 40 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 8/10/2021.<br><br>Due to an unexpected conflict with the Court's calendar, IT IS ORDERED that the 8/11/2021 hearing re 30 motion to reopen detention hearing is VACATED. The Court will re-set the hearing as soon as possible.<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - DCh) (Entered: 08/10/2021) |
| 08/12/2021 | 41 | STIPULATION TO CONTINUE (First Request) *Trial* by Vincent Cuomo as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger. (Margolis, Jason) (Entered: 08/12/2021) |

| | | |
|---|---|---|
| 08/12/2021 | 42 | Joint STIPULATION *for a Protective Order* by USA as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger. (Clarkson, Daniel) (Entered: 08/12/2021) |
| 08/12/2021 | 43 | ORDER TO CONTINUE - Ends of Justice - Granting 41 Stipulation to Continue re 24 , 25 , 26 , 27 Minutes of Proceedings (First Request) as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger. This continuance is excludable under the Speedy Trial Act and the time has been excluded. Jury Trial reset for 2/28/2022 at 09:00 AM in LV Courtroom 6C before Judge Andrew P. Gordon. Calendar Call reset for 2/22/2022 at 09:00 AM in LV Courtroom 6C before Judge Andrew P. Gordon. Proposed Voir Dire, Proposed Jury Instructions, and Trial Briefs due by 2/22/2022. Signed by Judge Andrew P. Gordon on 8/12/2021. (Copies have been distributed pursuant to the NEF - MR) (Entered: 08/12/2021) |
| 08/12/2021 | 44 | PROTECTIVE ORDER Granting 42 Stipulation for Protective Order as to Paul Engstrom (1), Vincent Cuomo (2), Abraham Elliott (3), Joseph Krieger (4). Signed by Magistrate Judge Elayna J. Youchah on 8/12/2021. (Copies have been distributed pursuant to the NEF - MR) (Entered: 08/12/2021) |
| 08/16/2021 | 45 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Brenda Weksler, as to Paul Engstrom on 8/16/2021. By Deputy Clerk: Jeff Miller.Re: Defendant's Motion to Reopen Detention 30 , **IT IS ORDERED:** Hearing re: Presentation of Order set for 8/17/2021 at 11:00 AM in LV Courtroom 3B before Magistrate Judge Brenda Weksler. Zoom Videoconference Invitations will be issued to parties of record, however parties may still appear in person in Courtroom #3B if preferred. Any telephonic appearances or observers should dial 1-877-810-9415 and enter access code #2365998 when prompted. Observing parties shall keep their phones muted during the proceedings. **(no image attached)** (Copies have been distributed pursuant to the NEF - JAM) (Entered: 08/16/2021) |
| 08/17/2021 | 46 | MINUTES OF PROCEEDINGS - Motion Hearing as to Paul Engstrom held on 8/17/2021 before Magistrate Judge Brenda Weksler. Crtrm Administrator: *Jeff Miller*; AUSA: *Christopher Burton, Daniel Clarkson*; Def Counsel: *Annie Youchah, FPD*; PTS: *Erin Oliver, Armando Ayala*; Court Reporter/Recorder: *Liberty/CRD*; Recording start and end times: *11:09:33 - 11:14:09*; Courtroom: *3B*; Defendant is present. Due to ongoing concerns for health and safety during the Covid-19 pandemic, Defendant, Government Counsel, and Pretrial Services appear via videoconference at these proceedings. Special Agent Daniel Kurinec appears via videoconference. The Court scheduled these proceedings to rule from the bench on Defendant's Motion to Reopen Detention 30 . The Transcripts of these proceedings will serve as the written Order of the Court. The Court makes findings for the record and finds that the government has met it's burden by a preponderance of the evidence that the Defendant is a risk of flight. **IT IS ORDERED:** Defendant's Motion to Reopen Detention 30 is DENIED, and Defendant shall remain detained pending further proceedings. Defendant is remanded to custody. **(no image attached)** (Copies have been distributed pursuant to the NEF - JAM) (Entered: 08/17/2021) |
| 08/26/2021 | 47 | MOTION - Notice of Waiver of Counsel, by Paul Engstrom (filed Pro Se). (MR) (Entered: 08/26/2021) |
| 08/27/2021 | 48 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Elayna J. Youchah, as to Paul Engstrom on 8/27/2021. By Judicial Assistant: E. Santiago.<br><br>Re: Notice of Waiver of Counsel (ECF No. 47).<br><br>IT IS HEREBY ORDERED that a hearing is set for **Wednesday, September 22, 2021 at 10:00 am in LV Courtroom 3A** before Magistrate Judge Elayna J. Youchah regarding |

| | | |
|---|---|---|
| | | Defendant's Notice and to hold a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975). All parties and counsel must be present in the courtroom.<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - ES) (Entered: 08/27/2021) |
| 08/30/2021 | 49 | **STRICKEN per 53 Order. (MR)** ~~MOTION for District Judge Review of Magistrate Judge's Release (or Detention) Order, by Paul Engstrom (filed Pro Se). Responses due by 9/13/2021.~~ (Entered: 08/30/2021) |
| 09/02/2021 | 50 | MOTION to Strike 49 Motion for District Judge Review of Magistrate Judges Release (or Detention) Order LCR 12-3 by USA as to Paul Engstrom. Responses due by 9/16/2021. (Burton, Christopher) (Entered: 09/02/2021) |
| 09/07/2021 | 51 | SUPPLEMENT to 49 Motion for District Judge Review of Magistrate Judges Release (or Detention) Order LCR 12-3, by Paul Engstrom (filed Pro Se). (MR) (Entered: 09/07/2021) |
| 09/13/2021 | 52 | RESPONSE to 49 Motion for District Judge Review of Magistrate Judges Release (or Detention) Order LCR 12-3 by USA as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger. *Governments Response in Opposition to Defendant Engstroms Motion for District Judge Review of Magistrate Judges Detention Order* Replies due by 9/20/2021. (Clarkson, Daniel) (Entered: 09/13/2021) |
| 09/17/2021 | 53 | ORDER. IT IS HEREBY ORDERED that 50 the Government's Motion to Strike Defendant Paul Engstrom's pro se Filing is GRANTED. IT IS FURTHER ORDERED that 49 Paul Engstrom's Motion for District Judge Review of Magistrate Judges Detention Order is struck from the record. Signed by Magistrate Judge Elayna J. Youchah on 9/17/2021. (Copies have been distributed pursuant to the NEF - cc: Defendant - MR) (Entered: 09/17/2021) |
| 09/21/2021 | 54 | MEMORANDUM re 47 Motion to Withdraw as Attorney *Govt' Memorandum re: Defendant Engstroms Notice of Waiver of Counsel and Request for a Faretta Hearing* by USA as to Paul Engstrom (Clarkson, Daniel) (Entered: 09/21/2021) |
| 09/22/2021 | 55 | MINUTES OF PROCEEDINGS - Faretta Hearing as to Paul Engstrom held on 9/22/2021 before Magistrate Judge Elayna J. Youchah. Crtrm Administrator: *A. Reyes/E. Garcia*; AUSA: *Daniel Clarkson and Chris Burton*; Def Counsel: *Jawara Griffin*; Recording start and end times: *10:11a.m. - 10:43a.m.*; Courtroom: *3A*;<br><br>Defendant is present in custody with counsel. The Court makes preliminary remarks and hears representations of counsel as to 47 Motion - Notice of Waiver of Counsel. The Court and government's counsel recites on the record the charges against the defendant and the penalties the defendant faces, if found guilty. The Court canvasses the defendant regarding his rights, nature of charges, penalties, dangers and disadvantages to self-representation. The Court canvasses the defendant regarding the filing of any motions. The Court finds that the defendant has knowingly and voluntarily waived his right to counsel. The Court will therefore permit defendant to represent himself in this case. At this time, the Court therefore discharges Jawara Griffin, Esq., as defendant's counsel to represent him at trial in this case. Defendant is remanded to custody.<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - EMG) (Entered: 09/22/2021) |
| 10/06/2021 | 63 | MOTION for District Judge Review of Magistrate Judge's Detention Order, by Paul Engstrom. Responses due by 10/20/2021. (MR) (Entered: 10/06/2021) |
| 10/11/2021 | 68 | STIPULATION TO CONTINUE (Second Request) by Vincent Cuomo as to Paul |

| | | Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger. (Margolis, Jason) (Entered: 10/11/2021) |
|---|---|---|
| 10/12/2021 | 70 | ORDER TO CONTINUE - Ends of Justice - as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger re 68 Stipulation filed by Vincent Cuomo. This continuance is excludable under the Speedy Trial Act and the time has been excluded. Jury Trial set for 6/6/2022 at 09:00 AM in LV Courtroom 6C before Judge Andrew P. Gordon., Calendar Call set for 5/31/2022 at 09:00 AM in LV Courtroom 6C before Judge Andrew P. Gordon., Exhibit List due by 5/31/2022., Proposed Voir Dire due by 5/31/2022., Proposed Jury Instructions due by 5/31/2022., Trial Briefs due by 5/31/2022. Signed by Judge Andrew P. Gordon on 10/12/21. (Copies have been distributed pursuant to the NEF - HAM) (Entered: 10/12/2021) |
| 10/17/2021 | 73 | TRANSCRIPT of Proceedings, 67 Detention Hearing, as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger held on 10/08/2021 before Magistrate Judge Brenda Weksler. Court Reporter: Paige Christian, Paige_Christian@nvd.uscourts.gov. Any Redaction Request is due by 11/7/2021. Redacted Transcript Deadline is set for 11/17/2021. Release of the Transcript Restriction is set for 1/15/2022.. Signed by Magistrate Judge Brenda Weksler. Before release date, the transcript may be viewed at the court public terminal or purchased through the reporter/transcriber. Transcript Order form is available on court website. After that date it may be obtained through the court reporter or PACER. (PMC) (Main Document 73 replaced on 10/17/2021) (PMC). (Entered: 10/17/2021) |
| 10/18/2021 | 75 | MOTION for Transcripts by Paul Engstrom. Responses due by 11/1/2021. (HAM) (Entered: 10/18/2021) |
| 10/20/2021 | 76 | RESPONSE to 63 Motion for District Judge Review of Magistrate Judges Release (or Detention) Order LCR 12-3 by USA as to Paul Engstrom. *Governments Response in Opposition to Defendant Engstroms Motion for District Judge Review of Magistrate Judges Detention Order [ECF No. 63]* Replies due by 10/27/2021. (Clarkson, Daniel) (Entered: 10/20/2021) |
| 10/20/2021 | 77 | ORDER Granting in part and Denying in part 75 Motion for Transcripts as to Paul Engstrom (1). See Order for details/deadlines.. Signed by Magistrate Judge Elayna J. Youchah on 10/20/2021. (Copies have been distributed pursuant to the NEF - cc: ECRO - MR) (Entered: 10/20/2021) |
| 10/31/2021 | 78 | TRANSCRIPT of Proceedings, 38 Order on Motion to Reopen Detention Hearing, Motion Hearing, as to Paul Engstrom held on 08/04/2021 before Magistrate Judge Brenda Weksler. Court Reporter: Paige Christian, Paige_Christian@nvd.uscourts.gov. Any Redaction Request is due by 11/21/2021. Redacted Transcript Deadline is set for 12/1/2021. Release of the Transcript Restriction is set for 1/29/2022.. Signed by Magistrate Judge Brenda Weksler. Before release date, the transcript may be viewed at the court public terminal or purchased through the reporter. Transcript Order form is available on court website. After that date it may be obtained through the court reporter or PACER. (PMC) (Entered: 10/31/2021) |
| 10/31/2021 | 79 | TRANSCRIPT of Proceedings, 46 Motion Hearing as to Paul Engstrom held on 08/17/2021 before Magistrate Judge Brenda Weksler. Court Reporter: Paige Christian, Paige_Christian@nvd.uscourts.gov. Any Redaction Request is due by 11/21/2021. Redacted Transcript Deadline is set for 12/1/2021. Release of the Transcript Restriction is set for 1/29/2022. Signed by Magistrate Judge Brenda Weksler. Before release date, the transcript may be viewed at the court public terminal or purchased through the reporter. Transcript Order form is available on court website. After that date it may be obtained through the court reporter or PACER. (PMC) (Entered: 10/31/2021) |

| 11/01/2021 | 81 | TRANSCRIPT of Proceedings, 38 Order on Motion to Reopen Detention Hearing, Motion Hearing as to Paul Engstrom held on 08/04/2021 before Magistrate Judge Brenda Weksler. Court Reporter: Paige Christian, Paige_Christian@nvd.uscourts.gov. Any Redaction Request is due by 11/22/2021. Redacted Transcript Deadline is set for 12/2/2021. Release of the Transcript Restriction is set for 1/30/2022.. Signed by Magistrate Judge Brenda Weksler. Before release date, the transcript may be viewed at the court public terminal or purchased through the reporter. Transcript Order form is available on court website. After that date it may be obtained through the court reporter or PACER. (PMC) (Entered: 11/01/2021) |
|---|---|---|
| 11/01/2021 | 82 | REPLY to Response to 63 Motion for District Judge Review of Magistrate Judges Release (or Detention) Order LCR 12-3 by Paul Engstrom. (DRS) (Entered: 11/01/2021) |
| 11/18/2021 | 88 | NOTICE OF ATTORNEY APPEARANCE Kimberly Anne Sokolich appearing for USA. (Sokolich, Kimberly) (Entered: 11/18/2021) |
| 11/24/2021 | 89 | ORDER Denying 63 Motion for Review of Magistrate Judge Detention Order as to Paul Engstrom (1). Signed by Judge Andrew P. Gordon on 11/24/2021. (Copies have been distributed pursuant to the NEF - DRS) (Entered: 11/24/2021) |
| 11/24/2021 | 91 | (Ex-Parte) NOTICE to the Court regarding untimely receipt of filings by Paul Engstrom. (A courtesy copy of the docket sheet mailed to Mr Engstrom this date - DRS) (Entered: 11/29/2021) |
| 12/07/2021 | 94 | TRANSCRIPT of Proceedings, 7 Initial Appearance, as to Paul Engstrom, Vincent Cuomo, Abraham Elliott, Joseph Krieger held on 06/23/2021 before Magistrate Judge Brenda Weksler. Court Reporter: Paige Christian, Paige_Christian@nvd.uscourts.gov. Any Redaction Request is due by 12/28/2021. Redacted Transcript Deadline is set for 1/7/2022. Release of the Transcript Restriction is set for 3/7/2022.. Signed by Magistrate Judge Brenda Weksler. Before release date, the transcript may be viewed at the court public terminal or purchased through the reporter. Transcript Order form is available on court website. After that date it may be obtained through the court reporter or PACER. (PMC) (Entered: 12/07/2021) |
| 12/13/2021 | 96 | First STIPULATION FOR EXTENSION OF TIME (First Request) *for Pre-trial Motion Deadline* by Vincent Cuomo as to ~~Paul Engstrom~~, Vincent Cuomo, Abraham Elliott, Joseph Krieger. (Pomerantz, Crane) Modified text on 12/15/2021 (MR). (Entered: 12/13/2021) |
| 12/13/2021 | 97 | MOTION for Reconsideration re 89 Order on Motion for Review of Magistrate Judge Release or Detention Order, by Paul Engstrom. Responses due by 12/27/2021. (Attachments: # 1 Cover letter)(DRS) (Entered: 12/14/2021) |
| 12/13/2021 | 98 | MOTION to Extend Time (First Request) to file an Appeal re: 89 Order on Motion for Review of Magistrate Judge Release or Detention Order, by Paul Engstrom. (DRS) Modified on 12/14/2021 (DRS). (Main Document 98 replaced on 12/14/2021) (DRS). Modified on 1/31/2022 (DRS). (Entered: 12/14/2021) |
| 12/13/2021 | 99 | MOTION to Extend Time (First Request) to File all Pretrial Motions by Paul Engstrom. (DRS) Modified filing date on 12/14/2021 (MR). (Entered: 12/14/2021) |
| 12/14/2021 | 100 | ORDER granting 96 Stipulation to Continue Pretrial Motion deadline as to Vincent Cuomo, Abraham Elliott, Joseph Krieger, ~~Paul Engstrom~~. Pretrial Motions due by 4/1/2022. Signed by Judge Andrew P. Gordon on 12/14/2021. (Copies have been distributed pursuant to the NEF - DRS) Modified text on 12/15/2021 (MR). (Entered: 12/14/2021) |
| 12/20/2021 | 101 | RESPONSE to 99 Motion to Extend/Shorten Time by USA as to Paul Engstrom. Replies |

| | | |
|---|---|---|
| | | due by 12/27/2021. (Sokolich, Kimberly) (Entered: 12/20/2021) |
| 12/27/2021 | 102 | RESPONSE to 97 Motion for Reconsideration by USA as to Paul Engstrom. Replies due by 1/3/2022. (Sokolich, Kimberly) (Entered: 12/27/2021) |
| 01/03/2022 | 103 | REPLY to Response to 99 Motion to Extend/Shorten Time by Paul Engstrom. (KF) (Entered: 01/03/2022) |
| 01/05/2022 | 104 | REPLY to Response to 97 Motion for Reconsideration by Paul Engstrom. (KF) (Entered: 01/05/2022) |
| 01/07/2022 | 105 | MOTION to File a Surreply to Defendants Reply to re 103 Reply to Response to Motion by USA as to Paul Engstrom. Responses due by 1/21/2022. (Sokolich, Kimberly) (Entered: 01/07/2022) |
| 01/07/2022 | 106 | SURREPLY to 103 Reply to Response to 99 Motion for Extension to File All Pretrial Motions by USA as to Paul Engstrom. (Attachments: # 1 Exhibit 1)(Sokolich, Kimberly) Modified to link to underlying on 1/7/2022 (MR). (Entered: 01/07/2022) |
| 01/07/2022 | 107 | NOTICE *OF COMPLIANCE WITH RULE 16 AND PRODUCTION OF DISCOVERY* by USA as to Paul Engstrom. (Attachments: # 1 Exhibit 1)(Sokolich, Kimberly) (Entered: 01/07/2022) |
| 01/21/2022 | 108 | RESPONSE to 105 Motion to File Surreply by Paul Engstrom. Replies due by 1/28/2022. (KF) (Entered: 01/21/2022) |
| 01/21/2022 | 109 | MOTION to Strike 106 SURREPLY by Paul Engstrom. Responses due by 2/4/2022. (KF) (Entered: 01/21/2022) |
| 01/21/2022 | 110 | MOTION to Strike 107 NOTICE OF COMPLIANCE WITH RULE 16 AND PRODUCTION OF DISCOVERY by Paul Engstrom. Responses due by 2/4/2022. (KF) (Entered: 01/21/2022) |
| 01/24/2022 | 111 | NOTICE *OF COMPLIANCE WITH RULE 16 AND PRODUCTION OF DISCOVERY* by USA as to Paul Engstrom. (Attachments: # 1 Exhibit 1 Receipt Engstrom (M004-M034)) (Sokolich, Kimberly) (Entered: 01/24/2022) |
| 01/28/2022 | 112 | RESPONSE to 109 Motion to Strike by USA as to Paul Engstrom. Replies due by 2/4/2022. (Sokolich, Kimberly) (Entered: 01/28/2022) |
| 01/28/2022 | 113 | RESPONSE to 110 Motion to Strike by USA as to Paul Engstrom. Replies due by 2/4/2022. (Sokolich, Kimberly) (Entered: 01/28/2022) |
| 01/31/2022 | 114 | ORDER as to Paul Engstrom on pending Motions. The Court DENIES the 97 Motion for Reconsideration and 109 and 110 Motions to Strike. The Court Further DENIES, without prejudice, as Moot the 98 Motion to Extend Appeal deadline.<br>The Court GRANTS 99 Motion to Extend Deadline to file pretrial motions. Motions are due by 4/1/2022.<br>The Court further GRANTS 105 Motion to file a Surreply. Signed by Judge Andrew P. Gordon on 1/31/2022. (Copies have been distributed pursuant to the NEF - DRS) Modified link on 1/31/2022 (MR). (Entered: 01/31/2022) |
| 02/17/2022 | 116 | NOTICE *Discovery* by USA as to Paul Engstrom. (Attachments: # 1 Exhibit Receipt of Discovery)(Sokolich, Kimberly) (Entered: 02/17/2022) |
| 02/22/2022 | 119 | NOTICE OF APPEAL by Paul Engstrom re 89 Order on Motion for Review of Magistrate Judge Release or Detention Order and 114 Order on Motion for Reconsideration. No filing fee paid, no IFP filed. E-mail notice (NEF) sent to the US Court of Appeals, Ninth Circuit. (DRS) (Entered: 02/23/2022) |

| 02/23/2022 | [122](#) | Designation of Transcripts and Transcript Order forms and instructions for [119](#) Notice of Appeal, as to Paul Engstrom. The forms may also be obtained on the Court's website at www.nvd.uscourts.gov. (Attachments: # [1](#) Transcript Order Form) (MR) (Entered: 02/23/2022) |
| --- | --- | --- |
| 02/23/2022 | [124](#) | USCA ORDER for Time Schedule as to [119](#) Notice of Appeal, filed by Paul Engstrom. **USCA Case Number 22-10049**. (DRS) Modified date filed. (Entered: 02/28/2022) |
| 02/28/2022 | [125](#) | NOTICE *OF COMPLIANCE WITH RULE 16 AND PRODUCTION OF DISCOVERY* by USA as to Paul Engstrom. (Sokolich, Kimberly) (Entered: 02/28/2022) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 03/07/2022 12:03:08 | | | |
| **PACER Login:** | durhamlaw:2959289:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cr-00190-APG-EJY |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

196